UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BRIAN LYNGAAS, D.D.S.,
individually and as the
representative  of a class of
similarly situated persons,

             Plaintiff,                Case No. 17-cv-10910
                                                Hon. Mark A. Goldsmith
vs.

                                                 CLASS ACTION

CURADEN AG, et al.

             Defendants.
_____/

**OPINION & ORDER
(1) GRANTING IN PART AND DENYING IN PART CURADEN AG'S MOTION FOR
SUMMARY JUDGMENT (Dkt. 60); (2) DENYING PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT (Dkt. 62); (3) GRANTING PLAINTIFF'S MOTION TO
CERTIFY CLASS (Dkt. 63); (4) DENYING WITHOUT PREJUDICE DEFENDANTS'
MOTION TO EXCLUDE PLAINTIFF'S EXPERT WITNESS (Dkt. 67); AND (5)
DENYING PLAINTIFF'S MOTION TO POSTPONE RULING ON PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT (Dkt. 68)**

In this case, Plaintiff Brian Lyngaas contends that Defendants Curaden AG and Curaden

USA Inc. are liable under the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227,

for sending him unsolicited fax advertisements.  Lyngaas has moved for summary judgment

against both Defendants (Dkt. 62), and seeks to certify a class of similarly-situated individuals

(Dkt. 63).  He has also filed a motion asking the Court to postpone ruling on his summary judgment

motion until the Court has ruled on the class certification motion (Dkt. 68).  Curaden AG has also

filed for summary judgment (Dkt. 60), and seeks to exclude Lyngaas' expert witness (Dkt. 67).

Because oral argument will not aid the decisional process, the motions will be decided based on

the parties' briefing.  See E.D. Mich. LR 7.1(f)(2); Fed. R. Civ. P. 78(b).  For the reasons that

follow, the Court (1) denies without prejudice Defendants' motion to exclude Lyngaas' expert

witness; (2) grants in part and denies in part Curaden AG's motion for summary judgment;[1] (3) denies Lyngaas' motion for summary judgment; (4) grants Lyngaas' motion to certify class; and (5) denies Lyngaas' motion to postpone ruling on his motion for summary judgment.

## I.    BACKGROUND

This case arises out of two faxes received by Plaintiff Brian Lyngaas, a dentist whose practice is located in Livonia, Michigan. Plaintiff's Statement of Material Facts ("PSMF") ¶ 1 (Dkt. 62). On March 8, 2016 and March 28, 2016, Lyngaas received faxes advertising the Curaprox Ultra-Soft CS 5460 toothbrush. Id. ¶ 3. Lyngaas contends that these faxes were sent in violation of the TCPA.

Defendant Curaden AG, a Swiss entity, manufactures toothbrushes, including the Curaprox Ultra-Soft 5460. Id. ¶ 10. The faxes at issue in this case were sent at the direction of its wholly-owned, U.S.-based subsidiary, Defendant Curaden USA, Inc. See id. ¶ 6. Curaden USA employee Diane Hammond created the fax advertisements, both of which state that an order of toothbrushes should be emailed to diane@curaproxusa.com or ordered online at www.curaproxusaprofessional.com. Id. ¶¶ 64-65.

Curaden USA is authorized to promote Curaden AG products, including the Curaprox Ultra-Soft 5460, throughout the United States. Id. ¶¶ 13, 15. Curaden AG authorized Curaden USA to use its trademarks, images, graphics, and pictures when promoting Curaden AG products. Id. ¶ 16. Curaden AG had the right to approve all marketing done by its distributors, Deposition of Clifford zur Nieden, Ex. 1 to Pl. Mot. for Summ. J., at 26 (Dkt. 62-2), but Curaden USA did not

---

[1] The complaint also includes a claim for conversion. The parties do not address this claim in the summary judgment briefing. The Court, therefore, construes both motions as seeking partial summary judgment.

need prior approval from Curaden AG to use its marketing materials, 11/13/2017 Johnson Dep., Ex. 2 to Pl. Mot. for Summ. J., at 43 (Dkt. 62-3).

Curaden USA did not send the faxes itself, but instead paid a company called AdMax Marketing to do so. Komniey Dep., Ex. 3 to Pl. Mot for Summ. J., at PageID.1368, 1373 (Dkt. 62-4). Curaden USA purchased the database and target list that was used in the fax campaigns. PSMF ¶ 66.[2] AdMax Marketing, in turn, hired a company called WestFax to send the faxes. Id. ¶ 58.

Chad Komniey, the owner of AdMax Marketing, explained that WestFax is a service provider that has a platform to broadcast faxes. Komniey Dep. at 12, 83-85. To use WestFax's broadcasting service, Komniey would visit WestFax's website, upload the list of numbers to which the faxes would be sent, and schedule the time and date to be sent. Id. at 85. After the faxes were sent, Komniey would receive an email showing the summary of the transmissions. Id. at 86. He would then go to WestFax's website, log into his account, and then download a report that showed which faxes were successful and which failed. Id. at 86-87.

The parties dispute how many of these faxes were successfully sent. Lyngaas' expert, Christopher Lee Howard, opined:

> It is my experience that fax systems report a successful transmission as a result of having received an "MCF" (message confirmation signal) from the receiver at the end of T.30 Phase D. Therefore, there are no instances of "false positives."
>
> Every fax receiver which employs ITU T.30 and confirms the receipt of a fax is inherently "equipment which has the capacity to transcribe text or images (or both) from an electronic signal received over a regular telephone line onto paper" as stipulated by the Telephone Consumer Protection Act.

---

[2] Dale Johnson, vice president and managing director of Curaden USA, testified that he could not recall the vendor from which the initial database was purchased. 12/5/2018 Johnson Dep., Ex. 5 to Pl. Mot. for Summ. J., at 11, 19 (Dkt. 62-6).

Howard Report, Ex. 12 to Pl. Mot. for Summ. J., at 3 (Dkt. 62-13). By reviewing the reports generated by WestFax, Howard concluded that the faxes were sent to 33,226 recipients on March 8, 2016, and to 32,678 recipients on March 28, 2016. Id.

Lyngaas now seeks to certify a class of individuals who received unsolicited faxes advertising the Curaprox Ultra-Soft CS 5460 in March of 2016, as well as summary judgment against both Defendants.[3] Curaden AG also seeks summary judgment, and both Defendants seek to exclude Howard's report.

## II.    MOTION TO EXCLUDE PLAINTIFF'S EXPERT

Defendants seek to exclude the testimony of Lyngaas' expert, Christopher Lee Howard. Howard has worked for over eighteen years as a fax consultant, is a developer of fax software, and has designed and developed fax applications as well as a software modem. Howard Report at 1. Defendants argue that Howard must be excluded because his export report fails to comply with Federal Rule of Civil Procedure 26. Federal Rule 26 provides that an expert report must contain:

> (i) a complete statement of all opinions the witness will express and the basis and reasons for them;
>
> (ii) the facts or data considered by the witness in forming them;
>
> (iii) any exhibits that will be used to summarize or support them;
>
> (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;

---

[3] Lyngaas also filed a motion to postpone the Court's ruling on his summary judgment motion until after the Court had ruled on the class certification motion (Dkt. 68). This motion is denied. As Lyngaas observes, the "rule against one-way intervention" counsels courts to define a class before deciding the merits of a case in order to prevent potential plaintiffs from waiting to obtain a favorable merits decision before deciding whether to intervene in the class action. See August v. Mich. Dep't of Corr., No. 16-11224, 2018 WL 4679597, at *3 (E.D. Mich. Sept. 29, 2018) (citing Gooch v. Life Inv'rs Ins. Co. of Am., 672 F.3d 402, 432 (6th Cir. 2012)). This rule is intended to protect Defendants, and Defendants have indicated that they are willing to have the Court rule on the dispositive motions. See Def. Resp. to Mot. to Postpone at 3 (Dkt. 75).

> (v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and

> (vi) a statement of the compensation to be paid for the study and testimony in the case.

Fed. R. Civ. P. 26(a)(2)(B)(i)-(vi).  Defendants argue that Howard's expert report does not contain his opinions or the bases and reasons for them; the facts he relied upon to draft his report, including the ITU T.30 document he states he relied upon; the list of all publications he has authored in the previous ten years; or a list of cases in which he testified as an expert.  Defs. Mot. to Exclude Expert at 3-4.

Howard's report does contain his opinions and the reasons for them – he explains that he examined the lists of fax broadcasts and determined that a fax was successfully transmitted to 33,226 individuals on March 8, 2016 and that another fax was successfully transmitted to 32,678 recipients on March 28, 2016.  Howard Report at 3.  Howard stated that "[i]t is my experience that fax systems report a successful transmission as a result of having received an 'MCF' (message confirmation signal) from the receiver at the end of T.30 Phase D.  Therefore, there are no instances of 'false positives.'"  Id.  In his deposition, Howard further explained:

> ITUT.30 is the document which describes fax protocol, the signals and information that go between two fax machines in order to communicate those pages. . . . [I]f you understand ITUT.30 protocol and how it works, that message confirmation signal indicates a positive signal from the receiver that it believes that that page was received complete.  So there's no question whether or not the recipient got it or not because the recipient confirmed that it did. . . . [T]here's no other way for a fax confirmation to occur.  So when you have a summary report that says, you know, 30,000 faxes were received by the recipients, the only way that that could be stated is through the MCF signal.

Howard Dep., Ex. 3 to Defs. Mot. to Exclude Expert, at 32-34 (Dkt. 67-4).

While the report is not deficient for failing to supply opinions, it is deficient in other respects.  It is missing ITU T.30, the document upon which Howard relies.  It also omits one

deposition, Pl. Resp. to Mot. to Exclude Expert at 14 (Dkt. 72), which was required by Rule 26 (a)(2)(B)(v). Regarding the omission of certain blogs, Lyngaas contends that Howard did not need to disclose them because his employer, not Howard, is the "author." Id. at 12. The Court disagrees. Because Howard wrote the blog postings, he is the "author" under a common understanding of the word. See Author, Merriam-Webster, available at www.merriam-webster.com/disctionary/author ("the writer of a literary work (such as a book)"). Thus, his report falls short of the Rule 26(a)(2)(B)(iv) requirement as well.

Lyngaas urges the Court not to exclude Howard's report entirely, but instead to re-open his deposition. The Court agrees that this is appropriate, and will re-open discovery for this limited purpose. Howard must furnish to Defendants a revised export report no later than June 3, 2019 containing the omitted information; if Defendants wish, they may take Howard's deposition no later than June 13, 2019. Defendants' motion is therefore denied without prejudice.

### III.  MOTIONS FOR SUMMARY JUDGMENT

#### A.  Standard of Review

A motion for summary judgment under Federal Rule of Civil Procedure 56 shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists when there are "disputes over facts that might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "[F]acts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Once the movant satisfies its initial burden of demonstrating the absence of any genuine issue of material fact, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue of material fact. Scott, 550 U.S. at 380; Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," Scott, 550 U.S. at 380 (quoting Matsushita, 475 U.S. at 586), as the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment," id. (quoting Anderson, 477 U.S. at 247-248) (emphasis in original); see also Babcock & Wilcox Co. v. Cormetech, Inc., 848 F.3d 754, 758 (6th Cir. 2017) ("A mere scintilla of evidence or some metaphysical doubt as to a material fact is insufficient to forestall summary judgment.").

## B.  Summary Judgment as to Curaden AG

The TCPA provides that it "shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States . . . to use any telephone facsimile machine, computer, or other device to send an unsolicited advertisement to a telephone facsimile machine." 47 U.S.C. § 227(b)(1)(C). Curaden AG does not dispute that the March 8, 2016 and March 28, 2016 faxes received by Lyngaas constitute "unsolicited advertisements" within the meaning of the statute. However, the parties dispute several other issues that bear on summary judgment: whether this Court lacks personal jurisdiction over Curaden AG; whether Curaden AG is liable as a "sender" of the faxes; and whether Curaden AG can be held liable for Curaden USA's actions under an alter ego theory. The Court will address each argument in turn.

### 1.  This Court has jurisdiction over Curaden AG

Nearly two years ago, Curaden AG argued in its motion to dismiss that it was not subject to this Court's jurisdiction. While the Court denied Curaden AG's motion, <u>Lyngaas v. Curaden AG</u>, No. 17-10910, 2018 WL 1251754 (E.D. Mich. Mar. 12, 2018), Curaden AG now argues that discovery has revealed that the Court does not have personal jurisdiction over it. Def. Mot. for Summ. J. at 16. Curaden AG is mistaken.

The Court previously found that Curaden AG was subject to Michigan's long-arm statute, Michigan Compiled Laws § 600.715(2), because "it created Curaden USA and authorized it to market . . . Curaden AG's toothbrushes in the entire United States including Michigan," <u>id.</u> at *4, and "any nexus between business transaction and tort shall allow limited personal jurisdiction to operate," <u>id.</u> (quotations and alterations omitted). This is still the case. Curaden AG argues that it did not "do or cause to be done" the acts that resulted in a tort; it only entered into a distribution agreement with Curaden USA, which is not tortious. Def. Mot. for Summ. J. at 16-17. But as this Court already found, Michigan Compiled Laws § 600.715(2) "has been interpreted broadly," and "Curaden AG caused consequences to occur in Michigan that resulted in an action for tort" when it created Curaden USA and authorized it to market Curaden AG's toothbrushes throughout the entire United States, including Michigan. <u>Id.</u>

This Court also found that the exercise of jurisdiction over Curaden AG comported with due process, because (i) Curaden AG purposefully availed itself of the privilege of acting in Michigan, (ii) the cause of action arose from Curaden AG's activities there, and (iii) the acts of Curaden AG or the consequences it caused had a substantial enough connection with Michigan to make the exercise of jurisdiction over it reasonable. <u>Id.</u> at *5, *8.

Curaden AG now claims that it did not purposefully avail itself of the privilege of acting in Michigan. Def. Mot. for Summ. J. at 18. Curaden AG points to certain testimony from Dale

Johnson and Clifford zur Nieden to show that Curaden USA had some freedom regarding its market activities. Dale Johnson, for example, testified that Curaden USA does not "clear with [Curaden AG] or talk to them about what our marketing activities are." 11/13/2017 Johnson Dep. at 28. In support, Curaden AG cites two Sixth Circuit cases – <u>Smith v. Home Depot USA, Inc.</u>, 294 F. App'x 186 (6th Cir. 2008), and <u>Bridgeport v. Still N the Water Publishing</u>, 327 F.3d 472 (6th Cir. 2003). But this Court already found that those cases support the opposite position, that Curaden AG did indeed purposefully avail itself of the privilege of acting in Michigan. <u>Lyngaas</u>, 2018 WL 1251754, at *5-*6. Even though Curaden USA has freedom to decide <u>how</u> to market the products, this does not negate the Court's prior conclusion that

> Curaden USA has the obligation to market products throughout the United States. Curaden AG was not "merely aware that their distributor was likely to market the product in all fifty states," but rather "the parties' contract required it." <u>Bridgeport</u>, 327 F.3d at 480. Curaden USA was not merely given the rights to market products in the United States; it was to use its "best endeavors" to do so. Curaden USA was to promote the sale of Curaden AG's products "throughout the Territory," i.e. throughout the United States. Further, the Sixth Circuit has established that "advertising is among the activities that constitute 'reaching out' to forum state residents." <u>Bridgeport</u>, 327 F.3d at 481 (quoting <u>Creech v. Roberts</u>, 908 F.2d 75, 79 (6th Cir. 1990)).

<u>Lyngaas</u>, 2018 WL 1251754, at *6.

With respect to the final two due process considerations noted above, Curaden AG again puts forth arguments that this Court rejected in connection with the motion to dismiss. For the reasons set forth in that opinion, the Court again finds that the exercise of jurisdiction over Curaden AG comports with due process.[4]

---

[4] Curaden AG also argues that Federal Rule of Civil Procedure 4(k)(2) does not provide a basis for this Court to exercise jurisdiction over it. Def. Mot. for Summ. J. at 24-25. "[T]he constitutional requirements with respect to Rule 4(k)(2) are the same as with any other personal jurisdiction inquiry, but are taken in reference to the United States as a whole, rather than the forum state." <u>Lyngaas</u>, 2018 WL 1251754, at *3. This Court already found that Curaden AG "has

## 2. There is an issue of fact as to whether Curaden AG is a "sender" of the faxes

Turning now to the merits of the TCPA claim, Curaden AG argues that it is not a "sender" of the faxes, as defined by the FCC regulation: "the person or entity on whose behalf a facsimile unsolicited advertisement is sent or whose goods or services are advertised or promoted in the unsolicited advertisement."  47 C.F.R. § 64.1200(f)(10).

### a. Entity "whose goods or services are advertised or promoted" standard

Curaden AG relies heavily on Health One Medical Center v. Mohawk, Inc., 889 F.3d 800 (6th Cir. 2018).  There, Mohawk Medical sent two unsolicited faxes to Health One Medical Center, listing Mohawk's contact information and offering discounts on fourteen drugs, including one manufactured by Bristol-Myers Squibb and one by Pfizer.  The plaintiff argued that Bristol-Myers and Pfizer had "sent" the unsolicited faxes because the faxes mentioned their drugs.  The Sixth Circuit rejected the argument that Bristol-Myers Squibb and Pfizer could be held liable under the TCPA, explaining that "the regulation purports to allocate liability in cases where the party that physically sends (i.e., dispatches) the fax and the party that causes it to be sent are not one and the same."  Id. at 802 (emphasis in original).  Thus, "only Mohawk can be liable for" the faxes, as "Bristol and Pfizer neither dispatched the faxes nor caused them to be sent; instead Mohawk did both."  Id.  Curaden AG argues that, like the defendants in Health One, it did not cause the faxes to be sent nor dispatch the faxes, and it therefore cannot be held liable.  Def. Mot. for Summ. J. at 10.

---

certainly availed itself of the privilege of acting in the United States, by creating a subsidiary to market its products here," id. at *8; that Lyngaas' cause of action arises out of Curaden AG's activities in the United States, id. at *10; and that it would be reasonable to exercise jurisdiction over Curaden AG, id.  The Court sees no reason to reconsider this finding.

Lyngaas points to two other Sixth Circuit cases that discuss the meaning of a "sender": Imhoff Investment, LLC v. Alfoccino, Inc., 792 F.3d 627 (6th Cir. 2015), and Siding & Insulation Co. v. Alco Vending, Inc., 822 F.3d 886 (6th Cir. 2016). In Imhoff, the defendant hired a third party to send faxes advertising its services, and the Sixth Circuit held that the defendant "is not entitled to summary judgment because [the plaintiff] has presented evidence that [the defendant] was the entity 'whose goods or services are advertised or promoted in the unsolicited advertisements' it received from [the third party] on two occasions in late 2006." 792 F.3d at 634-635. And in Alco, the defendant also hired a third party to send faxes advertising its products. 822 F.3d at 888. These faxes were sent before the FCC promulgated a new definition of "sender" in 2006, but Sixth Circuit stated that "liability after the promulgation of the 2006 definition would extend to both those entities 'on whose behalf the advertisement [was] sent' and those entities 'whose goods or services [were] advertised or promoted in the unsolicited advertisement[.]'" Id. at 894 (citing 47 C.F.R. § 64.1200(f)(10)) (alterations in Alco). But the Sixth Circuit distinguished these cases in Health One, explaining that "[i]n both those cases the defendant in fact hired a fax broadcaster to send out the junk faxes;" those cases did not hold that "an innocent party" was liable "by some legal alchemy." 889 F.3d at 802.

Lyngaas argues that Curaden AG approved of the fax campaign, because of the involvement of a Curaden employee named Richard Thomas. Pl. Mot. for Summ. J. at 20-21. Lyngaas' assertions are based on a March 8, 2016 email from Curaden USA Vice President Dale Johnson to Curaden USA's then-President Patrice LeMaire, where Johnson wrote:

> Diane is not getting an answer from Magen on if this fax was sent. Please look into it and give us word. This was discussed on the call with Richard Thomas on February 29. It was sent to Magen on February 27 so it really needs to be faxed so we can see what response we get as far as orders. Thanks.

12/5/2018 Johnson Dep., Ex. 5 to Pl. Mot. for Summ. J., at PageID.1495 (Dkt. 62-6). When asked about it in his deposition, Johnson testified that Richard Thomas was "managing director for the UK subsidiary of the company." Id. at 83. Johnson testified that Curaden UK was "within the Curaden AG family," and that Thomas' role with regard to Curaden USA was that "he was the person that Patrice informed of what we were doing in the U.S. so that – you know, he was kind of like an advisor, had been with the company for a numbers [sic] of years, he was running the operation in the UK and kind of oversaw, you know, the U.S. as well on behalf of Curaden AG." Id. Johnson could not recall the February 29, 2016 conversation with Thomas, but said typically, "I may have mentioned to him, you know, that we were doing these because he does the marketing for Curaden in the UK. . . . My guess from what we're reading here is that he was interested in knowing how it went because he may have had some interest in trying a similar tactic in the UK." Id. at 84.

Clifford zur Nieden, the managing director of Curaden AG, testified that Thomas "is at Curaden UK," which "is a distributor in the U.K." zur Nieden Dep., Ex. 1 to Pl. Mot. for Summ. J., at 21 (Dkt. 62-2). He further stated that Thomas was "acting as an area manager for different countries," id., which appears consistent with Johnson's statement that Thomas oversaw the U.S. "on behalf of Curaden AG," 12/5/2018 Johnson Dep. at 83. Patrice LeMaire stated that Thomas was his contact at Curaden AG, LeMaire Dep., Ex. 4 to Pl. Mot. for Summ. J., at 58 (Dkt. 62-5), but prior to this, he twice stated that he did not know which entity Thomas actually worked for, id. at 55, 58, and he later repeated that he did not know whether Thomas worked for Curaden AG, id. at 65.

The facts of the instant case, at this stage of factual development, do not show quite the level of attenuation between the entity sending the faxes and the entity whose products were

advertised in the faxes as in <u>Health One</u>. True, Curaden USA hired a third party to send the faxes, not Curaden AG. There is no evidence that Curaden AG designed the faxes, instructed Curaden USA to send the faxes, or engaged with AdMax Marketing in any way. The faxes themselves do not refer to Curaden AG – they refer communications to a Curaden USA employee, and, had an individual attempted to access the website on the fax, they would have been directed to Curaden USA's website. zur Nieden Aff., Ex. 1 to Def. Mot. to Dismiss, ¶ 4 (Dkt. 16-1). And as Defendants point out, the agreement between Defendants requires that Curaden USA "use its best endeavors to promote the sale of the Products throughout the Territory and to that end shall ensure that such marketing is ethical, tasteful and does not adversely affect the image of the Products or the Company." Distribution Agreement, Ex. 1 to Curaden AG Mot. for Summ. J., ¶ 5.1 (Dkt. 60-2).

However, there is a level of closeness between Curaden AG and its subsidiary that was not present between Mohawk Medical and Bristol-Myers or Pfizer. The agreement between Curaden AG and Curaden USA is in fact a template agreement used for all of Curaden AG's distributors; it was never signed by either entity. 11/13/2017 Johnson Dep. at 15-16. Curaden USA "basically follow[s] most of the tenets in the template . . . that was provided," but "there are elements of the template that don't apply to . . . [Curaden USA's] operation or maybe [sic] slightly different that are found in that template." <u>Id.</u> at 16. And the relationship between the two entities is informal in other ways, as well – Curaden USA does not pay for the goods it "purchases" from its parent company, instead taking on the cost as long-term debt that it will pay back when it is able. <u>Id.</u> at 22. Curaden USA did not take out an official loan with Curaden AG to pay for these products. <u>Id.</u>

Further, Richard Thomas' involvement suggests that Curaden AG was in fact aware of the faxing campaign. A factfinder could interpret the testimony regarding Thomas' role to mean that he was acting on behalf of Curaden AG, regardless of whether he was technically employed by its

subsidiary. In such case, Curaden AG would more closely resemble the defendants in <u>Imhoff</u> or <u>Alco</u> than <u>Health One</u>. There is also the possibility that a factfinder would find that Curaden AG truly knew nothing of the fax campaign and should be considered an "innocent" party.

"[T]he regulation does not purport to impose liability upon parties that did not 'send' the fax at all." <u>Health One</u>, 889 F.3d at 802. Here, there is a dispute of fact regarding whether Curaden AG can be considered to have "sent" the faxes at issue, depending on what Curaden AG knew about the marketing campaign.

### b. "On whose behalf" standard

Lyngaas also argues that Curaden AG is liable under the other prong of the FCC regulation, which provides that a "sender" is the entity "on whose behalf" the advertisements are sent. In <u>Alco</u>, the Sixth Circuit approved the following standard for determining on whose behalf a fax was sent:

> Circumstances to be considered include, but are not limited to, the degree of input and control over the content of the fax(es), the actual content of the fax(es), contractual or expressly stated limitations and scope of control between the parties, privity of the parties involved, approval of the final draft of the fax(es) and its transmission(s), method and structure of payment, overall awareness of the circumstances (including access to and control over facsimile lists and transmission information), and the existence of measures taken to ensure compliance and/or to cure non-compliance with the TCPA.

<u>Alco</u>, 822 F.3d at 899 (quoting <u>Cin-Q Autos. Inc. v. Buccaneers Ltd. Partnership</u>, No. 13-1592, 2014 WL 7224943, at *7 (M.D. Fla. Dec. 17, 2014)).

For the reasons already discussed, the Court finds that there is a question of fact as to whether the faxes were sent on behalf of Curaden AG. It is not clear what "degree of input and control" Curaden AG had over the faxes, or its "overall awareness of the circumstances" under which the faxes were sent.

### 3. Summary Judgment is Appropriate in favor of Curaden AG on the Alter Ego Issue

Lyngaas also argues that the Court should pierce the corporate veil to hold Curaden AG liable for the actions of Curaden USA. Pl. Resp. to Def. Mot. for Summ. J. at 18. Curaden AG seeks summary judgment on this issue, contending that Lyngaas did not allege in his complaint that Curaden USA is Curaden AG's alter ego, and also arguing that the evidence does not support that theory. Def. Mot. for Summ. J. at 14; Def. Reply in Supp. of Mot. for Summ. J. at 5 (Dkt. 85).

Even assuming that Lyngaas had properly raised this theory of liability, it would still fail. Under Michigan law,[5] "the general principle . . . is that separate corporate identities will be respected, and thus corporate veils will be pierced only to prevent fraud or injustice." In re RCS Eng'rd Prods. Co., Inc., 102 F.3d 223, 226 (6th Cir. 1996) (quoting Wodogaza v. H&R Terminals, Inc., 411 N.W.2d 848, 852 (Mich. Ct. App. 1987)). A plaintiff who wishes to pierce the corporate veil must show that the following requirements are met: "first, the corporate entity must be a mere instrumentality of another; second, the corporate entity must be used to commit a fraud or wrong; and third, there must have been an unjust loss or injury to the plaintiff." Id. (quoting Nogueroas v. Maisel & Assocs. of Mich., 369 N.W.2d 492, 498 (Mich. 1985)). Nonetheless, "there is no mechanical test for determining when the existence of a separate entity must be disregarded," and "whether to disregard the separate existence of an entity depends on the totality of the

---

[5] Both parties rely on Michigan law in determining whether alter-ego liability applies. The Court will follow Michigan law, as "[o]utside of labor law or ERISA claims, courts tend not to supplant state corporate liability doctrine with federal common law." Bd. of Trustees, Sheet Metal Workers' Nat. Pension Fund v. Courtad, Inc., No. 12-2738, 2014 WL 3613383, at *3-*4 (N.D. Ohio July 18, 2014) (noting that "the existence of related federal statutes does not automatically show that Congress intended courts to create federal common-law rules" and "a significant conflict between some federal policy or interest and the use of state law is normally a precondition" to justify applying federal common law).

circumstances." <u>Green v. Ziegelman</u>, 873 N.W.2d 794, 807 (Mich. Ct. App. 2015) (citing <u>Klager v. Robert Meyer Co.</u>, 329 N.W.2d 721, 725 (Mich. 1982)).

Lyngaas points to the fact that Curaden USA purchases products from Curaden AG to sell in the United States, but does not pay for them; instead, the corporations have an understanding that Curaden USA will start paying Curaden AG when it becomes profitable. <u>See</u> 11/13/2017 Johnson Dep. at 16-17, 74. Curaden USA, which was incorporated in July 2014, has never made a profit. <u>Id.</u> at 19, 66, 74. He stresses that "[u]ndercapitalization is generally regarded as an important factor in applying the alter ego doctrine," <u>Bucyrus-Erie v. General Products Corp.</u>, 643 F.2d 413, 418 (6th Cir. 1981), and argues that it would be inequitable to maintain the corporate fiction between the two entities when Curaden USA relies on Curaden AG to satisfy its financial obligations. Pl. Resp. to Def. Mot. for Summ. J. at 21.

Curaden AG argues that it and Curaden USA have different employees, different officers and executives, and different offices. <u>See</u> 11/13/2017 Johnson Dep. at 47, 64. The two entities maintain separate bank accounts and file separate bank returns. <u>Id.</u> at 64. Pursuant to the distribution agreement that governs the relationship between the two entities, Curaden USA is not Curaden AG's agent and is prohibited from marketing itself as such. Distribution Agreement ¶ 2.3. Curaden AG contests Lyngaas' characterization of Curaden USA as "undercapitalized," arguing that it has received $800,000 in revenue from Curaden USA since it was founded in 2014. Def. Mot. for Summ. J. at 15 n.5 (citing zur Nieden Dep. at 26).

To show that one entity is the "mere instrumentality" of another, the Court looks to the following factors:

> (1) whether the corporation is undercapitalized, (2) whether separate books are kept, (3) whether there are separate finances for the corporation, (4) whether the corporation is used for fraud or

> illegality, (5) whether corporate formalities have been followed, and
> (6) whether the corporation is a sham.

Lim v. Miller Parking Co., 560 B.R. 688, 706 (E.D. Mich. 2016) (quoting Glenn v. TPI Petrol.,

Inc., 854 N.W.2d 509, 520 (Mich. 2014)).  Here, only the first factor weighs in favor of finding

that Curaden USA is a mere instrumentality of Curaden AG.  Curaden USA's financial position is

certainly not strong, as it is not currently profitable and the evidence regarding whether it has ever

paid Curaden AG for any of the products it has purchased is not clear.  Compare 11/13/2017

Johnson Dep. at 22 (money does not flow from Curaden USA to Curaden AG "because we haven't

paid them for anything yet because we haven't had the profits yet") with zur Nieden Dep. at 26

("Curaden AG has received about $800,000 in revenue from Curaden USA[.]").  Curaden AG

points out that Curaden USA has only been in operation since 2014, and the company has an eight-

year plan to profitability.  11/13/2017 Johnson Dep. at 74.  The two companies keep separate books

and separate finances, and follow corporate formalities.  Curaden USA is used to distribute

Curaden AG's products in the United States, not to promote fraud or illegality.  Curaden USA has

its own employees and its own offices, and there is no basis for thinking it is merely a sham

corporation.

But even if Lyngaas could show "'such a unity of interest and ownership that the separate

personalities of the corporation and its owner cease to exist,' some form of culpable conduct is

required: 'The circumstances must be such that adherence to the fiction of separate corporate

existence would sanction a fraud or promote injustice.'"  Chrysler Corp. v. Ford Motor Co., 972

F. Supp. 1097, 1105 (E.D. Mich. 1997) (quoting United States v. Cordova Chem. Co. of Mich.,

113 F.3d 572, 580 (6th Cir. 1997)); see also Green, 873 N.W.2d at 807 (in evaluating the "fraud

or wrong" element, the court "must determine whether the manner of use [of the entity operated

as a 'mere instrumentality'] effected a fraud or wrong on the complainant"); Dutton Partners, LLC

17

v. CMS Energy Corp., 802 N.W.2d 717, 723 (Mich. Ct. App. 2010) (finding that judgment should be entered in favor of defendant when "[l]egitimate questions exist whether [the subsidiary] is a mere instrumentality of defendant," but "we cannot find any factual evidence showing that defendant merely used [the subsidiary] to commit fraudulent or otherwise wrongful acts").

"Establishing an entity for the purpose of avoiding personal responsibility is not by itself a wrong that would warrant disregarding the entity's separate existence." Green, 873 N.W.2d at 807 (citing Gledhill v. Fisher & Co., 262 N.W. 371, 373 (Mich. 1935)).  Here, there is no evidence that Curaden AG "engaged in deliberate wrongful conduct that was either designed to or actually did produce injury to" Lyngaas and the other recipients of the faxes, Lim, 560 B.R. at 705, or "exercised [its] control over [Curaden USA] in such a manner as to wrong" Lyngaas, Green, 873 N.W.2d at 807.  While Curaden AG set up a subsidiary in the United States in order to market and sell its products, there is nothing to suggest that it did so in order to effect a fraud or a wrong. There is simply no evidence of Curaden AG misusing the corporate form.

Thus, Curaden AG's motion for summary judgment is granted regarding any claim for alter-ego liability.  Nonetheless, as discussed above, because an issue of fact remains as to Curaden AG's knowledge of the faxing campaign at issue in this case, the Court denies summary judgment as to both Lyngaas and Curaden AG regarding Curaden AG's liability under the TCPA.

**C.** **Summary Judgment as to Curaden USA**

Curaden USA is in a different position than its parent company.  Defendants do not argue that Curaden USA is not liable for the faxes sent to Lyngaas; instead, their response to the motion for summary judgment focuses on Lyngaas' class-wide allegations.  Defendants contend that Lyngaas lacks admissible evidence establishing which putative class members actually received the fax advertisements, so he is not entitled to summary judgment on behalf of the proposed class.

Defs. Resp. to Pl. Mot. for Summ. J. at 8 (Dkt. 74). They contend that the fax transmission records cannot be relied upon, because they were created by WestFax – not AdMax – and no one from WestFax has verified or authenticated these records. Defendants also argue that Lyngaas has not put forth sufficient evidence regarding how each fax was received, contending that he must show that the fax was received by a fax machine rather than a computer. Id. at 11-12.

Lyngaas argues that he can establish the recipients of the unsolicited faxes based on the fax transmission logs, and offers several arguments for why these logs are admissible. First, he argues that he can rely on the deposition testimony of Barry Clark, the president of WestFax, that was taken in another case, to authenticate the records. Clark testified in another case that the WestFax computer system automatically generates the number of faxes that were successfully completed. Stonecrafters Clark Dep., Ex. 8 to Pl. Mot. for Summ. J., at 37-38 (Dkt. 62-9). Clark stated that he relied on the technology for accuracy, and had no reason to believe that the reports generated were inaccurate or unreliable. Id. at 45-46.

Lyngaas is correct that deposition testimony from another action may be considered at the summary judgment stage. Gulf USA Corp. v. Fed. Ins. Co., 259 F.3d 1049, 1056 (9th Cir. 2001) ("Sworn deposition testimony may be used by or against a party on summary judgment regardless of whether the testimony was taken in a separate proceeding. Such testimony is considered to be an affidavit pursuant to Federal Rule of Civil Procedure 56(c), and may be used against a party on summary judgment as long as the proffered depositions were made on personal knowledge and set forth facts that were admissible in evidence."); United States v. Atlas Lederer Co., 282 F. Supp. 2d 687, 695 (S.D. Ohio 2001) (adopting Ninth Circuit reasoning that depositions taken before a party joined an action "could not be used as depositions, because the defendant had lacked an opportunity to cross examine the deponents," but "were equivalent to Rule 56(c) affidavits").

However, the testimony that Lyngaas seeks to rely upon is from 2009. <u>Stonecrafters</u> Clark Dep. (Dkt. 62-9); <u>King</u> Clark Dep., Ex. 9 to Pl. Mot. for Summ. J. (Dkt. 62-10). Defendants point out that the faxes at issue in this case were sent in 2016, some seven years later, and thus Clark's prior testimony cannot authenticate these fax logs. Defs. Obj. to Evid. at 2 (Dkt. 86). The Court agrees. While Lyngaas says it is unfair to "speculate" that Westfax's systems might have changed, it is <u>his</u> burden on summary judgment to show that there is no issue of fact regarding the receipt of the faxes in 2016. Neither Clark's 2009 testimony nor his undated declaration, <u>see</u> Clark Decl., Ex. 1 to Pl. Reply in Supp. of Mot. for Summ. J. (Dkt. 84-1), help Lyngaas to meet this burden.

Next, Lyngaas argues that the records can be admitted through the testimony of Chad Komniey, the owner of AdMax Marketing who used the WestFax program to send the faxes. Lyngaas contends that he does not need an employee of WestFax to testify as to how the records were created, as he can rely on someone "familiar with the record keeping system" even if that person lacks personal knowledge. The Federal Rules of Evidence provide that a record of an act or event is not excludable as hearsay if (1) "the record was made at or near the time by – or from information transmitted by – someone with knowledge;" (2) "the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;" (3) "making the record was a regular practice of that activity;" (4) "all these conditions are shown by the testimony of the custodian <u>or another qualified witness</u> . . . ;" and (5) "the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness." Fed. R. Evid. 803(6)(A)-(E) (emphasis added). Lyngaas argues that Komniey is a "qualified witness" within the meaning of Rule 803(6), and therefore can testify about the Westfax transmission logs.

In <u>United States v. Hathaway</u>, 798 F.2d 902 (6th Cir. 1986), the defendant argued that, under Federal Rule of Evidence 803(6), the Government could not rely on the testimony of an FBI agent to lay a foundation for admissibility of records seized from defendant's employer's offices. The court disagreed, stating that "there is no reason why a proper foundation for application of Rule 803(6) cannot be laid, in part or in whole, by the testimony of a government agent or other person outside the organization whose records are sought to be admitted. When a witness is used to lay the foundation for admitting records under Rule 803(6), all that is required is that the witness be familiar with the record keeping system." <u>Id.</u> at 906; <u>see also</u> <u>Weinstein's Evidence</u> § 803(6)[2] ("The phrase 'other qualified witness' [in Rule 803(6)] should be given the broadest interpretation; he need not be an employee of the entity so long as he understands the system.").

Komniey agreed that he has "no personal knowledge as to the origin or production of that spreadsheet because that's something that WestFax does and [he is] a third party to WestFax[.]" <u>Id.</u> at 176. He further agreed that "[i]f a WestFax piece of information says a number failed, you don't know, as you sit here today, when [sic] it failed or not; you just know that's what WestFax told you; right?" <u>Id.</u> Thus, it is not clear that he could be considered someone who is "familiar with the record keeping system," as envisioned in <u>Hathaway</u>, 798 F.2d at 906, or that he "understands the system," <u>id.</u> He knows what the report purports to show, although he does not know how it is generated. [6]

---

[6] Lyngaas also argues that "computer-generated contemporaneously archived fax transmission log records cannot be considered 'hearsay.'" Pl. Reply in Supp. of Mot. for Summ. J. at 4 (Dkt. 84) (citing, <u>e.g.</u>, <u>United States v. Lamons</u>, 532 F.3d 1251, 1263, 1265 (11th Cir. 2008) ("[T]he statements in question are the statements of machines, not statements of persons. . . . To say that a wholly machine-generated statement is unreliable is to speak of mechanical error, not mendacity."); <u>United States v. Hamilton</u>, 413 F.3d 1138, 1142 (10th Cir. 2005) ("header information" that was automatically generated by the computer "without the assistance or input of a person" was not hearsay); <u>United States v. Crockett</u>, 586 F. Supp. 2d 877, 885 (E.D. Mich. 2008) ("[R]eadings from laboratory instruments implicate neither the hearsay rule nor the Confrontation

Lyngaas next argues that the records are admissible because Defendants "do not deny that the fax transmission logs are what Plaintiff claims they are." Pl. Reply in Supp. of Mot. for Summ. J. at 1 (Dkt. 84). He is correct to an extent – Defendants do not deny that the records are the records that Komniey downloaded from WestFax. See generally Defs. Resp. to Pl. Mot. for Summ. J. at 9-10. But Defendants' argument is that Lyngaas has failed to show that these records are an accurate reflection of the faxes that were sent and received. In that respect, Defendants are correct that Lyngaas is unable to show that the logs are what he claims them to be; i.e., an accurate depiction of which individuals received a fax. Lyngaas also contends that other evidence in the record – such as the fact that Curaden USA paid for the faxes to be sent out, and the fact that AdMax Marketing's primary business service is "fax blasting" – supports the authenticity and admissibility of the transmission logs. Pl. Resp. to Defs. Obj. to Evid. at 12-13 (Dkt. 87). But none of this evidence shows that the faxes were in fact sent to the individuals reflected in the logs.[7]

Lastly, Lyngaas argues that, even if the logs are inadmissible, his expert, Howard, need not rely on admissible evidence in reaching his opinion. Thus, Howard's testimony and report could

---

Clause.")). But even accepting this argument, Lyngaas still faces an authentication problem that Komniey's testimony cannot solve. As the court in Lamons explained, "[t]he best way to advance the truth seeking process with respect to such [computer-generated] statements is not through cross-examination of the machine operator, but through the process of authentication as provided for in Federal Rule of Evidence 901(b)(9)[.]" 532 F.3d at 1265. Federal Rule of Evidence 901(b)(9) provides that evidence sufficient to support a finding that the item is what the proponent claims it is may include "[e]vidence describing a process or system and showing that it produces an accurate result." Komniey cannot testify as to how WestFax's reports are generated.

[7] Lyngaas also contends that Defendants do not have any evidence showing that "even a single entry in Westfax's transmission logs" is inaccurate, Pl. Reply in Supp. of Mot. for Summ. J. at 4-5, and that he can discharge his burden of showing that there is no genuine dispute of material fact by "showing – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case," Biegas v. Quickway Carriers, 573 F.3d 365, 374 (6th Cir. 2009) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). But Lyngaas carries the burden at trial of proving his case; he cannot prevail on summary judgment if he has no evidence to meet his burden.

be used to establish which class members received a fax. Experts are permitted to testify "without personal knowledge of the underlying facts or data and . . . on the basis of hearsay or unadmitted evidence, as long as the evidence is of a kind 'reasonably relied upon by experts in the particular field.'" United States v. Bonds, 12 F.3d 540, 566 (6th Cir. 1993) (quoting Coal Resources Inc. v. Gulf & W. Indus., Inc., 954 F.2d 1263, 1272 (6th Cir. 1992)). Howard testified in his deposition that "[i]f WestFax is transmitting on behalf of somebody else, we could acquire the information from that somebody else who was transmitting or sending faxes through WestFax's services in order to produce a list of the recipients." Howard Dep. at 28.

Defendants argue that Howard offers only unsupported speculation to support his opinion regarding how WestFax created the fax transmission logs. Defs. Reply in Supp. of Mot to Exclude at 4-5 (Dkt. 81). Lyngaas points to a decision from the Northern District of Illinois to argue that Howard's opinion is one formed on his expertise:

> Here, Biggerstaff analyzed the data on the CDs provided to him from Top of Mind and MessageVision and drew conclusions based on his extensive knowledge of computer systems and fax transmission software. While he admittedly does not have experience with the proprietary program used by MessageVision, it was not necessary for Biggerstaff to possess this specialized knowledge because his task here was to analyze the meaning of the transmission logs on the CDs, rather than to scrutinize the method by which that data was generated. His opinion was formed after reviewing the transmission logs using principles and methods used to analyze data generated by various similar systems. This is sufficient to render his opinion credible and reliable. It is left to the trier of fact to determine how much weight to ultimately give that opinion.

Holtzman v. Turza, No. 08-2014, 2009 WL 3334909, at *3 (N.D. Ill. Oct. 14, 2009).

The Court agrees with Lyngaas that Howard has explained why he relied upon the WestFax reports despite not knowing how they were created. He testified that "[a]ll fax machines everywhere are designed to work around T.30. There isn't a fax machine that doesn't employ

T.30." Howard Dep. at 38. "[I]f you understand ITU T.30 protocol and how it works, that message confirmation signal indicates a positive signal from the receiver that it believes that that page was received complete. . . . [T]here's no other way for a fax confirmation to occur. So when you have a summary report that says, you know, 30,000 faxes were received by the recipients, the only way that that could be stated is through the MCF signal." Id. at 33-34. This is not mere speculation.

Nonetheless, because the Court has ordered that Mr. Howard provide an updated report and again make himself available for a deposition, the Court will not rely on the current expert report and deposition to grant summary judgment in Lyngaas' favor.

As such, Lyngaas has not satisfied his burden of showing that the class is entitled to relief against Curaden USA. The Court denies the motion for summary judgment against Curaden USA on behalf of the class.

## IV.    CLASS CERTIFICATION

### A.    Standard of Review

Class actions are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." Califano v. Yamasaki, 442 U.S. 682, 700-701 (1979). The party seeking to certify a class bears the burden of showing that the requirements of Federal Rule of Civil Procedure 23 are satisfied. Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011); Golden v. City of Columbus, 404 F.3d 950, 965 (6th Cir. 2005). Although district courts must conduct a "rigorous analysis" to ensure that Rule 23's requirements are met, Gen. Tel. Co. of Southwest v. Falcon, 457 U.S. 147, 161 (1982), they "maintain[] substantial discretion in determining whether to certify a class," Reeb v. Ohio Dep't of Rehab. & Corr., 435 F.3d 639, 643-644 (6th Cir. 2006). In determining the propriety of a class action, the inquiry is not whether the plaintiff will ultimately succeed on the merits; rather, scrutiny centers on whether the requirements

of Rule 23 are satisfied. <u>Eisen v. Carlisle & Jacquelin</u>, 417 U.S. 156, 178 (1974). To obtain class certification, Lyngaas must show that the following four requirements are met:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

<u>In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.</u>, 722 F.3d 838, 850 (6th Cir. 2013) (quoting Fed. R. Civ. P. 23(a)).

If these prerequisites are met, "the proposed class must also meet at least one of the three requirements listed in Rule 23(b)." <u>Id.</u> Here, Lyngaas seeks certification pursuant to Rule 23(b)(3), which requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

Rule 23(b)(3) classes must also meet "an implied ascertainability requirement." <u>Sandusky Wellness Center, LLC v. ASD Specialty Healthcase, Inc.</u>, 863 F.3d 460, 466 (6th Cir. 2017). In order to meet the ascertainability requirement, "a 'class definition must be sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member of the proposed class.'" <u>Id.</u> at 471 (citing <u>Young v. Nationwide Mut. Ins. Co.</u>, 693 F.3d 532, 537-538 (6th Cir. 2012)).

**B.**     **Analysis**

Lyngaas proposes the following class definition: "All persons who were successfully sent one or more facsimiles in March 2016 offering the Curaprox '5460 Ultra Soft Toothbrush' for '.98 per/brush' to 'dental professionals only.'" The Court will address the statutory requirements for class certification under Rule 23(a) and (b), as well as the ascertainability requirement. Finding

that those have been satisfied, the Court then turns to Defendants' argument regarding jurisdiction, and the appointment of class counsel.

### 1. Rule 23(a) Requirements

As noted above, a plaintiff seeking to certify a class must meet four prerequisites: numerosity, commonality, typicality, and adequacy. First, a class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Here, Lyngaas claims that the faxes at issue were sent to more than 40,000 telephone facsimile numbers; the logs indicate that faxes were sent to more than 30,000 recipients on two occasions. This group is sufficiently numerous to satisfy the first requirement. See Davidson v. Henkel Corp., 302 F.R.D. 427, 436 (E.D. Mich. 2014) ("[I]t generally is accepted that a class of 40 or more members is sufficient to satisfy the numerosity requirement.").

Next, Lyngaas must show that the requirement of commonality is met. "To demonstrate commonality, plaintiffs must show that class members have suffered the same injury." In re Whirlpool Corp., 722 F.3d at 852. The plaintiff's claims "must depend upon a common contention . . . of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each of the claims in one stroke." Id. Here, resolution of each class member's claim depends on whether Defendants are liable for sending unsolicited fax advertisements in March 2016. The commonality requirement is, therefore, met.

To demonstrate typicality, Lyngaas must demonstrate that "the class members' claims are fairly encompassed by the named plaintiffs' claims." In re Whirlpool, 722 F.3d at 852 (quotation marks omitted). Here, Lyngaas' claims are typical of the claims of the class, because all class members received an unsolicited fax advertisement in March 2016 advertising the Curaprox 5460

Ultra Soft Toothbrush, such that they suffered injury under the TCPA. Therefore, the typicality requirement is met.

Finally, Rule 23(a) requires that the class representative "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The Sixth Circuit employs the following two-prong test to determine adequacy: (i) the class representatives must have common interests with the putative class members; and (ii) the representatives must "vigorously prosecute the interests of the class through qualified counsel." Vassalle v. Midland Funding LLC, 708 F.3d 747, 757 (6th Cir. 2013). Here, Lyngaas has common interests with the putative class members, as described above, and as discussed further below, will vigorously prosecute the interests of the class through his qualified counsel. This requirement is satisfied.

Accordingly, the Court finds that the prerequisites of Rule 23(a) have been met.

### 2. Rule 23(b)(3) Requirements

Rule 23(b)(3) contains additional requirements that a plaintiff seeking class certification must satisfy. First, "questions of law or fact common to class members [must] predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). "In discerning whether a putative class meets the predominance inquiry, courts are to assess 'the legal or factual questions that qualify each class member's case as a genuine controversy,' and assess whether those questions are 'subject to generalized proof, and thus applicable to the class as a whole.'" Sandusky Wellness Center, 863 F.3d at 468 (quoting Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623 (1997) and Bridging Cmtys., Inc. v. Top Flite, 843 F.3d 1119, 1124 (6th Cir. 2016)) (internal citations omitted). The second requirement of Rule 23(b)(3) is that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Matters "pertinent to these findings" include the class members' interests in

individually controlling the prosecution of separate actions; the extent and nature of any litigation concerning the controversy that has already begun; the desirability or undesirability of concentrating the litigation in the particular forum; and the likely difficulties in managing a class action. Id.

### a. Predominance

Defendants raise several arguments that go to the requirements of predominance and ascertainability, discussed infra Section IV.B.3. First, they argue that Lyngaas cannot put forth admissible evidence showing which individuals actually received the fax advertisements. Defs. Resp. to Pl. Mot. for Cert. at 14 (Dkt. 73). According to Defendants, Lyngaas' motion relies on the opinion of his expert, Christopher Lee Howard, who analyzed the "contemporaneously archived fax transmission records" and the target list in order to determine which individuals successfully received a fax. Defendants argue that the fax transmission records cannot be relied upon, because they were created by WestFax – not AdMax – and no one from WestFax has verified or authenticated these records.

Defendants rely on Sandusky Wellness Center, 863 F.3d 460, where the Sixth Circuit upheld the district court's denial of class certification. The court concluded that the plaintiff could not satisfy the predominance and ascertainability requirements where she only had evidence that the fax was successfully transmitted to 40,343 individuals out of an attempted 53,502 – but lacked fax logs that would show which individuals successfully received the fax. Id. at 470. The district court reasoned that there was no method for weeding out the 25% of individuals who did not receive a fax, as having class members submit affidavits regarding receipt of a fax some seven years prior was not feasible. Id. at 472-473. The Sixth Circuit upheld this decision, noting that to its knowledge, "no circuit court has ever mandated certification of a TCPA class where fax logs

did not exist[.]" Id. at 473. Defendants argue that the same problems exist in the instant case, as there is no admissible evidence that this Court can rely on in order to determine who actually received the faxes. Defs. Resp. to Pl. Mot. for Cert. at 15-16.

This case is distinguishable from Sandusky. Here, the fax transmission logs do exist, and Defendants only question the manner in which they are presented. But if the fax transmission logs are presented as admissible evidence at trial, the Court can examine the logs and determine which individuals received the unsolicited faxes without having to resort to an individualized inquiry based on submitted affidavits. And while Defendants point to cases where courts have required that a plaintiff put forth admissible evidence to support a class certification motion, see, e.g., Unger v. Amedisys Inc., 401 F.3d 316, 319 (5th Cir. 2005), they do not point to any case law from the Sixth Circuit so stating. As a court in the Southern District of Ohio observed, "[i]t does not appear that the Sixth Circuit has weighed in on this issue. However, district courts within the circuit have generally not required the submission of admissible evidence at the class certification stage." In re Behr Dayton Thermal Prods., No. 08-326, 2015 WL 13651286, at *3 (S.D. Ohio. Feb. 27, 2015). This Court will consider the fax transmission logs at the class certification stage, particularly since Lyngaas has indicated that he will be able to admit the evidence at trial.

Defendants also argue that certain class members may have received an "e-fax," that is, a fax received on a computer rather than on a fax machine. They argue that the TCPA makes it unlawful "to use any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement." Defs. Resp. to Mot. for Cert. at 17 (quoting 47 U.S.C. § 227(b)(1)(C)) (emphasis added). Thus, Defendants say, a TCPA claim is not actionable if the message is received by anything other than a fax machine. Id. at 18. Defendants claim that Lyngaas' expert is unable to determine which individuals received a fax on a fax

machine, rather than a computer, and Lyngaas therefore can satisfy neither the predominance nor superiority requirements of Rule 23(b)(3).

Lyngaas responds that the Sixth Circuit and the FCC have both recognized that an individual has a claim under the TCPA even if the individual received the unsolicited fax advertisement on a computer rather than a fax machine. He points to American Copper & Brass, Inc. v. Lake City Industrial Products, Inc., 757 F.3d 540, 544 (6th Cir. 2014), where the Sixth Circuit observed that "unsolicited fax advertisements impose costs on all recipients, irrespective of . . . the cost of paper and ink, because such advertisements waste the recipients' time and impede the free flow of commerce." The court then cited favorably language from the Seventh Circuit: "'Even a recipient who gets the fax on a computer and deletes it without printing suffers some loss: the value of the time necessary to realize that the inbox has been cluttered by junk.'" Id. (quoting Ira Holtzman, C.P.A. v. Turza, 728 F.3d 682, 684 (7th Cir. 2013)) (emphasis in original). The FCC has also stated as much. See In re WestFax, Inc. Petition for Consideration & Clarification, 30 FCC Rcd. 8620, 8623, ¶ 9 (rel. Aug. 28, 2015) ("Efaxes also satisfy the statutory requirements to be a fax on the receiving end. The definition of 'telephone facsimile machine' sweeps in the fax server and modem, along with the computer that receives the efax . . . the recipient computers are attached to fax servers or services that convert the fax into a format that is attached to an email received by the computer.").

Based on the reasoning provided by the Sixth Circuit and the FCC, the Court agrees with Lyngaas that the TCPA covers claims brought by individuals who received an unsolicited e-fax advertisement. As such, there is no need to distinguish between individuals who received a traditional fax and those who received an e-fax.

Finally, in their response to Lyngaas' motion for summary judgment – but not in their response to the motion for class certification – Defendants point out that Curaden USA "likely did have EBRs [established business relationships] with a number of the dentists on the target list," but admitted that it "has not identified specific recipients who provided express consent." Defs. Resp. to Pl. Mot. for Summ. J. at 6-7. Lyngaas argues that this is not sufficient to preclude class certification. The Court agrees.

In <u>Sandusky</u>, the district court found that individual questions of consent dominated because the defendant had put forth "considerable evidence indicating that at least some intended Prolia fax recipients had indeed solicited the fax." 863 F.3d at 465. The Sixth Circuit upheld the district court's finding that individual questions of consent dominated over class-wide issues. <u>Id.</u> at 468. In so doing, the court distinguished <u>Top Flite</u>, 843 F.3d at 1126, where the Sixth Circuit held that "the mere mention of a defense is not enough to defeat the predominance requirement of Rule 23(b)(3)." "[T]here, the defendant had simply 'raised the possibility' that 'individual class members <u>might</u> have solicited or consented to receiving the challenged faxes.'" <u>Sandusky</u>, 863 F.3d at 469 (quoting <u>Top Flite</u>, 843 F.3d at 1123, 1125) (emphasis in <u>Sandusky</u>). In <u>Sandusky</u>, in contrast, the defendant produced "concrete evidence of consent, evinced by hundreds of thousands of documents[.]" <u>Id.</u>

Here, Defendants have, at best, raised the possibility that some of the proposed class members at one point consented to receiving fax advertisements. This mere possibility is insufficient to show that individual questions of consent predominate over the class-wide questions. Accordingly, Lyngaas has shown that the legal and factual questions regarding receipt of an unsolicited fax advertisement are subject to generalized proof.

**b. Superiority**

Defendants argue that the requirement of superiority has not been satisfied because the individualized review necessary to determine whether each proposed class member actually received a fax renders a class "unmanageable." They further assert that under the TCPA, those who have been injured have sufficient incentive to bring individual claims. Defs. Resp. to Pl. Mot. for Cert. at 21-22. Defendants also argue that the harm suffered by the proposed class members is disproportionate to their potential liability under the TCPA. Id. at 23-24.

For the reasons already discussed, it will be straightforward for the Court to determine whether each proposed class member received an unsolicited fax advertisement in violation of the TCPA. Defendants' argument that each of these individuals has sufficient incentive to bring an individual claim is not well-taken; as Lyngaas points out, an individual stands to recover $500 for a violation of the TCPA ($1500 for a willful or knowing violation, 47 U.S.C. § 227(b)(3)), and the filing fee to bring a claim in federal court is now $400.00. It is unlikely that an individual would be incentivized to bring an individual TCPA claim. See Mims v. Arrow Fin. Servs., LLC, 565 U.S. 368, 386 (2012) ("The current federal district court civil filing fee is $350. How likely is it that a party would bring a $500 claim in, or remove a $500 claim to, federal court?") (internal citations omitted); C-Mart, Inc. v. Metro. Life Ins. Co., 299 F.R.D. 679, 691 (S.D. Fla. 2014) (noting that the "large number of claims, along with the relatively small statutory damages, the desirability of adjudicating these claims consistently, and the probability that individual members would not have a great interest in controlling the prosecution of these claims" all point toward the superiority of a class action for TCPA claims).

Defendants point to several cases where the courts weighed the proportionality of harm to the defendant when determining whether to certify a class. See London v. Wal-Mart Stores, Inc., 340 F.3d 1246, 1255 n.5 (11th Cir. 2003) (noting in dicta that economic harm suffered by plaintiffs

may be required for superiority, "especially . . .when . . . the defendants' potential liability would be enormous and completely out of proportion to any harm suffered by the plaintiff"); Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 167 n.8 (3d Cir. 2001) (recognizing that the enormous size of potential liability would impose an intense pressure to settle on defendants, which is "a factor we weigh in our certification calculus"). But Congress has determined that damages of $500 is proportionate for each violation of the TCPA. "That proportionality does not change as more plaintiffs seek relief; indeed, the size of the defendant's potential liability expands at exactly the same rate as the class size." Physicians Healthsource, Inc. v. Doctor Diabestic Supply, LLC, No. 12-22330, 2014 WL 7366255, at *9 (S.D. Fla. Dec. 24, 2014) (quoting Bateman v. Am. Multi-Cinema, Inc., 623 F.3d 708, 719 (9th Cir. 2010) (alterations omitted)). It is not up to this Court to decide that this amount is unfair to Defendants. These arguments do not counsel against a finding that a class action is the superior method for resolving the claims.

For these reasons, the Court finds that the Rule 23(b)(3) requirements of predominance and superiority have been satisfied.

### 3. Ascertainability

A class certified under Rule 23(b) must also meet an implied requirement of ascertainability. In order to meet this requirement, "a 'class definition must be sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member of the proposed class.'" Sandusky, 863 F.3d at 471 (quoting Young, 693 F.3d at 537-538). "In the context of the TCPA, where fax logs have existed listing each successful recipient by fax number, our circuit has concluded that such a 'record in fact demonstrates that the fax

numbers are objective data satisfying the ascertainability requirement.'" Id. (quoting Am. Copper. & Brass, 757 F.3d at 545).

As mentioned, Defendants argue that Lyngaas cannot meet the requirement of ascertainability because he has failed to put forth sufficient admissible evidence to certify the proposed class. Defs. Resp. to Pl. Mot. for Cert. at 10, 15. For the reasons provided, the Court disagrees and finds that it is feasible for it to ascertain whether a particular individual is a member of the proposed class.

### 4. Jurisdiction

Defendants also argue that the Court lacks personal jurisdiction over them for the proposed out-of-state class Plaintiffs, relying on Bristol-Myers Squibb Co. v. California Superior Court, 137 S. Ct. 1773 (2017). Def. Resp. to Pl. Mot. for Cert. at 6. In Bristol-Myers, the defendant was sued in California state court by a group of plaintiffs who alleged that they were injured by Plavix, a drug sold by the defendant; the plaintiffs included 86 California residents and 592 plaintiffs who resided in other states. The Court noted that "the nonresidents were not prescribed Plavix in California, did not purchase Plavix in California, did not ingest Plavix in California, and were not injured by Plavix in California." Id. at 1781. It continued to say that "[t]he mere fact that other plaintiffs were prescribed, obtained, and ingested Plavix in California . . . does not allow the State to assert specific jurisdiction over the nonresidents' claims." Id. (emphasis in original). Defendants seek to apply Bristol-Myers to the instant case, and argue that the proposed class contains out-of-state members over whose claims this Court lacks jurisdiction. For this reason, they contend that Lyngaas' motion must be denied, or, alternatively, the class must be limited to individuals who were injured in Michigan.

The Sixth Circuit has not addressed Bristol-Myers, and out-of-circuit district courts are divided on whether it should be applied to class actions. Compare, e.g., Practice Mgmt. Support Servs., Inc. v. Cirque du Soleil, Inc., 301 F. Supp. 3d 840 (N.D. Ill. 2018) (TCPA case holding that Bristol-Myers applies in the class action context, "at least for causes of action where courts look to state law for the limits on personal jurisdiction"), with Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc., No. 17-564, 2017 WL 4224723, at *5 (N.D. Cal. Sept. 22, 2017) (holding that Bristol-Myers "is meaningfully distinguishable [from the putative class action before the court] based on that case concerning a mass tort action, in which each plaintiff was a named plaintiff").

The Court agrees with the courts that have held that Bristol-Myers does not extend to the class action context.[8]  Indeed, Justice Sotomayor noted in her dissent that the majority did not address whether the opinion "would also apply to a class action in which a plaintiff injured in the forum State seeks to represent a nationwide class of plaintiffs, not all of whom were injured there." Bristol-Myers, 137 S. Ct. at 1789 n.4 (Sotomayor, J., dissenting).  Bristol-Myers was a mass tort action, where each of the plaintiffs was a real party in interest.  In a class action, however, one or more plaintiffs seeks to represent a class of similarly-situated individuals, and the "named plaintiffs" are those who are actually named in the complaint.  As another court in this circuit has observed, "the inquiry for personal jurisdiction lies with the named parties of the suit asserting their various claims against the defendant, not the unnamed proposed class members." Day v. Air Methods Corp., No. 17-183, 2017 WL 4781863, at *2 (E.D. Ky. Oct. 23, 2017); see also Jones v. Depuy Synthes Prods., Inc., --- F.R.D. --- , 2018 WL 6431013, at *8 (N.D. Ala. 2018) ("[C]lass actions are brought in a representative capacity.  Thus, absent class members are not considered

---

[8] Accordingly, the Court does not address Lyngaas' argument that Defendants waived this defense by failing to raise it in their Answers.

parties when determining whether there is complete diversity of citizenship . . . There is no reason why this rationale does not also apply for personal jurisdiction purposes.") (internal citations omitted); <u>Fitzhenry-Russell</u>, 2017 WL 4224723, at *5 (acknowledging support for the position that "in class actions, the citizenship of the unnamed plaintiffs is not taken into account for personal jurisdiction purposes").  Class actions "'need[] to meet the additional due process standards for class certification under Rule 23,'" which "supply due process safeguards not applicable in the mass tort context."  <u>Molock v. Whole Foods Mkt., Inc.</u>, 297 F. Supp. 3d 114, 126 (D.D.C. 2018) (quoting <u>In re Chinese-Manufactured Drywall Prods. Liability Litig.</u>, No. 09-2047, 2017 WL 5971622, at *14 (E.D. La. Nov. 20, 2017)).

Expanding <u>Bristol-Myers</u> to class actions would eviscerate the class action vehicle as we know it, drastically reducing the number of forums in which a nationwide class action could be brought.  As one court in the Northern District of Illinois observed,

> <u>Bristol-Myers</u> characterized its holding as a "straightforward application . . . of settled principles of personal jurisdiction."  137 S. Ct. at 1783.  That characterization is hard to square with the extraordinary sea change in class action practice that Pfizer's reading of <u>Bristol-Myers</u> would prompt. Had the Supreme Court truly sought to bar certification of nationwide or multistate <u>class</u> actions on due process grounds in all but the one or two States where the defendant is subject to general jurisdiction, it implausible that it would have done so obliquely, in a <u>mass</u> action, and with the caveat that it was "'leav[ing] open the question whether the Fifth Amendment imposes the same restrictions on the exercise of personal jurisdiction by a federal court" as the Fourteenth Amendment does "on the exercise of specific jurisdiction by a State." 137 S.Ct. at 1783-84.

<u>Al Haj v. Pfizer, Inc.</u>, 338 F. Supp. 3d 815, 819 (N.D. Ill. 2018) (emphases in original).

Accordingly, this Court has jurisdiction over the claims brought by unnamed class members, whether they received faxes in Michigan or out-of-state.[9]

Because the proposed class satisfies the requirements of Rule 23, and this Court has jurisdiction over all of the class members' claims, the Court grants Lyngaas' motion for class certification.

### 5. Appointment of class counsel

Finally, Federal Rule 23 provides that a court that certifies a class must appoint class counsel. Fed. R. Civ. P. 23(g)(1). In appointing counsel, the court must consider "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class," Fed. R. Civ. P. 23(g)(1)(A)(i)(-(iv), and may consider "any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class," Fed. R. Civ. P. 23(g)(1)(B).

Lyngaas has attached his counsel's resumes to his motion. Bock, Hatch, Lewis & Oppenheim, LLC works exclusively on class actions, and has worked on TCPA class actions since 2003. Firm Resume, Ex. 3 to Pl. Mot. for Cert., at 1 (Dkt. 63-4). The firm's attorneys have substantial experience serving as lead counsel on TCPA class actions, and are knowledgeable in this area of the law. See id. at 1-3. Richard Shenkan, who also represents Lyngaas, states that he has twenty-one years of litigation experience, including work on TCPA class actions. Id. at 29.

---

[9] The Court also notes that it previously found that the exercise of jurisdiction over Curaden AG was proper pursuant to Federal Rule of Civil Procedure 4(k)(2), based on Curaden AG's contacts with the entire United States, not just Michigan. Lyngaas, 2018 WL 1251754, at *8. Defendants do not address this issue in their brief.

Counsel has represented Lyngaas in this case since its inception more than two years ago, and assert that they will continue to commit adequate staffing and monetary resources to ensure that the class is represented in this case.  Pl. Mot. for Cert. at 13.

The Court finds that Lyngaas' counsel will fairly and adequately represent the interests of the class, and appoints them as class counsel.

## V.      CONCLUSION

For the reasons provided, the Court grants in part and denies in part Curaden AG's motion for summary judgment (Dkt. 60); denies Lyngaas' motion for summary judgment (Dkt. 62); denies without prejudice Defendants' motion to exclude expert witness (Dkt. 67); and denies Lyngaas' motion to postpone ruling on the class certification motion (Dkt. 68).  Howard must submit a revised expert report to Defendants no later than June 3, 2019; any follow-up deposition must take place on or before June 13, 2019.  The Court grants Lyngaas' motion for class certification (Dkt. 63) and certifies the following class: All persons who were successfully sent one or more facsimiles in March 2016 offering the Curaprox "5460 Ultra Soft Toothbrush" for ".98 per/brush" to "dental professionals only."  Lyngaas' counsel is appointed as counsel for the class.

SO ORDERED.

Dated:  May 23, 2019                                           s/Mark A. Goldsmith
    Detroit, Michigan                                   MARK A. GOLDSMITH
                                           United States District Judge