Transcript of the Testimony of

**30(b)(6) of WESTFAX, INC., BARRY CLARK**
**April 20, 2017**

<u>**Comprehensive Health Care Systems**</u>
<u>**vs.**</u>
<u>**M3 USA Corporation, et al.**</u>

# Doreen Girdeen, RMR

*Doreen Girdeen, RMR*
**Hansen and Company, Inc.**
Registered Professional Reporters
1600 Broadway, Ste. 470
Denver, Colorado 80202
Phone (303) 691-0202 * Fax (303) 691-2444



Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA,
WEST PALM BEACH

Case No. 16-cv-80967, Division:  Judge Beth Bloom

_____

30(B)(6)VIDEO-RECORDED DEPOSITION OF WESTFAX, INC.,
BARRY CLARK - APRIL 20, 2017

_____

COMPREHENSIVE HEALTH CARE SYSTEMS OF THE PALM BEACHES,
INC., a Florida corporation, DR. ROBERT W. MAUTHE,
M.D., P.C., individually and as the representatives of
a class of similarly-situated persons,

Plaintiffs,

v.

M3 USA CORPORATION, and JOHN DOES 1-12,

Defendants.

_____


PURSUANT TO NOTICE AND AGREEMENT, the

30(b)(6)VIDEO-RECORDED DEPOSITION OF BARRY CLARK was

taken on behalf of the Plaintiffs at 5150 East Yale

Circle, Suite 200, Denver, Colorado 80222, on

April 20, 2017, at 10::13 a.m., before Doreen Girdeen,

Registered Merit Reporter and Notary Public within

Colorado.

Comprehensive Health Care Systems                    30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                                  April 20, 2017

Page 2

```
 1                          A P P E A R A N C E S

 2
       For the Plaintiffs:        DANIEL J. COHEN, ESQ.
 3                                Bock & Hatch, LLC
                                  134 North La Salle Street
 4                                Suite 1000
                                  Chicago, Illinois  60602
 5                                (312) 658-5500
                                  danieljaycohen209@gmail.com
 6
       For the Defendants:        DAVID M. POELL, ESQ.
 7                                Sheppard, Mullin, Richter &
                                  Hampton, LLC
 8                                70 West Madison Street
                                  Suite 4800
 9                                Chicago, Illinois  60602
                                  (312) 499-6349
10                                dpoell@sheppardmullin.com

11     For WestFax, Inc.:         WILLIAM B. HAYES, ESQ.
                                  William B. Hayes
12                                257 Jackson Street
                                  Denver, Colorado  80206
13                                (303) 514-0658
                                  sqhayes@aol.com
14
       Also Present:             John Arnold, videographer, CLVS
15

16

17

18

19

20

21

22

23

24

25
```

Comprehensive Health Care Systems              30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                                April 20, 2017

```
                                                                    Page 3

  1                        I N D E X
  2                                                                   PAGE
        EXAMINATION OF BARRY CLARK:
  3     April 20, 2017
  4     By Mr. Cohen:                                              7, 100
        By Mr. Poell:                                                  82
  5     By Mr. Hayes:                                                  --
  6                                                               INITIAL
        DEPOSITION EXHIBITS                                     REFERENCE
  7
        Exhibit 1      Subpoena to Produce Documents,                  12
  8                    Information, or Objects or to
                       Permit Inspection of Premises in a
  9                    Civil Action; Subpoena Rider
 10     Exhibit 2      WestFax, Inc., Responses to                     13
                       Subpoena
 11
        Exhibit 3      10/29/2015 WestFax invoice to                   48
 12                    Account Number 5725, October 29,
                       2015, e-mail from Deanna Gasseling
 13                    to Douglas Clayton (M3 Mauthe 227,
                       M3 USA005926)
 14
        Exhibit 4      E-mail chain between Douglas                    60
 15                    Clayton and Melody Ducker, WestFax
                       invoice to Account Number 5725
 16
        Exhibit 5      11/5/2015 WestFax invoice to                   49
 17                    Account Number 5725; November 2,
                       2015, e-mail from Deanna Gasseling
 18                    to Douglas Clayton
 19     Exhibit 6      11/6/2015 WestFax invoice to                   49
                       Account Number 5725; November 6,
 20                    2015, e-mail from Lisa Roe to
                       Douglas Clayton
 21
        Exhibit 7      WestFax invoice for Account Number             65
 22                    5725 dated 11/17/2015
 23     Exhibit 8      WestFax invoice to Account Number              65
                       5725 for 11/18/2015 and 11/18/2015
 24
        Exhibit 9      11/19/2015 WestFax invoice to                  49
 25                    Account Number 5725
```

Hansen & Company, Inc. Registered Professional Reporters
(303) 691-0202 * (303) 691-2444

Comprehensive Health Care Systems                30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                          April 20, 2017

Page 4

1                      I N D E X, Continued

2    Exhibit 10   11/30/2015 WestFax invoice to                    49
                  Account Number 5725
3
     Exhibit 11   12/1/2015 WestFax invoice to                     49
4                 Account Number 5725

5    Exhibit 12   WestFax invoices and e-mail chains               66

6    Exhibit 13   3/29/2016 WestFax invoice to                     49
                  Account Number 5725; March 29,
7                 2016, e-mail from Deanna Gasseling
                  to Douglas Clayton
8
     Exhibit 14   4/4/2016 WestFax invoice to                      49
9                 Account Number 5725; April 4,
                  2016, e-mail from Deanna Gasseling
10                to Douglas Clayton

11   Exhibit 15   4/5/2016 WestFax invoice to                      49
                  Account Number 5725
12
     Exhibit 16   4/6/2016 WestFax invoice to                      49
13                Account Number 5725; April 6,
                  2016, e-mail from Deanna Gasseling
14                to Douglas Clayton

15   Exhibit 17   WestFax invoices for 5/2/2016,                   69
                  5/3/2016, e-mail chain between
16                Deanna Gasseling and Andrew Thiers

17   Exhibit 18   E-mails between one or more people              106
                  at M3 or MDLinx and one or more
18                people at WestFaxM3 (USA006629,
                  6630, and 6631)
19                (Exhibit 18 with Daniel Cohen)

20   (Attached to original and copy transcripts.)
     (Exhibit 18 with Daniel Cohen)
21
     PREVIOUSLY MARKED DEPOSITION                              INITIAL
22   EXHIBITS:                                              REFERENCE
     (None)
23
                      INFORMATION REQUESTED:
24                         (None)
25

Comprehensive Health Care Systems          30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                        April 20, 2017

Page 5

1                         I N D E X, Continued

2              QUESTIONS INSTRUCTED NOT TO ANSWER:

3                         Page      Line
                           18        17
4                          18        25
                           20         2
5                          28         4
                           30         5
6                          56        16

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 6

```
 1              WHEREUPON, the following proceedings were
 2   taken pursuant to the Florida Rules of Civil Procedure.
 3              THE VIDEOGRAPHER:  We are on the record at
 4   10:13 a.m. on April 20th, 2017, at the Offices of
 5   William Sather & Associates, CPA, PC, located at 5150
 6   East Yale Circle, Denver, Colorado.  We are here for
 7   the video-recorded deposition of WestFax, Incorporated
 8   and its 30(b)(6) designee, Barry Clark, in the matter
 9   of Comprehensive Health Care Systems of the Palm
10   Beaches, Incorporated, et al. versus M3 USA
11   Corporation, et al., in the United States District
12   Court for the Southern District of Florida, West Palm
13   Beach, Case Number 16-CV-80967.
14              The videographer is John Arnold; the court
15   reporter is Doreen Girdeen of Hansen & Company.
16              Will counsel please state their appearances
17   beginning with plaintiff's counsel.
18              MR. COHEN:  Dan Cohen for the plaintiff and
19   putative plaintiff class.
20              MR. POELL:  David Poell, P-o-e-l-l, attorney
21   for the defendant M3 USA Corporation.
22              MR. HAYES:  William Hayes, attorney for
23   WestFax.
24              THE VIDEOGRAPHER:  Will the court reporter
25   please swear in the witness.
```

Comprehensive Health Care Systems                30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                              April 20, 2017

Page 7

```
 1                      BARRY CLARK,

 2    having been first duly sworn to state the whole truth,

 3    testified as follows

 4                      EXAMINATION

 5    BY MR. COHEN:

 6        Q.   Good morning, sir.  Would you please state

 7    your name?

 8        A.   Barry Clark.

 9        Q.   Mr. Clark, my name is Dan Cohen.  We just met

10    for the first time this morning just before starting

11    the deposition.  I'm an attorney, and I represent the

12    plaintiff in the case that's been filed in the federal

13    court in the southern district of Florida seeking to

14    represent a class of persons who claim they received

15    unsolicited fax advertisements.  And we're taking your

16    deposition today because it's my understanding that you

17    or your company may have had some involvement in some

18    of the events or activities relating to this case.  And

19    I'm really just here to find out what your involvement,

20    if any, was or your company's involvement and what you

21    might be able to help us understand about what that

22    involvement was.  Okay?

23        A.   Okay.

24        Q.    I know you've given a deposition before, but

25    you've never given a deposition to me before.  I have a
```

Page 8

 1    different way of asking questions.  They get long; they

 2    get confusing.  If you don't know what I'm getting at,

 3    just tell me, "Rephrase it," and I will.  Okay?

 4        A.    Okay.

 5        Q.    It's my understanding that you have an

 6    ownership role in a company known as WestFax, Inc.; is

 7    that correct?

 8        A.    Yes.

 9        Q.    Can you help us understand the nature of that

10    ownership role?

11        A.    I own the company.

12        Q.    The sole owner?

13        A.    Yes.

14        Q.    And have you always been the sole owner?

15        A.    No.

16        Q.    At what point did your sole ownership begin

17    through to its current point?

18        A.    About five years ago.

19        Q.    Prior to that, what other ownership

20    participation was there?

21        A.    50 percent.

22        Q.    And to whom?

23        A.    Can you restate the question?

24        Q.    Certainly.  I'm assuming prior to five years

25    ago, you owned 50 percent, correct?

Comprehensive Health Care Systems                    30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                              April 20, 2017

                                                                           Page 9

     1      A.   Yes.

     2      Q.   And who -- who was the other owner or

     3   co-owners at that time?

     4      A.   James Edwards.

     5      Q.   Is Mr. Edwards still alive?

     6      A.   Yes.

     7      Q.   Is he in the Denver area?

     8      A.   No.

     9      Q.   Do you know what part of the country he lives

    10   in?

    11      A.   Yes.

    12      Q.   Could you tell us, please.

    13      A.   The mountains -- Colorado mountains.

    14      Q.   What does WestFax do?

    15      A.   Fax broadcasting.

    16      Q.   And a jury may one day be watching this, and

    17   we all have an idea of what fax broadcasting would be

    18   in a commercial context, but can you help us understand

    19   what that means in terms of what WestFax actually does?

    20      A.   We send a fax to multiple recipients on behalf

    21   of our customers.

    22      Q.   That's actually what I was going to ask,

    23   whether WestFax did that on its own behalf or for the

    24   benefit of others?

    25      A.   For the benefit of others.

Comprehensive Health Care Systems                30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                            April 20, 2017

Page 10

1          Q.    We're going to get into some detail about it

2     as the deposition goes on, but I guess I may as well

3     jump right to the chase.

4          A.    That's a good idea.

5          Q.    The defendant in this case is M3 USA Corp.,

6     and the claim is that faxes were sent on their behalf

7     to multiple recipients.  Did WestFax, to your

8     knowledge, participate in fax broadcasting on behalf of

9     M3 USA Corp.?

10         A.    WestFax provided fax broadcast service for M3

11    Corp.

12         Q.    And we'll get into this in more detail later

13    too.  But when you say "provided fax -- fax broadcast

14    service," generally, what does that mean within the way

15    that WestFax's -- the way WestFax operates?

16         A.    We send faxes for customers as previously

17    described.

18         Q.    And how is that accomplished?

19         A.    Through our proprietary technology.

20         Q.    If a customer or a client -- whether an

21    existing client or somebody contacting WestFax for the

22    first time about the possibility of using WestFax's

23    broadcast services -- wanted to submit targeted lists

24    of fax numbers for WestFax to broadcast to, what are

25    the different ways that that potential or existing

Comprehensive Health Care Systems                30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                          April 20, 2017

Page 11

 1    **customer client could deliver that information, those**

 2    **lists, to WestFax?**

 3              MR. COHEN:  I'm going to object on form and

 4    vagueness of the phrase "targeted fax list."

 5        A.   I don't understand your question.

 6        **Q.   (BY MR. COHEN)  Does WestFax provide lists of**

 7    **fax recipient populations to its customers or clients?**

 8        A.   No.

 9        **Q.   Where does WestFax obtain the lists that are**

10    **then used as part of WestFax broadcast services for its**

11    **clients?**

12        A.   We don't obtain them.  The customer sends them

13    as part of the order submitted to WestFax.

14        **Q.   What are the different ways or methods that a**

15    **customer can deliver such a list to WestFax?**

16        A.   They can upload via a web portal, they can

17    e-mail them, they can send them via U.S. mail on a

18    CD-ROM, they can get them to us in any way that a

19    database is transmitted.

20        **Q.   In either of those three scenarios -- the**

21    **upload via the portal, the e-mail, or mailing WestFax a**

22    **CD-ROM -- is there a particular format that is**

23    **necessary for WestFax's proprietary system to interface**

24    **properly?**

25        A.   No.

Comprehensive Health Care Systems                30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                           April 20, 2017

Page 12

```
 1        Q.    Can WestFax's proprietary technology interface
 2   with a list provided by a customer in Excel spreadsheet
 3   form?
 4        A.    Yes.
 5        Q.    Are there any other formats that you've had
 6   experience where a customer provides it in a format
 7   other than Excel and WestFax's technology is able to
 8   interface with it?
 9        A.    Yes.
10        Q.    What other formats can you recall?
11        A.    All database formats.
12        Q.    Including CVS -- or CSV?  I'm sorry.
13        A.    Yes.
14              (Deposition Exhibit 1 was marked.)
15        Q.    (BY MR. COHEN)  Sir, I'm handing you what's
16   been marked as Exhibit 1 for purposes of your
17   deposition today.  I represent to you this is a
18   subpoena to produce documents, and it was served on
19   WestFax.  And it has a subpoena rider listing 19
20   topics.  Have you seen this document or this subpoena
21   rider before?
22        A.    I or my attorney have.
23              THE DEPONENT:  Can we go off the record just a
24   sec?
25              MR. COHEN:  Sure.
```

Comprehensive Health Care Systems                30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                        April 20, 2017

Page 13

1              THE VIDEOGRAPHER:  Going -- stand by.

2              Going off the record.  The time is 10:22.

3              (Recess from 10:22 a.m. until 10:23 a.m.)

4              THE VIDEOGRAPHER:  We are back on the record.

5    The time is 10:23.

6              (Deposition Exhibit 2 was marked.)

7              MR. COHEN:  Let the record reflect that during

8    the off-record period requested by the witness, he

9    indicated that he's going to stay here until noon, and

10   if we're not done by noon, we'll have to reschedule.

11   Just so the record is clear, I don't know when we'll be

12   done, but we won't be consenting to that.

13        **Q.   (BY MR. COHEN)  So passing to counsel and the**

14   **witness what we've marked as Exhibit 2.  Mr. Clark, I**

15   **previously showed you Exhibit 1, the subpoena rider**

16   **containing 19 paragraphs.  And I asked you if you had**

17   **reviewed these, and you said you or your attorney had,**

18   **correct?**

19        A.   Yes.

20        **Q.   Exhibit 2 is a WestFax, Inc., response to the**

21   **subpoena.  Do you see page 2, at the bottom, it's an**

22   **indication of a notarized sworn signature of Barry**

23   **Clark?**

24        A.   Yes.  I see that.

25        **Q.   Is that you?**

Comprehensive Health Care Systems                30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                              April 20, 2017

Page 14

 1      A.    Yes.

 2      **Q.    Is that your signature?**

 3      A.    Yes.

 4      **Q.    You wouldn't have signed that, attesting under**

 5  **oath that these were correct, true answers to these**

 6  **issues set forth in 19 paragraphs on the subpoena rider**

 7  **if you had not, yourself, reviewed it; would you have?**

 8      A.    I would not have signed it if I would have not

 9  reviewed it, if that's what your question is.

10      **Q.    That was my question, sir.**

11          **What personal recollection do you have of any**

12  **fax activity that WestFax participated in for the**

13  **benefit of M3?**

14      A.    None.

15      **Q.    Have you ever communicated with anyone from M3**

16  **or any third-party contractors or marketing entities on**

17  **its behalf?**

18      A.    Not to my knowledge.

19      **Q.    Do you know who within your company would have**

20  **done that at any time in the past?**

21      A.    Our customer service department.

22      **Q.    How many people are in the customer service**

23  **department?**

24      A.    It varies.  Somewhere between three and five.

25      **Q.    We have some documents I'll be showing you in**

Comprehensive Health Care Systems          30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                        April 20, 2017

Page 15

1    a little while that seemed to be e-mails between people

2    in WestFax and people either at M3 or people working on

3    behalf of M3.  Were your customer service personnel's

4    communications with customers limited to e-mail or did

5    they also engage in telephone conversations?

6              MR. POELL:  Objection.  Form.

7        A.   I don't know.

8        Q.   (BY MR. COHEN)  You don't know as to M3 or you

9    don't know at all?

10       A.   Well, you're deposing me about the case of M3,

11   so I'm asking [sic] the question specific to M3.

12       Q.   Yeah.  My question is not specific to M3.  My

13   question is, do you know whether in -- across the

14   board, your customer service people, when they interact

15   with clients of WestFax, on occasion, interact by

16   phone?

17       A.   Yes, they do.

18       Q.   Documents were produced to us by your

19   attorney, Mr. Hayes, who is here today.  Are you

20   familiar with the production that Mr. Hayes made for

21   you in compliance with the subpoena?

22       A.   Yes.

23       Q.   One of the sets of documents was identified as

24   a removal list.  Are you familiar with that kind of a

25   document?

Comprehensive Health Care Systems                30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                            April 20, 2017

Page 16

 1        A.   It's not typically a document, but I
 2   understand that we've provided it to you as a document.
 3        **Q.   What is the nature of the information that's**
 4   **contained in a removal list?**
 5        A.   It's -- they are numbers that the client
 6   either provides or people who have opted out using our
 7   opt-out service to prohibit future faxes from being
 8   sent to those individuals, those fax numbers.
 9        **Q.   And I just want to be clear, because I was**
10   **misunderstanding what you were saying at first, but**
11   **then I got it toward the end.  The whole list is people**
12   **who, in one way or another, have manifested a desire**
13   **not to receive any further faxes.  But the list can**
14   **come from or be contributed to by the actual past**
15   **recipients taking advantage of WestFax's opt-out option**
16   **or the customer of WestFax could have provided a**
17   **removal -- a set of names or phone numbers to be**
18   **removed too, correct?**
19             MR. POELL:  Object -- objection.  Foundation,
20   form, leading.
21        A.   WestFax provides removal service, and numbers
22   can be contributed to that removal service by people
23   who call the opt-out number or by the customer that can
24   either upload those numbers or provide them via -- they
25   could call the number, actually, as well.  Anyone can

Comprehensive Health Care Systems                30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                              April 20, 2017

Page 17

 1   call the number.

 2        Q.   (BY MR. COHEN)  I understand, then, that the

 3   customer has the option of uploading names or numbers

 4   to the removal list or calling in just like a recipient

 5   could.  Does an actual past recipient of a West -- of a

 6   fax through the WestFax broadcasting service -- can the

 7   recipient add themselves to the removal list through

 8   any way other than calling in the opt out?

 9        A.   No.

10        Q.   This opt-out service, this removal service,

11   where is it located?  How is it handled?

12        A.   I don't understand your question.

13        Q.   Do WestFax employees administer and process

14   and handle all aspects of the removal service?

15        A.   I don't know what that means.

16        Q.   A recipient calls the removal service.  What

17   number do they call?

18        A.   They call a number provided to them by

19   WestFax.

20        Q.   Are there multiple numbers provided by WestFax

21   to fax recipients to call for the removal service?

22        A.   Yes.

23        Q.   How many different numbers?

24        A.   I don't know.

25        Q.   What makes you think there's more than one?

Comprehensive Health Care Systems                30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                            April 20, 2017

Page 18

     1        A.    Because we have more than one customer that

     2    use the service.

     3        Q.    **You have a different removal number for each**

     4    **customer?**

     5        A.    Yes.

     6        Q.    **When a person, a recipient of a fax, calls one**

     7    **of the WestFax removal-service numbers, who is going to**

     8    **answer the phone?**

     9        A.    It's an automated system.

    10        Q.    **Did WestFax create the automated system?**

    11        A.    Yes.

    12        Q.    **Is the automated system kept on site at**

    13    **WestFax?**

    14        A.    No.

    15        Q.    **Where is it located?**

    16        A.    Proprietary location.

    17        Q.    **Why is the location of the removal service**

    18    **proprietary?**

    19              MR. HAYES:  Objection.  That's a -- calls for

    20    a legal conclusion.  Mr. Clark's not a lawyer.

    21              MR. COHEN:  Well, to whatever extent the local

    22    rules may require certification of questions, we'll

    23    certify that question.

    24        Q.    **(BY MR. COHEN)  I assume you would be able to**

    25    **tell me the location if the judge ordered you to?**

Comprehensive Health Care Systems                30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                               April 20, 2017

Page 19

 1              MR. HAYES:  Object -- same objection.

 2              MR. COHEN:  Are you instructing him not to

 3      answer?

 4              MR. HAYES:  Yes.

 5              MR. COHEN:  On what grounds?

 6              MR. HAYES:  WestFax has a very simple policy

 7      that it doesn't discuss or answer any questions

 8      regarding its proprietary software or property.

 9              MR. COHEN:  The location of a structure or

10      the --

11              MR. HAYES:  I don't want to argue with you,

12      Dan.  You -- you understand my explanation.  That's

13      what it is.  If you want to take it up with the court,

14      you go right ahead.

15              MR. COHEN:  You understand we'll have to seek

16      sanctions?

17              MR. HAYES:  Dan, I don't -- you don't have to

18      negotiate with me.

19              MR. COHEN:  I'm not negotiating.  I'm making

20      certain that the judge understands I made it fully

21      clear to you and your client --

22              MR. HAYES:  You did.

23              MR. COHEN:  -- what you are facing.

24              MR. HAYES:  You did.

25              MR. COHEN:  Okay.

Page 20

```
 1        Q.    (BY MR. COHEN)  Does anyone work -- anyone
 2   employed by WestFax work at this location where the
 3   automated removal service is -- is located?
 4        A.    I'm not interested in answering that question.
 5   That's -- that discloses information about the
 6   proprietary nature of our system that I think is not
 7   appropriate.
 8             MR. COHEN:  We'll go a little bit further, and
 9   then we'll just adjourn so we can get an order.
10             MR. HAYES:  Dan, do whatever you want.
11             THE DEPONENT:  Do you want to adjourn right
12   now?  Save us all a bunch of time?
13             MR. COHEN:  No.  I want to give the judge a
14   little bit more time to watch you.
15             THE DEPONENT:  Okay.
16        Q.    (BY MR. COHEN)  Subpoena rider topic 1, "Any
17   and all agreements entered into by M3 USA Corp.,
18   MDLinx, Inc. or any of its officers, agents or
19   representatives, including but not limited to Craig
20   Overpeck, Jessica McCann, and/or Aki Tomaru, at any
21   time with WestFax, Inc., known as WestFax."
22             Are there any agreements entered into that are
23   subject to the description in subpoena rider paragraph
24   1?
25        A.    No.
```

Comprehensive Health Care Systems                    30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                              April 20, 2017

Page 21

1      Q.   Were there ever any agreements that would have

2   fallen within that description?

3      A.   I don't have a clear understanding of your

4   question.

5      Q.   Well, I asked the first time, are there any,

6   and you said no.  That presupposes the possibility

7   there could have been such agreements in the past, but

8   they are no longer in existence.

9      A.   Can you restate the question?

10     Q.   Were there ever, at any point in the past, any

11  agreements such as described in paragraph 1?

12     A.   Not that I know of.

13     Q.   Does WestFax enter into agreements with its

14  customers at any times?

15     A.   We do enter into agreements with our

16  customers, yes.

17     Q.   Is there a reason why WestFax wouldn't have

18  entered into an agreement with M3 or MDLinx for the

19  service that WestFax provided to them when it does

20  enter into agreements with others?

21     A.   I don't understand what you're asking me.

22     Q.   Well, I asked you if you had an agreement of

23  the type described in paragraph 1 with --

24     A.   Okay.  Let me restate my answer.  I don't

25  know, and I don't understand your question.

Comprehensive Health Care Systems                    30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                               April 20, 2017

Page 22

```
1        Q.    Well, as long as you don't understand my
2   question, then I'll have to rephrase it to make certain
3   that I can rely on the answer I get.
4        A.    Thank you.
5              Can you please restate the question?
6        Q.    Yes.  I'm taking a look at your --
7              MR. HAYES:  You need to read your answer.
8        Q.    (BY MR. COHEN)  -- answer to the subpoena
9   rider.  Your answer, which is Exhibit 2 to paragraph 1
10  of the subpoena rider, reads, "None - each time the
11  customer sent in a fax broadcast order, it received a,
12  quote, bounce back, closed quote, e-mail from WestFax
13  thanking the customer for the order and confirming with
14  the customer that by sending in the order, the customer
15  agrees to the terms and conditions on WestFax's
16  website."
17             Did I read that correctly?
18        A.    Yes.  I understand what my answer was; I
19  didn't understand your question.  It's very simple if
20  you could just restate the question.
21        Q.    Oh, I'm going to.
22        A.    Thank you.
23        Q.    Other than what's described in your answer to
24  paragraph 1 of the subpoena rider, has WestFax, with
25  any of its customers at any time in the past, had
```

Comprehensive Health Care Systems          30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                        April 20, 2017

Page 23

1    **actual agreements relating to the faxing services**

2    **beyond what's described in paragraph Number 1 answer to**

3    **the rider?**

4          A.    Yes.  Our customers agree to our terms and

5    conditions when they become a WestFax customer.

6          Q.    **Is that memorialized anywhere?**

7          A.    In some cases it is.

8          Q.    **And when it is, how is it?**

9          A.    Via a signed agreement.

10         Q.    **Is there any reason why WestFax did not have**

11   **such a signed agreement with M3 or MDLinx of the type**

12   **you've indicated WestFax has had at times in the past**

13   **with other customers?**

14               MR. POELL:  Objection.  Form.

15         A.    Now the nature of our business has changed in

16   such that the -- sometimes our customers agree to our

17   terms and conditions by checking a box or receiving a

18   bounce-back e-mail, sometimes they sign an agreement.

19   It -- it just depends on the nature of the situation.

20         Q.    **(BY MR. COHEN)  Well, I understand that**

21   **WestFax does other things than just fax broadcasting.**

22   **And I'm not, at this time, asking you about anything**

23   **beyond fax broadcasting.  So I just want to make**

24   **certain that's not creeping in.**

25               **Narrowed to fax broadcasting, under what**

Comprehensive Health Care Systems                30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                       April 20, 2017

Page 24

1   circumstances would WestFax want a signed written

2   contract as opposed to just checking a box for other

3   customers?

4        A.   There's no specific circumstances.  It's an

5   operational procedure.

6        Q.   Who establishes the operational procedure?

7        A.   I do.

8        Q.   Under the operational procedure you've

9   established, what are the circumstances or why does one

10  customer end up having to sign an agreement where

11  another just checks a box?

12       A.   There's no rhyme or reason to that.

13       Q.   Paragraph Number 2 of the subpoena rider, it

14  says, "Any and all invoices provided to M3, MDLinx,

15  Overpeck, McCann, and/or Tomaru by WestFax or any

16  affiliated or related company from June 10, 2012 to the

17  present."

18            Your answer -- notarized answer, Exhibit 2,

19  says, "WestFax sends its customers invoices for

20  services rendered.  The customer may have such

21  invoices.  The invoices WestFax has for the fax

22  broadcast orders it transmitted for the customer are

23  attached."

24            Did I read all that correctly?

25       A.   Yes.

Comprehensive Health Care Systems                30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                              April 20, 2017

Page 25

1      Q.    Does WestFax maintain a database that retains

2   all invoices for all customers?

3      A.    We do.  We don't have all invoices for all

4   customers, just because of storage, but we do have a

5   database that contains invoices for customers.

6      Q.    I assume -- well, I don't want to assume.

7   Does your system have a protocol by which older data is

8   overwritten when there's no room?

9      A.    No.

10     Q.    Does your system have a protocol by which data

11  is deleted even when it's not necessary at that moment

12  to preserve space?

13     A.    No.

14     Q.    How and why does your system delete data?

15     A.    If we need space, we delete data.

16     Q.    I thought that was the first of the options I

17  had given.  So data is only deleted off of your

18  database when there's otherwise not enough space?

19     A.    Yes.

20     Q.    Does your system do that automatically?

21     A.    No.

22     Q.    Who makes the decision or has decision-making

23  authority to approve deleting data to make room?

24     A.    Me.

25     Q.    Does anybody else?

Comprehensive Health Care Systems                30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                          April 20, 2017

Page 26

1    A.    No.

2    Q.    **Who actually accomplishes the -- the deletion?**

3    A.    One of our tech people or I do.

4    Q.    **How many tech people do you have?**

5    A.    It's proprietary.

6    Q.    **Are they employees or are they outside**

7    **contractors?**

8    A.    Both.

9    Q.    **I just want to -- I understand, but I need the**

10   **record to be clear.  You're refusing to provide the**

11   **numbers of the contract or employed tech people for**

12   **your company?**

13   A.    Yes.

14   Q.    **And I assume if you're not willing to provide**

15   **the number, you're certainly not willing to tell me**

16   **their names?**

17   A.    That's true.

18   Q.    **I've read some of your old depositions.  It's**

19   **my recollection you said that you did participate in**

20   **the actual creation and development of the proprietary**

21   **software program's technology that is the WestFax**

22   **service, correct?**

23         MR. COHEN:  Objection.  Foundation, form.

24   A.    I'm not a programmer, but I was involved in

25   the process.

Comprehensive Health Care Systems                30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                              April 20, 2017

Page 27

1        Q.    (BY MR. COHEN)  How long ago -- and first of

2    all, I assume any program software's improved over

3    time.  Would -- would you agree your software has

4    improved over time?

5               MR. POELL:  Objection.  Foundation, form.

6        A.    There hasn't been substantial improvement in

7    our software over time.

8        Q.    (BY MR. COHEN)  How long ago --

9    approximately -- not an exact date -- how long ago was

10   it that your proprietary technology software was

11   finished and in use?

12       A.    I don't remember.  A long time ago.

13       Q.    **What other people, whether employed by WestFax**

14   **or employed by you or independent contractors, had any**

15   **role in the development of the proprietary technology**

16   **and software?**

17       A.    It's proprietary.

18       Q.    **And you're refusing to provide that**

19   **information?**

20       A.    Yes.

21               Just to make sure I clearly understand your

22   question.  You're asking me who wrote our software or

23   who was involved in developing our software?

24       Q.    **Yes.**

25       A.    No.  That's not a question that is relevant,

Comprehensive Health Care Systems                    30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                                    April 20, 2017

Page 28

 1   and I'm not going to answer.

 2       **Q.   We can disagree about its relevance, and for**

 3   **now, you can refuse to answer.**

 4           **If you are the person who makes the decision**

 5   **for WestFax about when to delete data to make room on**

 6   **the server or in the program, after you've made a**

 7   **decision that data needs to be deleted to make room,**

 8   **who decides what data will be deleted?**

 9           MR. POELL:  Objection; form.  Objection;

10   confusing.

11           MR. HAYES:  Dan, I'm going to object as well.

12   The -- unless you tie this to this lawsuit, I don't see

13   how any of this is even relevant.  So I'm going to

14   instruct Mr. Clark not to answer any questions that

15   aren't at least remotely related to the lawsuit.  Just

16   the general things of how he does -- does things, I

17   just don't see any relevance to the lawsuit.

18           MR. COHEN:  Well, I'll disagree with you, and

19   we'll take that up with the judge.  But I'm not going

20   to argue with you either.

21       **Q.   (BY MR. COHEN)  Mr. Clark, can you swear on**

22   **personal knowledge to the court and the jury that**

23   **WestFax has in its database and has produced to us in**

24   **this case every single invoice or anything else that**

25   **ever existed in its database related to any fax**

Comprehensive Health Care Systems             30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                              April 20, 2017

Page 29

1    **services provided for M3 or MDLinx?**

2        A.    I've already answered the questions to the

3    subpoena.

4        Q.    **That wasn't my question.**

5              MR. COHEN:  I'll move to strike that.

6        Q.    **(BY MR. COHEN)  You can answer.**

7        A.    Okay.  Can you restate the question?

8              MR. COHEN:  Can you read it back to him,

9    please.

10             THE REPORTER:  Sure.

11             Question:  Mr. Clark, can you swear on

12   personal knowledge to the court and the jury that

13   WestFax has in its database and has produced to us in

14   this case every single invoice or anything else that

15   ever existed in its database related to any fax

16   services provided for M3 or MDLinx?

17       A.    I don't understand the question.

18       Q.    **(BY MR. COHEN)  To the extent your system or**

19   **any aspect of your system receives any information**

20   **regarding M3 or MDLinx or creates any information**

21   **regarding M3 or MDLinx, can you testify on personal**

22   **knowledge that all such information and data is still**

23   **in your system and none of it has been deleted?**

24       A.    No.

25             MR. COHEN:  That's why I want to know what his

Comprehensive Health Care Systems        30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                      April 20, 2017

Page 30

 1    protocols are for how things are deleted and when

 2    they're deleted.  So I will ask again, giving you an

 3    opportunity, if you choose to, to make the same

 4    objection.

 5         **Q.   (BY MR. COHEN)  When you've made the decision**

 6    **that you tell me only you and your company make to**

 7    **delete data from your system to make room for new data,**

 8    **who makes the decision of what existing data is going**

 9    **to be deleted?**

10         A.   You've only asked me questions relative to

11    invoices.  So are you asking me questions about other

12    data as well?

13         **Q.    I'm -- my question is as it stands.  My**

14    **question wasn't limited to invoices.**

15              MR. HAYES:  Again --

16         A.   Your previous question was, but --

17              MR. HAYES:  Just a sec.

18              THE DEPONENT:  Okay.  Sorry.

19              MR. HAYES:  Again, Dan, my objection is, is

20    that to ask a general question about deletion that

21    isn't related to the lawsuit or the customer or the

22    faxes or the information that may have been for the

23    customer, I just don't see how that's relevant, and so

24    I'm going to ask Mr. Clark not to answer that.

25         **Q.   (BY MR. COHEN)  And I assume you're going to**

Comprehensive Health Care Systems      30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.      April 20, 2017

Page 31

1    follow your attorney's instruction?

2       A.   Yes.

3       Q.   We will narrow it, then, to my original

4    question, which you pointed out my later question was

5    broader.

6         Are you able to testify on personal

7    knowledge --

8       A.   I don't agree to what you said.  I don't

9    understand what you said or agree.  But go ahead.

10       MR. HAYES:  That's fine.

11       A.   Yeah.

12       Q.   (BY MR. COHEN)  Are you able to testify on

13    personal knowledge that all invoices created by the

14    WestFax system relating to M3 or MDLinx is still

15    preserved in the system and none of it has been

16    deleted?

17       MR. POELL:  Objection.  Compound, form.

18       A.   I don't know.

19       Q.   (BY MR. COHEN)  Paragraph Number 3 seeks, "Any

20    and all receipts provided to M3, MDLinx, Overpeck,

21    McCann, and/or Tomaru by WestFax or any affiliated or

22    related company from June 10, 2012 to the present."

23    And your sworn answer on Exhibit 2 was "none."  WestFax

24    doesn't issue receipts at all?

25       A.   No.

Comprehensive Health Care Systems          30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                        April 20, 2017

Page 32

 1      Q.    Is WestFax paid by its customer for the fax

 2   services it provides before it does them or after?

 3      A.    Both.

 4      Q.    What about with M3 and MDLinx; how was that

 5   handled?

 6      A.    I don't remember.

 7      Q.    If the invoices that we have obtained from

 8   WestFax from the subpoena compliance show invoice, a

 9   job, a date, and it says "terms net 30," would that --

10   at least as to each invoice that says that, would that

11   be a good indication that WestFax billed M3 or MDLinx

12   after the fax broadcast?

13           MR. POELL:  I'm going to object on form and

14   foundation.

15      A.    That's a general data field that is sometimes

16   maintained, sometimes not.  So I would not make the

17   correlation that if it says "net 30" that they paid

18   after.

19      Q.    (BY MR. COHEN)  It doesn't tell us one way or

20   another?

21      A.    I just answered the question.

22           So are you asking a different question?

23      Q.    I'm saying, we can't infer one way or the

24   other, correct?

25      A.    Correct.

Comprehensive Health Care Systems                    30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                                     April 20, 2017

Page 33

1        Q.    It -- it doesn't tell us either way.   Thank

2    you.

3              Number 4 on Exhibit 1, subpoena rider, "Any

4    and all reports provided to M3, MDLinx, Overpeck,

5    McCann, and/or Tomaru by WestFax or any affiliated or

6    related company from June 10, 2012 to the present."

7              And your answer at Exhibit Number 2 is, "The

8    customer did not request any reports."  Correct?

9        A.    Yes.

10       Q.    What kind of reports can WestFax offer to

11   customers that the customer in this case could have

12   requested but didn't?

13             MR. POELL:  I'm going to object to vagueness,

14   meaning the report.  Foundation.

15       A.    We can give them any kind of report they want.

16   There are several different options, and we can

17   customize their report as well or we can give them no

18   report if they don't want them.

19       Q.    (BY MR. COHEN)  Does WestFax -- strike that.

20             Does WestFax's technology and system allow it

21   not only to recognize out of a total population of

22   facsimile transmissions how many were successfully sent

23   and how many failed, but also to identify the specific

24   numbers that succeeded and the specific numbers that

25   failed?

Comprehensive Health Care Systems          30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                    April 20, 2017

Page 34

1              MR. POELL:  Objection; form.  Objection;

2      leading.

3         A.   Are you asking me if we have a way to

4      determine which faxes were successful and which were

5      not?

6         Q.   (BY MR. COHEN)  Yes.

7         A.   Yes.

8         Q.   **And I just wanted to make sure your answer is**

9      **as specific as my intended question has been.  You can**

10     **tell which ones were successful by phone number,**

11     **correct?**

12             MR. POELL:  Objection.  Form.

13        A.   Yes, we can.  However, sometimes numbers are

14     reported, sometimes numbers are forwarded, sometimes

15     faxes are received by somebody other than the intended

16     recipient.  So my testimony is that we don't know who

17     the exact recipient is based on that report.  We just

18     know that the attempt that we made to a specific number

19     was successful.

20             It's really important to note that in this

21     case and in all cases, there's no specific way of

22     knowing whether the fax was actually received by our

23     system or who received it.

24        Q.   **(BY MR. COHEN)  Received by your system?**

25        A.   No.  By the recipient.

Comprehensive Health Care Systems          30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                        April 20, 2017

Page 35

 1        Q.    I wanted to make certain I understood what you

 2   were saying.  I appreciate your clarification.

 3             MR. COHEN:  And I move to strike as

 4   nonresponsive.

 5             MR. POELL:  I will object to the request to

 6   strike.

 7             THE DEPONENT:  Nonresponsive?  I don't

 8   understand.

 9             MR. HAYES:  You -- you don't have to.

10             THE DEPONENT:  Okay.  All right.

11        Q.    (BY MR. COHEN)  If a customer indicated to

12   WestFax, prior to a particular broadcast for that

13   customer, that the customer wanted a report after the

14   broadcast of how many transmissions were attempted, how

15   many were successful, how many failed -- and for the

16   successful, the actual phone numbers that were

17   successful -- would you be able -- would WestFax be

18   able to provide such a report?

19        A.    I'm a little unclear as to your question, but

20   I think yes.

21        Q.    If a customer didn't ask for that kind of

22   detailed information and they get their invoice and

23   they pay it and at some point after the fact, they

24   decide they'd like to see that kind of information, is

25   there some period of time after the broadcast that that

Page 36

 1    information is likely or certain to remain in WestFax's

 2    system retrievable to provide the customer with that

 3    information?

 4              MR. POELL:  Objection; form.  Objection;

 5    compound.

 6        A.    When you say "that information," I don't know,

 7    specifically, what you're -- can you be a little bit

 8    more specific?

 9        Q.    (BY MR. COHEN)  Sure.  If a customer did not

10    request the information of the type we've been

11    discussing, which is that WestFax's system can identify

12    how many faxes were attempted, how many succeeded, how

13    many failed, and as to the ones that succeeded, exactly

14    which phone numbers those were, if the customer did not

15    ask for a report before the broadcast went out that

16    contained that information, but then at some point

17    after the broadcast went out, after they got the

18    invoice, after they paid it, the customer decided that

19    would be some useful information they'd like to see,

20    and they came back to WestFax and said, "Hey, as to

21    that broadcast you did for us in the past, can you get

22    us that information -- the attempts, the successful,

23    the fails, and as to the successfuls, the phone numbers

24    for the successfuls -- is there some period of time

25    after the broadcast when that information would remain

Page 37

1    in WestFax's system retrievable so that the customer

2    could get it?

3              MR. POELL:  Objection; form.  Objection;

4    compound.

5        A.   I don't believe there is.

6        Q.   (BY MR. COHEN)  And only because of the way I

7    phrased the question -- I said is there some period of

8    time after the broadcast where the customer could ask

9    for that and you could still get it, and you said you

10   don't believe there is.  As you understand it, if the

11   customer didn't request it beforehand, it's never

12   recorded at all, so it's never available after the

13   broadcast?

14       A.   I'm straining to understand the nature of your

15   question.  But if you're asking me if we can recreate a

16   report after a period of time has elapsed, then I don't

17   believe that we can.

18       Q.   And I appreciate that.  I wasn't asking if you

19   can quote, unquote, "recreate a report."  I was wanting

20   to know if the electronic data that would have

21   generated a report of successfuls versus unsuccessfuls

22   with correlating phone numbers to each, if the

23   electronic data containing that information that was

24   not put into a report for the customer right at the

25   time of the broadcast remained in the system for any

Comprehensive Health Care Systems          30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                    April 20, 2017

Page 38

1    **period of time where it could then be captured if the**

2    **customer wanted it later.**

3            MR. POELL:  Objection; foundation.  Objection;

4    form.

5        A.   I don't believe so.

6        **Q.   (BY MR. COHEN)  Not for any period of time?**

7        A.   I don't believe so.

8        **Q.   What is the basis for your belief in that**

9    **regard?**

10       A.   Several items specifically relating the raw

11   data to that specific broadcast, that's the most

12   problematic.  But there are several other issues that

13   don't come to mind.  But that's the most significant.

14       **Q.   On some invoices that you have produced for**

15   **the M3, MDLinx broadcasts, it indicates -- and we'll be**

16   **-- we'll look at some, but I'm trying to make sure I**

17   **understand some general concepts.  It indicates a**

18   **number of faxes and an amount to be paid for that**

19   **number of faxes.  And I ask you because I assume you**

20   **know how your invoices are laid out and what they're**

21   **supposed to mean.  The number of faxes for a specific**

22   **invoice sent to a customer after the broadcast, is that**

23   **the number of successfuls or is that the total number**

24   **tried?**

25            MR. POELL:  Objection.  Foundation.  We

Comprehensive Health Care Systems          30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                       April 20, 2017

Page 39

 1    haven't had any testimony about the contents of the

 2    invoices.

 3       A.    That is the number of faxes that we've

 4    received a response from the recipients's fax machine

 5    that would indicate that the fax was received by the

 6    recipient's fax machine.

 7            Very important to note that that has no

 8    relevancy as to whether or not the fax was actually

 9    received by the intended recipient.

10       Q.    **(BY MR. COHEN)   Thank you.**

11            MR. COHEN:  I'll move to strike everything

12    starting with "very important to note" as

13    nonresponsive.

14            MR. POELL:  I will object to the request to

15    strike the testimony.

16       Q.    **(BY MR. COHEN)   With regard to paragraph 4 of**

17    **the subpoena rider and your answer in Exhibit Number 2,**

18    **"The customer did not request any reports" --**

19       A.    When you say "paragraph 4," do you mean

20    Question Number 4?

21       Q.    **Yes.**

22       A.    Okay.

23       Q.    **And your corresponding answer on Exhibit 2**

24    **where you say, "The customer did not request any**

25    **reports," does WestFax have any documentation of any**

Page 40

1    sort that in any way reflects what M3 or MDLinx did or

2    did not request in terms of reports?

3         A.    Not to my knowledge.

4         Q.    What is your basis for saying the customer did

5    not request any reports?

6         A.    I don't remember, specifically, this -- when I

7    -- when we did the research on this, it was several

8    months ago, so I don't remember, specifically, how we

9    came to that conclusion.

10        Q.    And I appreciate that.  When you gave your

11   answer just now, you said "when we did the research."

12   And I understand we're taking your deposition as a

13   corporate designee, you speak for the company on its

14   behalf -- WestFax, I mean.  But when you said "we did

15   the research," who participated in any of the search or

16   investigation to attempt to comply with the subpoena

17   rider or answer these subpoena questions?

18        A.    Myself and my counsel.

19        Q.    Mr. Hayes?

20        A.    Yes.

21        Q.    Anyone else from within your company?

22        A.    Not aware of anyone, but there may have been

23   some other people that helped.

24        Q.    We were talking earlier about whether it would

25   be possible for WestFax to go into its system and

Comprehensive Health Care Systems          30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                         April 20, 2017

Page 41

1   retrieve data for a past broadcast in terms of

2   successfuls versus unsuccessfuls and the numbers

3   corresponding, and you indicated you did not believe

4   that could be done.  And you gave me -- among other

5   reasons, you said you couldn't think of it at the

6   moment.  But one thing you said was relating to raw

7   data to a specific broadcast, you didn't think it could

8   be done.

9          Have you ever attempted or, to your knowledge,

10  has anyone attempted to try to do that, to correlate

11  raw data to a specific past broadcast and the data that

12  is kept on WestFax's server?

13         MR. POELL:  I'm going to object just to the

14  extent that the first part of the question

15  misrepresents any part the witness's prior testimony.

16     A.   Can you restate the question?

17     Q.   (BY MR. COHEN)  Have you or, to your

18  knowledge, has anyone else ever attempted, after the

19  fact, after a broadcast, to go back into the data in

20  your system to attempt to relate or correlate raw data

21  to a specific broadcast in the past?

22     A.   There's -- there would be no -- there are no

23  data fields that would present that opportunity, to the

24  best of my knowledge.

25     Q.   And that sounds more like an explanation why

Comprehensive Health Care Systems                30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                              April 20, 2017

Page 42

 1    you wouldn't even try.  But my question was, to your

 2    knowledge, have you or anyone else ever even attempted

 3    to do so to see if it was possible?

 4         A.   No.

 5         Q.   Subpoena rider paragraph Number 5 says, "Any

 6    and all e-mail correspondence, including but not

 7    limited to any and all attachments, between M3, MDLinx,

 8    Overpeck, McCann, Tomaru, or any other employee or

 9    agent of M3 or MDLinx and WestFax or any affiliated or

10    related company from June 10, 2012 to the present."

11              And your answer was "none."  Am I correct that

12    was your answer?

13         A.   Yes.

14              MR. HAYES:  Dan, what is the purpose of

15    re-asking all the questions he's already answered under

16    oath?

17              MR. COHEN:  Because then I'm going to have

18    follow-up questions, and it serves to set the context.

19              MR. HAYES:  Again, to move things along,

20    perhaps we could stipulate that the answers are the

21    responses to the subpoena rider, and you could just go

22    on with your follow-up questions.

23              MR. COHEN:  Sure, as long as defense counsel

24    stipulates that when we're presenting this to the jury,

25    we can stop the videotape and we can read to the jury

Comprehensive Health Care Systems                30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                          April 20, 2017

Page 43

1    the subpoena rider question and then we can read to the

2    jury the subpoena answer, and then we can turn the

3    videotape back on.

4          MR. POELL:  Reserving my right to object in

5    the future, for purposes of moving the deposition

6    along, at this point, I'm fine with that arrangement.

7          MR. COHEN:  I don't understand what it means

8    to say "reserving my right to object in the future."

9          MR. POELL:  Well, I mean, you're stipulating

10   something on your terms right now during the

11   deposition.  I'm not going to agree to something on the

12   record that's going to be binding on me later in the

13   litigation.

14         MR. COHEN:  That's the nature of a

15   stipulation.

16         So we don't have a stipulation, so I'm afraid

17   we won't be able to do that, Mr. Hayes.

18      **Q.   (BY MR. COHEN)  I'll represent to you, sir,**

19   **that we have received e-mail communications between**

20   **persons in your company, WestFax, and people with M3**

21   **and MDLinx pertaining to fax broadcasts.  So -- and I'm**

22   **only asking you to assume that for the sake of telling**

23   **you there was e-mail communication between your company**

24   **and M3 and MDLinx.  Why would -- why would WestFax no**

25   **longer have e-mail correspondence between itself and**

Page 44

1    its customers if there was e-mail correspondence?

2          MR. POELL:  Objection; foundation.  Objection;

3    argumentative.

4       A.   There's no utility to that information for us

5    or for our customer.

6       Q.   (BY MR. COHEN)  Well, if you had a dispute

7    with a customer in the future about what was or wasn't

8    authorized or what was or wasn't agreed, and there were

9    e-mails about it, it would be helpful to have that kind

10   of information to explain and justify WestFax's conduct

11   vis-a-vis its customer, wouldn't it?

12         MR. POELL:  Objection.  Form.

13      A.   No.

14      Q.   (BY MR. COHEN)  So what process does WestFax

15   use or follow or protocol followed to delete e-mail

16   communications it has with its customers?

17         MR. POELL:  Objection.  Foundation.

18      A.   We -- there's no utility to saving those

19   e-mails.  If the customer wants a report, the report

20   provides the necessary information.

21      Q.   (BY MR. COHEN)  I understand that's why you

22   don't save them.  But e-mails don't just disappear on

23   their own; somebody has to delete them.  So what is the

24   protocol for how and when e-mails with a customer are

25   deleted?

Comprehensive Health Care Systems                30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                              April 20, 2017

Page 45

 1        A.    As soon as the order is processed, we delete

 2    the e-mail.

 3        Q.    **Even before the broadcast actually issues?**

 4        A.    Yes.

 5        Q.    **Is that by some kind of automatic setting in**

 6    **your company's e-mail system or is that a protocol that**

 7    **each person who works for WestFax knows they are to do**

 8    **as to all such e-mails?**

 9        A.    It's a manual protocol.

10        Q.    **Meaning each person has to do it each time?**

11        A.    I wouldn't put it that way.  I would say, as

12    I've answered the question, it's a manual protocol.

13        Q.    **Well, help those of us who aren't as tech**

14    **savvy.  As you understand, what does that mean, to**

15    **describe it as a quote, unquote, "manual protocol"?**

16        A.    They are deleted by the person who processes

17    the order.

18        Q.    **What function -- and I'm looking for more than**

19    **just process the order, because I want to know what**

20    **"processes the order" means, and I want to know if**

21    **other WestFax personnel have any role in an order.**

22              **The person in WestFax who processes the order,**

23    **exactly what do they do?  What is their function and**

24    **how do they do it?**

25        A.    That's proprietary.  I refuse to answer the

Comprehensive Health Care Systems          30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                        April 20, 2017

Page 46

 1    question.

 2        Q.   Other than the person -- and we'll take that

 3    up with the judge -- but other than the person at

 4    WestFax who processes the order that we just talked

 5    about and you didn't want to give me detail about,

 6    other than that person, does anybody else at WestFax

 7    have any role or responsibility with regard to a

 8    particular customer's specific broadcast or -- or,

 9    alternatively, is that one person who quote, unquote,

10    "processes it," do they do it all?  Are they

11    responsible for all of it?

12            MR. POELL:  Objection.  Compound.

13        A.   I'm struggling to understand your question.  I

14    don't understand what you're getting at.

15        Q.   (BY MR. COHEN)  Well, a customer deals with

16    WestFax to obtain, in the end, a fax broadcast

17    utilizing WestFax's fax broadcasting services.  And at

18    some point in the process of accomplishing the end goal

19    of getting the fax broadcast to issue, there's this

20    person who processes it, the person you don't want to

21    tell me what they do.  I'm saying take them out of the

22    equation.  Does anybody else from WestFax have any role

23    or participation in bringing about the end result, the

24    actual fax broadcast, other than that one person who

25    quote, unquote, "processes it," that you don't want to

Page 47

```
 1    tell me about?

 2           MR. POELL:  Objection; form.  Objection;

 3    argumentative.

 4      A.    I don't understand what you're getting at.  I

 5    don't know.  The answer is I don't know.

 6      Q.    (BY MR. COHEN)  Okay.  Is there only one

 7    person who handles each customer's broadcast?

 8      A.    No.  There may be several people.

 9      Q.    Would all of them -- assuming it's a

10    situation -- I know it's not always several, but

11    assuming we have a situation like where it's several

12    people participating in the handling of a customer's

13    broadcast, would all of them be doing the processing

14    that you told me is proprietary and you wouldn't

15    discuss?

16      A.    They can do various things.  They can provide

17    information about billing.  There are several different

18    roles in providing service to our customers.

19      Q.    Have any of your current or former employees,

20    to your knowledge, ever been deposed in any TCPA case?

21      A.    Not to my knowledge.

22           MR. HAYES:  Do you want some water?

23           THE DEPONENT:  I'm okay.  Thank you.

24      Q.    (BY MR. COHEN)  Early in the deposition, we

25    had been talking about the way in which a customer of
```

Comprehensive Health Care Systems                30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                              April 20, 2017

Page 48

1    **WestFax can deliver to WestFax a list, and we talked**

2    **about the formats that would be necessary to interface**

3    **with WestFax's system.  And you said, "All of them."**

4    **Can WestFax's proprietary technology successfully**

5    **interface with merely a PDF?**

6               MR. POELL:  Objection.  Vague.

7         A.    What do you mean interface with a PDF?

8         Q.    (BY MR. COHEN)  Well, we didn't have questions

9    about what I meant by that word earlier, but I'll try

10   to be more clear.  Can a customer, either by e-mail,

11   using the upload of WestFax's portal, or sending by

12   U.S. mail on CD-ROM a list of desired fax recipients,

13   can that list be in PDF form?  In whichever of those

14   three ways it's delivered to Westfax, can Westfax's

15   proprietary technology utilize and extract from that

16   PDF list a usable list that can function within

17   WestFax's proprietary technology to accomplish that fax

18   broadcast?

19              MR. POELL:  I'm going to say objection to

20   form.

21        A.    No.  PDF is not a database format.

22              (Deposition Exhibit 3 was marked.)

23              THE DEPONENT:  There's no Bates stamp on this

24   one (indicating).  I don't know what this is.

25              MR. HAYES:  It's another -- apparently, Dan is

Comprehensive Health Care Systems          30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                  April 20, 2017

Page 49

 1   giving you some documents he's going to ask you

 2   questions about.

 3            THE DEPONENT:  Okay.  That one is not stamped.

 4            MR. HAYES:  I think the stamp is on the first

 5   one, and this is a continuation of that.

 6            THE DEPONENT:  We have that one stamped.

 7            MR. HAYES:  Oh, I gave you the wrong one.

 8            Okay.

 9            (Deposition Exhibits 3 through 17 were

10   marked.)

11       **Q.   (BY MR. COHEN)  Mr. Clark, I've passed down to**

12   **you, with the assistance with other counsel at the**

13   **table, what I've marked as Exhibits 3 through 17.**

14            MR. COHEN:  And for the record, I've also

15   given both other counsel copies.

16       **Q.   (BY MR. COHEN)  Exhibit Number 3 is a**

17   **three-page document.  And I'd like to draw your**

18   **attention first to the second page of Exhibit Number 3.**

19   **Does this document appear to be an invoice in the**

20   **format that would be issued by WestFax for fax**

21   **broadcasting for a customer?**

22       A.   It was the format we used in 2015.

23       **Q.   And to the extent there's a date indicated of**

24   **October 29, 2015, would that correspond, to your**

25   **recollection, of when this was a format for your**

Comprehensive Health Care Systems          30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                        April 20, 2017

Page 50

 1    invoices?

 2         A.    Yes.

 3         Q.    Under "Account Number," there's 5725.  Can you

 4    tell us what that account number means, how it's come

 5    by, and what it designates?

 6         A.    That's the account number.

 7         Q.    For whom?

 8         A.    For MDLinx.

 9         Q.    And who gave MDLinx that account number?

10         A.    WestFax.

11         Q.    Is that an automatically-generated number?

12    When a first-time new customer comes, the system

13    decides in some sequential fashion what the next

14    customer's number will be, or does somebody actually

15    manually select that?

16              MR. POELL:  Objection.  Form, compound.

17         A.    The system selects the account number.

18         Q.    (BY MR. COHEN)  And in your experience, does

19    the same customer retain the same account number

20    throughout sequential fax broadcasting activities?

21         A.    I don't know what "sequential fax broadcasting

22    activities" are.

23         Q.    Well, MDLinx asks WestFax to utilize its

24    broadcasting services, pays for it; comes back two

25    weeks later, does it again; comes back a month later,

Comprehensive Health Care Systems                30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                            April 20, 2017

Page 51

1  does it again; comes back six months later, does it

2  again.  Will the account number that WestFax has given

3  to MDLinx the first time remain the same throughout?

4              MR. POELL:  Objection.  Form.

5       A.   Yes, unless they set up a different account.

6  So it can certainly change.

7       Q.   (BY MR. COHEN)  As we sit here today, do you

8  have any information or knowledge indicating that at

9  any time MDLinx changed its account number?

10      A.   I don't know.

11      Q.   Under the "Item Description," it's got two

12  fields.  What draws the distinction between those two

13  -- two fields?  Are they two different broadcasts?

14           What are -- what does it mean to have two

15  separate fields there under "Item Description"?

16      A.   I don't have a clear understanding what you

17  mean by "fields," but there are two distinct fax

18  broadcasts -- broadcasts listed on this invoice.

19      Q.   And so drawing your attention to the second

20  one further down the page, it says, "Broadcast fax per

21  page normal..."  For a layperson who has no idea about

22  faxing, in general, and certainly nothing -- no

23  knowledge about commercial fax broadcasting, what does

24  that language signify?

25      A.   It signifies that it's a normal resolution

Comprehensive Health Care Systems                30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                              April 20, 2017

Page 52

 1    quality versus fine, which is a higher resolution

 2    quality.

 3         Q.    And then the "MDLinx" after is simply an

 4    identifier of the customer?

 5         A.    Yes.

 6         Q.    The date -- because I'm looking at the date of

 7    the invoice and then back at the date of -- for this

 8    broadcast, and they are the same.  So is this -- is

 9    October 29, 2015, not only the date of the invoice but

10    also the date the broadcast actually issued?

11              MR. POELL:  Objection.  Form.

12         A.    The date indicated in the "Item Description"

13    category is the date the broadcast was completed, not

14    necessarily the date that all the recipients were

15    contacted.  The date next to account number and between

16    account number and invoice number is the date we issued

17    the invoice.

18         Q.    (BY MR. COHEN)  And I appreciate that

19    distinction.  To your knowledge, does the WestFax

20    system generate the invoice contemporaneous with

21    completing the broadcast so that the broadcast date

22    will be the same as the invoice date?

23         A.    No.  That's why I made the distinction.

24         Q.    So it's -- "coincidental" is the wrong word,

25    but the fact that the two dates on the second page of

Comprehensive Health Care Systems                    30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                                      April 20, 2017

Page 53

1   **Exhibit 3 are the same here doesn't mean they'll always**

2   **be the same, right?**

3            MR. POELL:  Objection.  Form.

4        A.   Again, the date of the invoice is the number

5   that -- is the date that is indicated between account

6   number and the invoice number.  The date indicated in

7   the "Item Description" is the date the broadcast

8   completed.

9        **Q.   (BY MR. COHEN)  In your experience, have there**

10  **been times when those two dates are actually identified**

11  **as different dates on the same invoice?**

12       A.   Yes.

13       **Q.   And I think we covered this, but just to make**

14  **certain we were understanding the same things without a**

15  **document in front of us, to the right of "Item**

16  **Description," the column "Quantity" for the second**

17  **broadcast shows 2,879, correct?**

18       A.   No.  It says 2,879.0.

19       **Q.   Numerically, is that a different number?**

20       A.   No.

21       **Q.   And am I correct just -- and if I'm wrong, you**

22  **correct me.  Based on a prior discussion, am I correct**

23  **that 2,879.0, as a quantity, is identifying the number**

24  **of what your system recorded as successful**

25  **transmissions on that broadcast?**

Comprehensive Health Care Systems          30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                          April 20, 2017

```
Page 54

 1              MR. POELL:  Objection.  Form.

 2       A.   That's the number where we received a tone

 3   from the recipient's fax machine indicating they had

 4   received the document.  As I've noted before, that

 5   doesn't indicate that the intended recipient received

 6   the fax.

 7       Q.   (BY MR. COHEN)  And I -- thank you.

 8              MR. COHEN:  I'll move to strike everything

 9   starting with "As I've noted before" as nonresponsive.

10              MR. POELL:  And I will object to the request

11   to strike the testimony of the witness.

12       Q.   (BY MR. COHEN)  You have mentioned on a couple

13   of occasions this idea of a tone.  Can you explain your

14   understanding, to the extent you're using that

15   reference to the tone that your system receives back

16   from the recipient's machine and that it records that,

17   what is the significance of that tone as your system

18   records it?

19              MR. POELL:  Objection; form.  Objection;

20   compound.

21       A.   What is the significance of the tone?  That is

22   an indication that the fax has been received by the

23   recipient's fax machine or fax server or fax process.

24       Q.   (BY MR. COHEN)  Under "Item Description,"

25   Exhibit 3, the second broadcast that we've been talking
```

Comprehensive Health Care Systems          30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                        April 20, 2017

Page 55

1    about, it says, "Billing Code R9170F40."  Does WestFax

2    generate the billing code for a particular broadcast?

3        A.   No.  It's provided by the customer.

4        Q.   If we go to the third page of Exhibit 3 -- and

5    this is a document, at the bottom, Bates labeled M3

6    USA005926.  I'm not asking you, sir, to authenticate

7    this, but I'll ask you does this appear to be an e-mail

8    chain between some people at WestFax and some people at

9    usa.m3?

10       A.   It's -- it appears to be that, but I can't

11   authenticate that it's legitimate.

12       Q.   At the very top of the page, the sender is

13   identified as Deanna Gasseling.  And Deanna is

14   D-e-a-n-n-a.  Gasseling is G-a-s-s-e-l-i-n-g.

15            And she's indicated at deanna@westfax.com.  Do

16   you know who Ms. Gasseling is?

17       A.   Yes.

18       Q.   As of the indicated date of this apparent

19   e-mail, October 29, 2015, was she employed by WestFax?

20       A.   Yes.

21       Q.   What was her title?

22       A.   Account manager.

23       Q.   As an account manager interacting --

24   apparently, according to what we see -- and I

25   understand you can't authenticate the e-mails --

Comprehensive Health Care Systems          30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                       April 20, 2017

Page 56

1    **interacting with what appears to be two people from**

2    **usa.m3 about a fax broadcast, would she be or have**

3    **been, at that time what she was doing there, the person**

4    **doing the processing of a broadcast that you said is**

5    **proprietary and you wouldn't go into the details of**

6    **exactly what they do?**

7              MR. POELL:  Objection; form.  Objection;

8    vague.

9         A.   She assists the customer in sending the order.

10        **Q.   (BY MR. COHEN)  Is that part of the processing**

11   **that was referenced earlier in the deposition?**

12        A.   It's exactly what I said it was.  They are

13   assisting the customer to send an order.

14        **Q.   Yes.  And I had asked you earlier what**

15   **processing involved, and you refused to tell me.  And**

16   **I'm asking you is what Ms. Gasseling is doing here part**

17   **of the processing?**

18             MR. HAYES:  Again, the processing as to how we

19   do it as opposed to what we did is proprietary.  So I

20   would instruct Mr. Clark not to answer questions that

21   say how West -- how WestFax does things.

22             MR. COHEN:  Well, I disagree with the

23   objection, but it doesn't even apply to my question.

24             MR. HAYES:  The objection still stands.  So

25   I've asked Mr. Clark not to ask that ques -- answer

Comprehensive Health Care Systems                30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                              April 20, 2017

Page 57

1    that question.

2              MR. COHEN:  We'll take all these up with the

3    judge.

4         Q.   (BY MR. COHEN)  So if we're looking at the

5    third page of Exhibit 3, this apparent e-mail

6    communication back and forth between Ms. Gasseling and

7    people at usa.m3, in the subject line, there is a

8    reference to PO number R9170F40.  Do you see that?

9         A.   Yes.

10        Q.   And in your experience, is that common when

11   your account managers are helping customers with a

12   broadcast, that the subject heading on an e-mail will

13   include the billing code designated by the customer?

14        A.   Not necessarily.

15        Q.   Have you seen it before?

16        A.   I don't know.

17        Q.   In this instance, the PO number R9170F40 shown

18   in the subject lines of the e-mails on the second page

19   of Exhibit 3 are the same as the second broadcast

20   billing code on the WestFax invoice, correct?

21        A.   Yes.

22        Q.   Did you ever have any involvement at all with

23   MDLinx or M3's business with WestFax?

24        A.   What does that even mean?

25        Q.   Did you communicate with anybody?  Did you

Comprehensive Health Care Systems                    30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                              April 20, 2017

Page 58

 1   participate in the processing of their broadcasts?

 2        A.    When you say "you," are you asking me as a

 3   representative of WestFax or was I personally involved?

 4        Q.    Personally.

 5        A.    No.

 6        Q.    The first page of Exhibit 3 appears to be a

 7   fax transmission of a fax, and in the middle of the

 8   page, it's got an invite code.  And it's R9170F40,

 9   which is the same billing code on the WestFax invoice

10   and the same purchase number order code shown in the

11   subject lines of the e-mails at page 3 of the exhibit.

12   In your experience, is that something that WestFax or

13   the customer would sometimes do, is incorporate the

14   customer's designated billing code into a fax

15   broadcast?

16        A.    We don't look at the fax broadcast.

17        Q.    What does that mean?

18        A.    It means exactly what I said.  We don't look

19   at the document.

20        Q.    You don't look at the actual fax?

21        A.    No.

22        Q.    Nobody at WestFax looks at the fax at any

23   time?

24        A.    No.

25        Q.    So you aren't able to tell me whether it's

Comprehensive Health Care Systems          30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                      April 20, 2017

                                                                Page 59

 1    common at WestFax to include the customer's designated

 2    billing information in the fax because nobody at

 3    WestFax ever looks at the fax, right?

 4          MR. POELL:  Objection.  Form.

 5    A.    Correct.

 6    Q.    (BY MR. COHEN)  And I will not nor would you

 7    want me to or stand for it go through every single one

 8    the same way.  What I -- what I want to see if we can

 9    understand when the jury or anyone is looking at

10    WestFax invoices, the account number is the number that

11    designates the customer, correct?

12    A.    Yes.

13    Q.    Generated by WestFax?

14    A.    I've already answered that question.

15    Q.    But I want to -- it will cover all of them,

16    not just the one invoice we went through.  These are

17    things that applied to all?

18    A.    Understood, yes.

19    Q.    Okay.  And I'll do a broader question.  To the

20    extent we ask what things mean and what they signify in

21    various fields of Exhibit 3 on the WestFax invoice,

22    your answers would be the same for any WestFax invoices

23    for other broadcasts involving account number 5725?

24    A.    I can't --

25          MR. POELL:  Objection; form.  Objection;

Comprehensive Health Care Systems                    30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                                  April 20, 2017

Page 60

1   foundation.

2       A.   I can't speak, specifically, to each of these

3   documents.  But in general, the policy hadn't changed

4   during that period, as far as I know.

5       **Q.   (BY MR. COHEN)  Okay.  And when we see, on**

6   **Exhibit 3, page 2, the WestFax invoice that the**

7   **quantity -- and we've already discussed what that**

8   **number signifies, but when we see that the number is**

9   **2,879.0, did somebody manually enter that or does the**

10  **WestFax system automatically take from its data for the**

11  **broadcast that information and automatically plug it**

12  **into the invoice, or does somebody have to manually**

13  **look at the broadcast data and then manually enter it**

14  **into the invoice?**

15          MR. POELL:  Objection; form.  Objection;

16  compound.  Objection -- and assumes that those data

17  generated with every FaxWest [sic].

18      A.   It's an automated process.

19      **Q.   (BY MR. COHEN)  Drawing your attention to**

20  **Exhibit 4, the fourth page of Exhibit 4 is another**

21  **apparent e-mail chain.  And there's a different person**

22  **a little below halfway.  It's a woman named Melody**

23  **Ducker.  Did I pronounce that right?**

24      A.   Yes.

25      **Q.   And this is dated October 26, 2015.  Was**

Comprehensive Health Care Systems                30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                                  April 20, 2017

Page 61

1    **Ms. Ducker an employee of WestFax at that time?**

2        A.    Yes.

3        **Q.    What was her title?**

4        A.    Account manager.

5        **Q.    And are Ms. Ducker and --**

6        A.    Ms. Gasseling.

7        **Q.    -- Ms. Gasseling, are they both still employed**

8    **by WestFax?**

9        A.    No.  Ms. Ducker is not.

10       **Q.    But Ms. Gasseling is?**

11       A.    I've already testified to that.

12       **Q.    So it shows Ms. Ducker e-mailing to Douglas**

13   **Clayton and saying for a certain purchase order number,**

14   **"Please see attached test page."**

15           **What does that mean?  What would that signify?**

16   **What does that mean is going on?**

17       A.    I don't know, specifically, in this case.  But

18   a customer will typically request that a test page be

19   sent with the document so they can confirm the

20   formatting.  So perhaps that was what was happening

21   here.

22       **Q.    Okay.  And then at the top of that page,**

23   **Mr. Clayton responds to Ms. Ducker and says, "Looks**

24   **good.  Please send."**

25           **What would that -- you're the owner of**

Comprehensive Health Care Systems          30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                          April 20, 2017

---

Page 62

1    **WestFax; you're here as WestFax corporate designee.**

2    **What would that signify to WestFax in terms of whether**

3    **or not that customer had authorized that fax broadcast**

4    **order?**

5         A.   I think it's self-explanatory.  It would

6    indicate that the customer had viewed the test page and

7    was wanting to confirm that the test page is

8    appropriate to be sent.

9         **Q.   And that they were confirming it?**

10        A.   That's what I just said.

11        **Q.   Okay.  The last page of this, I'm only going**

12   **to ask you about it once, because it shows up in other**

13   **doc -- other of these documents, but I just need an**

14   **explanation one time.  It says "Broadcast Order Form"**

15   **-- "Broadcast Fax Order."  And then it's got, below**

16   **that, "Order Information" and a lot of pieces of**

17   **information or bits of information.  Is this a WestFax**

18   **document that information is entered into?**

19        A.   I don't recognize this document.

20        **Q.   A little more than halfway down the text,**

21   **there is a line that says "Customer Merge," and it says**

22   **"yes" -- I'm sorry -- "Custom Merge," and it says**

23   **"yes."  Is that a term that WestFax uses with regard to**

24   **its fax broadcasting services, "custom merge"?**

25        A.   A custom -- yes, it is a term that we use.

---

Comprehensive Health Care Systems          30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                      April 20, 2017

Page 63

 1   However, I don't know how it applies to this document.

 2   This seems to be profile information.  But -- but I

 3   don't recognize this document.  A custom merge is a

 4   mail merge document where individual data fields would

 5   be merged into the document.

 6        Q.   And just for people who -- and I -- I don't

 7   claim to know nearly what you know, but people who have

 8   very little information about electronics or tech, the

 9   custom merge would be able to take a customer list that

10   might be provided in a data form by a customer to

11   WestFax, and it would allow recipient's specific

12   information to be extracted from fields in the data and

13   inserted into fields on the outgoing fax broadcast?

14             MR. POELL:  Objection; form.  Objection;

15   foundation.

16        A.   Yes.

17        Q.   (BY MR. COHEN)  Almost all of these documents

18   that we have in front of you -- not all of them, but

19   almost all of them -- show that to the extent there's a

20   fax transmission header, it indicates a fax number of

21   202-478-0237.  Do you have any knowledge or familiarity

22   of that number?

23        A.   No.

24        Q.   Does WestFax have the ability to have its fax

25   broadcasts that it sends out show that they are coming

Comprehensive Health Care Systems                    30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                                    April 20, 2017

Page 64

1      **-- on the recipient's header line, does WestFax have**

2      **the ability to control that header line to show a**

3      **number such as 202-478-0237?**

4           A.   I wouldn't describe it that way, no.

5           **Q.   And when you say it that way, it makes me**

6      **sound like I'm just not articulating it the way it**

7      **should be articulated, but that there is a way somebody**

8      **who knows how things are done could articulate it.**

9                **Can WestFax cause a fax broadcast to issue and**

10     **a recipient see a header fax number originating from a**

11     **different number, like 202-478-0237?**

12               MR. POELL:  I'm going to object to form;

13     confusing.

14          A.   That number is -- is something provided by the

15     client that they have indicated as the -- as the

16     sending fax number.

17               MR. COHEN:  Mr. Hayes, I intend to, at some

18     point, just show Mr. Clark the entire document that was

19     produced as the removal list, the entire document that

20     was produced as the invoices.  And I'm actually -- I

21     have a jump drive that I'm going to put a sticker on,

22     and I'm going to let him put it in a laptop and look at

23     it.  But is there any disagreement -- and I'm not

24     asking for three stipulation to it, but is there any

25     disagreement on your own end that the documents that

Comprehensive Health Care Systems                30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                             April 20, 2017

Page 65

1    were produced in response to the subpoena, the removal

2    list, the invoices, are authentic business records?

3            MR. HAYES:  There's no objection.  But what we

4    sent you is what we had, and they are business records

5    that are kept in the ordinary course of business that

6    WestFax relies upon and hasn't had any complaints.

7            MR. COHEN:  I understand.  Thank you.

8        Q.   (BY MR. COHEN)  If I'm not asking you a

9    question about one of these, it's shortening it up.  So

10   I'm trying to do that, sir.

11           Sir, if you would take a look at Exhibits 7

12   and 8.  And the reason I was drawing these to your

13   attention is because if you look at Exhibit 7, both on

14   the apparent received fax with an invite code that

15   corresponds to the billing code on the WestFax invoice

16   of R8567F15, and then you look at Exhibit 8, the invite

17   code on the fax is the same.  The billing code on the

18   WestFax invoice in Exhibit 8 is the same, except it's

19   got the capital letters O-N at the end.  I was

20   wondering what significance to a billing code on a

21   WestFax invoice having the word O-N might mean or the

22   letters O-N after the billing code?

23       A.   There's no significance.  I don't know.  It's

24   not provided by WestFax.

25       Q.   In the invoice on Exhibit 7, before the

Comprehensive Health Care Systems                30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                           April 20, 2017

Page 66

1    billing code, it's got the word "splitfile-2."  In

2    WestFax invoices, what does it mean when we see the

3    term "split file"?

4         A.   I don't know.

5         Q.   Is there somebody at WestFax who has something

6    to do with creating the billing invoices who might be

7    able to explain the significance of that?

8         A.   No.

9         Q.   On Exhibit 12, we have the fax as a cover page

10   and a WestFax invoice as the next three pages.  And

11   then we have some e-mails and e-mail attachments.  And

12   it starts, I believe, at the last page where Ms. Jensen

13   at usa.m3 is communicating with Ms. Gasseling.  And she

14   says, "I submitted a rather large database for R9666

15   fax request."  And she goes on to ask how long it's

16   going to take to go out.

17             And then Ms. Gasseling -- and this is on Bates

18   page USA010622 -- it says she can "split it 5 ways,

19   this just speeds up the merging time."

20             And Ms. Jensen says the "Test page looks

21   great.  You are good to send."

22             And the conversation concludes with

23   Ms. Gasseling saying, "Great We will start queing [sic]

24   them now."

25             What does it mean in terms of the way

Comprehensive Health Care Systems                30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                              April 20, 2017

Page 67

 1    **WestFax's system works to -- when Ms. Gasseling is**
 2    **saying, "We will start queing them now"?**
 3              MR. POELL:  I just want to object and
 4    stipulate -- state for the record that Mr. Cohen read
 5    parts of the e-mails.  They weren't read verbatim, so I
 6    just don't want there to be any confusion about whether
 7    they were completely stated or not.  So the documents
 8    speak for themselves.
 9              MR. COHEN:  I agree.
10        A.    So I can't speak to the specific term of
11    queuing, but I can tell you that it seems to, in
12    general, be sending the broadcast order.
13        **Q.    (BY MS. COHEN)  And when you use the phrase**
14    **"sending the broadcast order," sending it where or to**
15    **whom?**
16        A.    The recipients.
17        **Q.    Okay.  So it's actually the broadcast going**
18    **out?**
19        A.    Yes.
20        **Q.    I understand that you've indicated you're not**
21    **a computer programmer, but then you participated in the**
22    **development of the programming and the software that**
23    **goes into the proprietary technology which provides the**
24    **WestFax broadcasting services to its customers.  Given**
25    **your involvement at the time, the people who were**

Comprehensive Health Care Systems                30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                              April 20, 2017

Page 68

 1    involved, at your request, in developing it, and your

 2    experience over the years working with it, have you had

 3    an opportunity -- an adequate opportunity to assess its

 4    reliability and the accuracy of the results it

 5    generates in terms of distinguishing between successful

 6    sends and fails and being able to recognize the data

 7    and accurately record that and reflect that?

 8             MR. POELL:  I'm just going to object to form.

 9        A.   Are you trying to ask me if I look at our

10    system to ensure that it works correctly?

11        Q.   (BY MR. COHEN)  And if you've done it enough

12    that you feel you have an adequate basis to say, "Our

13    system works correctly and it generates reliable

14    information."

15        A.   Our system works correctly.

16        Q.   And is the information it generates reliable?

17        A.   Yes.

18        Q.   And if I understood something you told me

19    earlier, the generation by your system of the data

20    about what it did is contemporaneous and it's

21    automated.  So when it talks -- when the system talks

22    about how many successful sends there were on a

23    broadcast, that's automatically generated by the system

24    at the time that it's accomplishing that, correct?

25             MR. POELL:  Objection; form.  Objection;

Comprehensive Health Care Systems          30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                           April 20, 2017

Page 69

1    vague, confusing.

2           THE DEPONENT:  Well, you're not the only one

3    that's confused.

4       A.    Our system works correctly.  I don't really

5    understand what you're trying to ask me.

6       Q.    (BY MR. COHEN)  If your customers were to ask

7    you before they agreed to pay you for a broadcast

8    whether they could rely on the information you give

9    back to them in reports about successful sends, fails,

10   the numbers corresponding to successful sends, if your

11   customers wanted you to assure them before they hired

12   you to do it that your system generated reliable

13   information, do you have any enough information to look

14   at your customers and tell them, "Yes, it does"?

15          MR. POELL:  Again, objection.  Form.

16      A.    Our system provides reliable information.

17      Q.    (BY MR. COHEN)  Thank you, sir.

18          Sir, if you'll look at Exhibit Number 17.

19   This has a WestFax invoice, the first three pages.

20          MR. POELL:  Just hold on for a second.  Sorry.

21          Proceed.

22      Q.    (BY MR. COHEN)  And then it's got e-mails.

23   And there is a document behind the e-mails that is

24   Bates labeled M3 USA008811.  And it says "Document

25   Produced in Native Form [sic]."  And then it's got that

Comprehensive Health Care Systems                30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                              April 20, 2017

Page 70

 1    **same Bates referencing page at the top of the next page**
 2    **with a list of people and what appear to be phone**
 3    **numbers.  If -- is this the kind of information that if**
 4    **provided as a list in native form by a customer to**
 5    **WestFax, the system can do a merge and send out a fax**
 6    **broadcast individualized to people?**
 7              MR. POELL:  Objection; form.  Objection;
 8    foundation.
 9         A.   I have no idea what this is.  I mean, it looks
10    like it's a database.
11              Are you asking me if we can do a custom merge
12    application, as I previously testified to?
13         **Q.   (BY MR. COHEN)  With this kind of information**
14    **as a -- as a database is, yes.**
15         A.   I don't know what this is.
16         **Q.   Well, assume that it comes in a data format**
17    **and these are fields.  Can your system then extract**
18    **from those fields?**
19              MR. POELL:  Objection.  Foundation.
20         **Q.   (BY MR. COHEN)  To do a customized broadcast?**
21              MR. POELL:  Same objection.
22         A.   Yeah.  I wouldn't say that our system is
23    extracting from the data fields.  Data fields are
24    provided by the customer.
25         **Q.   (BY MR. COHEN)  What would you say your system**

Comprehensive Health Care Systems          30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                      April 20, 2017

Page 71

1    does with the information in the data fields to

2    accomplish the fax broadcast?

3         A.    It merges the date fields into the document.

4         Q.    And if this kind of data that we see on the

5    Document 08811 selection, if this kind of information

6    were provided in data fields and uploaded to your

7    system by the customer, would your system be able to

8    utilize this data and these data fields to do a merged

9    broadcast?

10             MR. POELL:  Objection; form.  Objection;

11   vague.

12        A.    If formatted correctly, I suppose.

13        Q.    (BY MR. COHEN)  I -- I understand you

14   indicated you're the owner of WestFax.  Are you also

15   the president?

16        A.    Yes.

17        Q.    Have you held that position since the

18   company's inception in approximately 1999?

19        A.    Yes.

20        Q.    And in your capacities as owner and president,

21   have you become knowledgeable and experienced with the

22   computer electronic programming and software technology

23   used in all facets of WestFax's business activities?

24        A.    To the best of my knowledge.

25        Q.    The documents produced by your lawyer in

Comprehensive Health Care Systems                30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                        April 20, 2017

Page 72

1   **response to the subpoenas in this case, were those true**

2   **copies of records that were generated in the ordinary**

3   **course of business and kept by WestFax as business**

4   **records?**

5        A.    We produced business records that we use in

6   the ordinary course of business.

7        **Q.    And were you or the person who produced those**

8   **the authorized custodian of those business records?**

9        A.    Yes.

10       **Q.    Am I correct that WestFax does not have any**

11  **role in deciding what images will be used for the fax**

12  **broadcasting and it does not have any role in deciding**

13  **what facsimile numbers are sent faxes for its**

14  **customers?**

15            MR. POELL:  Objection.  Compound.

16       A.    WestFax does not have any involvement with the

17  document or the database.

18       **Q.    (BY MR. COHEN)  Paragraph Number 12 of the**

19  **subpoena seeks "Any and all contracts with vendors who**

20  **may have provided services for fax transmissions sent**

21  **on behalf of or at the direction of M3 and/or MDLinx."**

22  **And your response in Exhibit Number 2 to paragraph**

23  **Number 12 of the subpoena reads, "Any contract WestFax**

24  **may have with its vendors is confidential and**

25  **privileged information that WestFax will not provide."**

Comprehensive Health Care Systems                    30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                              April 20, 2017

Page 73

1              What -- I'm stepping back from the request.

2    I'm not waiving it, but for the purposes of this

3    question, I'm stepping away from the request for the

4    contract, and I'm not asking you the content of the

5    contract at this time.  But there's no reason to fight

6    about something if there is nothing.

7              Is WestFax aware of the existence of any

8    contracts with vendors who may have provided services

9    for fax transmissions sent on behalf of or at the

10   direction of M3 or MDLinx?

11      A.   Are you asking me if they used other companies

12   to do fax broadcasting?

13      Q.   Well, I'm not certain what the meaning of

14   "vendors" is in our paragraph Number 12 or your answer

15   to paragraph Number 12.  So I'm trying to figure out

16   what everybody's talking about when they reference

17   vendors that might be providing services for fax

18   transmissions on behalf of or at the direction of M3 or

19   MDLinx.  But you're then referencing in your answer,

20   "Contracts WestFax may have with its vendors."  So I

21   don't know -- I didn't write the original Question 12,

22   but I also didn't write your answer.

23              Were there any contracts between WestFax and

24   vendors in any way related to or involved with M3 or

25   MDLinx?

Comprehensive Health Care Systems                30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                            April 20, 2017

```
Page 74
 1             MR. POELL:  And I'm just going to object;
 2   vague.  And I'm going to speak for just a quick second.
 3   And how is he supposed to know what you mean by
 4   "vendors" if you yourself don't know what you meant by
 5   "vendors" in your subpoena rider?
 6             MR. COHEN:  I'm using what he meant when he
 7   said WestFax's and he described it as "its," meaning
 8   WestFax's vendors.
 9             MR. POELL:  Right.  But my understanding was
10   that you just said that you didn't write this request
11   and you weren't sure what -- what plaintiffs meant by
12   "vendors" in the subpoena rider.  So I'm just trying to
13   clarify what are we talking about when we mean
14   "vendors"?
15             MR. COHEN:  With that clarification, fair
16   enough.  Since --
17             MR. HAYES:  Well, let me interrupt very
18   briefly.  So, Dan, what you're saying is you're
19   stepping away from this question.  You're asking your
20   own question?
21             MR. COHEN:  I am, and I'm asking a question
22   about what he meant in his sentence when he says, "Any
23   contract WestFax may have with its vendors is
24   confidential and privileged information that WestFax
25   will not provide."
```

Comprehensive Health Care Systems                    30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                                  April 20, 2017

                                                                                    Page 75

 1      A.   Okay.  Let me just answer it.  Yeah.  So we

 2   have relationships with vendors, and that's

 3   confidential.

 4            THE VIDEOGRAPHER:  Counsel, we have about two

 5   minutes for media change.

 6            MR. COHEN:  Let me ask one quick question, and

 7   you'll get it.

 8      **Q.   (BY MR. COHEN)  Were any such vendors --**

 9   **without asking who they are, what they were, or what**

10   **the contracts provided, were any such vendors in any**

11   **way at any time involved in anything relating to M3 or**

12   **MDLinx?**

13      A.   I don't know.  I mean, there -- we have

14   vendors, and those vendors are confidential.  So I --

15   there's not anyone else, that I know of, that is

16   involved with sending the fax.

17            MR. COHEN:  We can go off the record.

18            THE VIDEOGRAPHER:  This is the end of Media

19   Unit 1.  We are going off the record.  The time is

20   12:11.

21            (Recess from 12:11 p.m. until 12:22 p.m.)

22            THE VIDEOGRAPHER:  This is the beginning of

23   Media Unit Number 2 in today's 30(b)(6) testimony of

24   Barry Clark.  We are back on the record.  The time is

25   12:22.

Comprehensive Health Care Systems          30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                     April 20, 2017

Page 76

1              MR. COHEN:  We're back in the record.  In the

2    interest of not taking up Mr. Clark's time fruitlessly,

3    we discussed off the record that Mr. Hayes had

4    delivered to both counsel at or about the same time, by

5    electronic transmission, large volumes of documents or

6    information, one of them being a removal list and one

7    of them being a set of invoices.  And the idea was that

8    the witness knows what he sent.  But if I show him back

9    what he was sent, he just has to trust me that I'm

10   showing him what I sent him or what he originally sent

11   me and -- or look through it.

12             And so to try to avoid that, I think we have

13   an agreement.  Counsel is not waiving any objection to

14   foundation to business record status.  But just in

15   terms of what records we're talking about that the

16   witness is purporting to lay foundation for and

17   authenticating, we're agreeing that the records that

18   were mutually produced to both of us by Mr. Hayes are

19   the records the witness is talking about.

20             MR. POELL:  Agreed.

21             MR. COHEN:  Okay.

22        **Q.   (BY MR. COHEN)  Mr. Clark, the removal lists**

23   **that your counsel provided to us on your behalf and**

24   **your response to the subpoena and the large volume of**

25   **invoices that your counsel provided to us on your**

Comprehensive Health Care Systems              30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                              April 20, 2017

Page 77

 1   behalf, were those -- was the information contained in

 2   those documents and those documents themselves

 3   information that was generated at or about the time of

 4   the matters or events described in the documents either

 5   by people with personal knowledge of the truth of the

 6   information or by an automated system, which would

 7   ensure its accuracy, and was all that information in

 8   those materials maintained within the custody of

 9   WestFax, preserved and created and maintained in the

10   ordinary course of business, and delivered to us in its

11   accurate form?

12         A.    The business records we provided were

13   accurate.  We have had sole custody of those, to the

14   best of my knowledge, and they are true and accurate.

15         Q.    Thank you very much, sir.

16               I wanted to go back, just for a moment, to

17   what we were talking about when we had to change tapes.

18   And you've made it clear to me there are things you'll

19   tell me, there are things you won't.  If I want to find

20   out, I can try and go to a judge and get an order, but

21   I want to try as best I can to even understand what I'm

22   asking about.  What -- if I go to a judge right now and

23   I tell him you wouldn't tell me about vendors, he's

24   going to say, "Vendors who do what?"

25               And so I need to at least try to figure out

Comprehensive Health Care Systems                30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                            April 20, 2017

Page 78

1    the outline of what we're even talking about, without

2    you disclosing the things that are -- you're refusing

3    to disclose.  I need to get as much information as

4    you'll let me have.  And you'll -- as you've shown,

5    you'll define where that line is.  But I'm going to try

6    with a few questions.  Okay?

7            What -- without -- without identifying any

8    particular vendor or as to any particular customer, as

9    to any particular broadcast, what kind of thing would a

10   vendor do in -- in contractual cooperation with WestFax

11   to promote or facilitate WestFax's operations?

12           I just don't understand what we're even

13   talking about when we talk about a vendor of WestFax.

14           MR. HAYES:  Again I'm going to object.  I

15   don't mean to be difficult, but as soon as you start

16   into the road as to how WestFax does its fax

17   broadcasting, even by saying who it does its -- who it

18   may have relationships with, you're stepping inside

19   what WestFax protects as being proprietary.

20           So there's not really a way to be a little bit

21   pregnant in these types of things.  We have

22   consistently tried to answer what we did for a

23   particular customer, but tried to stay away from how we

24   did it and with who we did it and what types of

25   services those persons may have provided, because it's

Comprehensive Health Care Systems       30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                      April 20, 2017

Page 79

1    -- it is very possible to reverse engineer that

2    information once it becomes public.  And that could

3    compromise the way WestFax does business and its

4    competitive advantage.

5                THE DEPONENT:  I want to take one step --

6                MR. HAYES:  Yeah.

7                THE DEPONENT:  -- in deference to your advice.

8         A.   If I were to answer your question as you've

9    asked it, Mr. Hayes would be a vendor of WestFax in the

10   normal course of business.  We have a landlord that we

11   pay rent to that would be a vendor in the normal course

12   of business.  There are lots of people that contribute

13   to the operation of WestFax as vendors.

14        Q.   (BY MR. COHEN)  Without asking you who --

15        A.   Go ahead.

16        Q.   Okay.  Without asking you -- and I'm not

17   talking about the types of vendors you just described.

18   Without asking you who any vendor is or exactly what

19   role they fill or how they fulfill it, can you tell me

20   whether with regard to M3 and MDLinx there was any

21   vendor that served as an intermediary between them and

22   WestFax or any vendor that -- other than WestFax

23   itself, that contributed to the actual accomplishment

24   of the fax broadcasts paid for by M3 and MDLinx?

25        A.   I'll defer to my attorney's advice on that.

Comprehensive Health Care Systems                    30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                              April 20, 2017

Page 80

 1             MR. HAYES:  The short answer is no.  It's

 2      just --

 3             MR. COHEN:  No, he can't tell me?

 4             MR. HAYES:  He can't tell you.  The short

 5      answer is, is that intermediary or assisted not only is

 6      a little bit nebulous, but the provision of the fax

 7      broadcasting services presumably uses vendors that you

 8      could -- you could assume that would be in -- necessary

 9      in order to accomplish a fax broadcast.  But as soon as

10      you get past that point -- and we've had this

11      discussion for seven, eight, nine, ten years -- as soon

12      as you get past that point, you just -- you ring a bell

13      that maybe you wish you wouldn't have rung.

14             THE DEPONENT:  And I honestly -- and I can say

15      this to you and to the judge and whoever might see this

16      -- I don't really understand what you're getting at.

17             MR. HAYES:  But -- but I do.  I understand

18      what you're trying to say.  But I'm just saying that

19      that package is what we have put a wrapper around and

20      says it's proprietary.

21          Q.   (BY MR. COHEN)  Does WestFax have any contract

22      with any companies that provide the telephonic

23      services -- the telephone service that allows the fax

24      broadcasts to go out to the recipients?

25          A.   That's proprietary.

Comprehensive Health Care Systems                30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                              April 20, 2017

Page 81

 1             MR. HAYES:  Let me just interject for a

 2      second.  Mr. Clark is right about the services that

 3      those telephone companies provide is proprietary and

 4      how they do it.  But WestFax does have one or more

 5      telephone carriers.

 6             MR. COHEN:  But I assume the identity would be

 7      something you would not disclose?

 8             MR. HAYES:  We have not disclosed.  Not

 9      personal to you, Dan.  We just have never disclosed

10      that, to my knowledge.

11             MR. COHEN:  I understand.  And I'm not trying

12      to waste any time.  If I ask him, he'd say no.  You'd

13      instruct him not to answer?

14             MR. HAYES:  Right.

15             MR. COHEN:  Obviously, we've had a lot of

16      disagreements as to what is or is not subject to proper

17      discovery in the course of this deposition.  Except to

18      the extent that we had to bicker a little bit, I tried

19      to get through what I could.  For the record, I reserve

20      the right to try and present these things to the court,

21      get rulings.  Whatever comes of those rulings, maybe

22      we'll see each other again; maybe we don't.  But

23      reserving that right, I don't have any further

24      questions at this time.

25

Comprehensive Health Care Systems             30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                              April 20, 2017

Page 82

     1                              EXAMINATION

     2    BY MR. POELL:

     3         Q.    Mr. Clark, I just have a couple of questions.

     4    I'll just reintroduce myself to you.  My name is David

     5    Poell.  I'm the attorney for M3 USA Corporation, which

     6    is the defendant in this matter and, of course, at one

     7    time at least, was a customer of WestFax.  My questions

     8    are going to primarily relate to just document

     9    retention-policies of WestFax.  So just give me one

    10    moment here.

    11              Mr. Clark, in your capacity as a corporate

    12    representative of WestFax, to your knowledge, is M3

    13    still a customer of WestFax?

    14         A.    They are not an active customer, no.

    15         Q.    And could you explain what you mean by "active

    16    customer"?

    17         A.    To my knowledge, they no longer send fax

    18    broadcasts with WestFax.

    19         Q.    Okay.  And what is the basis for your

    20    statement that they no longer send fax broadcasts?

    21         A.    We looked to see if they did, and they don't.

    22         Q.    And could you tell me what, I guess, records

    23    or business records you examined to make that

    24    determination?

    25         A.    Our accounting file.

Comprehensive Health Care Systems                    30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                                       April 20, 2017

Page 83

1      Q.    So based on your review of your accounting

2    file, that's how you've come to the conclusion that

3    WestFax no longer sends faxes on behalf of M3?

4      A.    Yes.

5      Q.    Do you know when the last time was that

6    WestFax would have sent faxes on behalf of M3?

7      A.    I know that we've provided that in -- in

8    answer to some questions.  But I believe it was 2015,

9    but I don't have the exact date.

10     Q.    I'll just --

11           MR. HAYES:  Again, if I can help out.  It

12   appears that the information I've provided to Mr. Clark

13   shows the last fax was June 2nd, 2016.

14           THE DEPONENT:  I'm sorry.  Thank you.

15           MR. POELL:  And I'll get to some -- we can --

16   we can establish that through his testimony as well.

17           MR. HAYES:  Okay.

18           MR. POELL:  Maybe it's just easier to go -- to

19   reference the invoices.

20     Q.    (BY MR. POELL)  Now, Mr. Clark, pursuant to

21   our stipulation, I'm going to make some references to

22   WestFax's document production to the subpoena, which

23   consisted of over 1100 pages of invoices generated by

24   -- as a result of M3's faxing activities during the

25   period in question.

Comprehensive Health Care Systems                30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                            April 20, 2017

Page 84

 1          Now, I'll represent to you, Mr. Clark, that

 2    the date of the first invoice is January 2nd, 2015.

 3    And my question is, you consider your -- you consider

 4    WestFax's production of its invoices to be complete and

 5    accurate based on a search of WestFax's business

 6    records?

 7        A.   Yes.

 8        Q.   Okay.  So would it be fair to say that you did

 9    not have any invoices for WestFax prior to the date of

10    January 2nd, 2015?

11        A.   To the best of my knowledge, no.

12        Q.   And then, similarly, I'll represent to you

13    that based on WestFax's production pursuant to the

14    subpoena, the date of the last invoice is June 2nd,

15    2016.  So would it be fair to say that WestFax does not

16    have any invoices for M3 after that date, June 2nd,

17    2016?

18        A.   Yes.

19        Q.   So just to conclude, the only invoices for

20    which WestFax has invoices generated by M3 are those

21    that were generated between January 2nd, 2015, and June

22    2nd, 2016.  Is that correct?

23        A.   Yes.

24        Q.   And if there were any additional invoices

25    either generated prior to January 2nd, 2015, or

Comprehensive Health Care Systems          30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                      April 20, 2017

Page 85

1    generated after June 2nd, 2016, those invoices would

2    have been found in the course of the search of your

3    business records, correct?

4         A.    Yes.

5         Q.    Okay.  Now, I'm going to try not to be

6    repetitive of -- of Mr. Cohen's examination.  So

7    apologies in advance if anything is repetitive.  I

8    think we'll be able to take these last points

9    relatively quickly.

10             Now, just to -- to be clear, all of the

11   records that WestFax produced pursuant to the subpoena,

12   which includes the invoices we just discussed as well

13   as the opt-out removal list, to the best of your

14   knowledge and in your capacity as a corporate

15   representative, there are no other business records

16   stored in the ordinary course of business relating to

17   M3 or MDLinx; is that correct?

18        A.    To the best of my knowledge, that's correct.

19        Q.    Mr. Clark, does WestFax maintain any data

20   listing the fax numbers to which M3 sent faxes during

21   this period in question?

22        A.    No.

23        Q.    What type of data, if any, does WestFax

24   maintain in the regular course of business with respect

25   to faxes sent by its customers aside from invoices and

Comprehensive Health Care Systems                30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                           April 20, 2017

Page 86

 1    opt-out removal lists?

 2        A.    There's none.

 3        Q.    So would it be fair to say that for M3,

 4    specifically, there are no other records relating to

 5    them aside from those documents we just mentioned, the

 6    invoices and the removal list?

 7        A.    Yes.

 8        Q.    Okay.  I believe it was your testimony, but

 9    just to be clear, does WestFax retain images of faxes

10    that were sent by its customers in the regular course

11    of business?

12        A.    No.

13        Q.    And so would it be fair to say that WestFax

14    does not retain images of any faxes sent by M3 during

15    the period in question; is that correct?

16        A.    Correct.

17        Q.    We talked a little bit earlier about how a

18    customer, including M3, prior to using WestFax's

19    services would either upload a spreadsheet to WestFax

20    or, alternatively, it'd send a spreadsheet to a WestFax

21    employee and instruct them to send faxes on M3's

22    behalf.  Is that a fair summary of your testimony?

23        A.    I would make a distinction that we're not

24    sending them, necessarily, on M3's behalf.  M3 is still

25    sending them.  Our customer service representatives are

Comprehensive Health Care Systems                30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                              April 20, 2017

Page 87

 1   simply helping them with that transmission.

 2        Q.    Okay.   But it -- just so I'm clear.   It could

 3   be the case that -- strike that.

 4             When a customer, like M3, sends faxes using

 5   WestFax portals, typically, it's the case that they

 6   have to use a fax list that they upload prior to

 7   sending the fax; is that correct?

 8        A.    Yes, that's correct.

 9        Q.    Okay.   Does WestFax maintain copies of fax

10   lists that are used by customers to send faxes?

11        A.    No.

12        Q.    Does WestFax maintain any fax lists that were

13   used or uploaded by M3 to send faxes?

14        A.    No.

15        Q.    If a customer does upload a fax list to

16   WestFax's portal prior to sending it, what happens to

17   that fax list after the faxes are actually sent?

18        A.    The customer can -- the customer can manage

19   those lists on the portal, but their -- WestFax doesn't

20   maintain that data.

21        Q.    So WestFax does not have those fax lists

22   stored in the ordinary course of business?

23        A.    Not for M3 data, no.

24        Q.    Okay.   So would it be fair to say that WestFax

25   does not have any fax lists that were used by M3 to

Page 88

1    **send faxes during the period in question?**

2        A.    Correct.

3        **Q.    Does WestFax maintain any reports internally**

4    **that summarize the success or failure rate of**

5    **transmissions that were sent by its customers?**

6        A.    We don't maintain reports, no.

7        **Q.    Okay.  So would it be fair to say that WestFax**

8    **does not have any reports generated in the ordinary**

9    **course of business that summarize how many faxes were**

10   **sent by M3 during the period in question?**

11       A.    No.  We do not have that data.

12       **Q.    Okay.  In your capacity as a corporate**

13   **representative, does WestFax know how many faxes M3**

14   **sent using WestFax during the period in question?**

15       A.    Yes.  We do know.

16       **Q.    And how many faxes is that?**

17       A.    Well, we would have to add them up on the

18   invoices, but I don't know that number off the top of

19   my head.  But that number could be obtained.

20       **Q.    And just so I'm -- I'm clear.  When we're**

21   **talking about faxes sent, are we talking about**

22   **successful transmissions sent?**

23       A.    Yes.

24       **Q.    Okay.  And just to stay on that topic for a**

25   **second here.  Earlier there was some testimony when we**

Comprehensive Health Care Systems                30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                              April 20, 2017

Page 89

1    were discussing the content of the invoices themselves,

2    and I just want to make sure we're clear on this point.

3    I'll represent that all the WestFax invoices are

4    identical in format insofar as they all list the

5    account number, the date, the invoice number, as well

6    as the item description and the quantity.

7              And, Mr. Clark, I believe you testified that

8    the "Quantity" column represents all those faxes that

9    were -- actually, strike all of that.

10             Could you just testify, one more time -- and

11   I'll just direct your attention to Exhibit 17 for

12   present purposes.

13             MR. COHEN:  I object to you using my exhibit.

14   Just kidding.

15        Q.   (BY MR. POELL)  So on Exhibit 17, in the

16   "Quantity" column, it says 14,035.0.  Do you see that?

17        A.   Yes.

18        Q.   Okay.  Now, what does that number, 45 --

19   14,035 represent?

20        A.   This is an incredibly important distinction.

21   What this presents is the number of fax machines or fax

22   servers or other types of fax-receiving devices that

23   actually received the fax.  That has absolutely no

24   correlation to whether or not the intended recipient

25   received the fax in question.

Comprehensive Health Care Systems                30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                              April 20, 2017

Page 90

```
 1              There are several different ways that you can
 2    receive a fax.  A very common way of receiving a fax is
 3    as an e-mail attachment.  The proliferation of what's
 4    called fax to e-mail is very significant in the sending
 5    of fax transmissions in modern society.  And there's a
 6    very important distinction as to whether or not the
 7    intended recipient actually received the fax or
 8    somebody else received the fax.
 9         Q.   Okay.
10              MR. COHEN:  Before you go on, I just want to
11    object to the extent the witness's answer by reference
12    to important distinction seems to be making a statement
13    of relevant distinction of law.  And because I think
14    that's an incorrect statement of law, we would object
15    to it and move to strike.
16              THE DEPONENT:  I'm simply stating the
17    technology, with no reference to the law.
18              MR. POELL:  I -- I object to opposing
19    counsel's request to strike Mr. Clark's testimony on
20    that point.
21              MR. HAYES:  And, David, may I interject?  What
22    has been a question that Mr. Clark's been asked in the
23    past I think is the most relevant.
24              Mr. Clark, with respect to the summary
25    invoices, is it my understanding that WestFax quantity
```

Comprehensive Health Care Systems            30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                           April 20, 2017

Page 91

```
 1    reflects its agreement with the customer to bill those

 2    on the basis of the faxes that WestFax's platform shows

 3    that the fax was transmitted to them -- to the other

 4    machine; in other words, there was a tone and a

 5    handshake?

 6                 THE DEPONENT:  Yes.

 7                 MR. HAYES:  And is that the basis for which

 8    WestFax bills its customer?

 9                 THE DEPONENT:  Yes.

10                 MR. HAYES:  And is -- is that reflective of

11    the quantity that -- of the people that -- of the fax

12    recipients that accomplished that task?

13                 THE DEPONENT:  Yes.

14                 MR. HAYES:  Okay.

15                 MR. POELL:  Thank you, Mr. Hayes.

16           Q.    (BY MR. POELL)  So, Mr. Clark, not to belabor

17    it too much, but just so everyone -- so it's clear for

18    the record.  The "Quantity" column, that does not

19    represent the number of recipients who actually

20    physically received a fax transmission; is that

21    correct?

22           A.    That's correct.  We have no way of knowing

23    that.  Technology does not allow us to make that

24    distinction.

25           Q.    Thank you.
```

Comprehensive Health Care Systems                30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                                April 20, 2017

Page 92

 1            And in the ordinary course of business, does

 2    WestFax maintain any data listing the fax numbers of

 3    all intended recipients of faxes sent by -- sent by

 4    WestFax customers?

 5        A.    I'm sorry.  You lost me in that question.

 6        Q.    Okay.  I'll rephrase.

 7            Does WestFax, in the ordinary course of

 8    business, maintain any records listing the fax numbers

 9    of intended recipients?

10        A.    WestFax does not maintain fax records of

11    intended recipients.

12        Q.    So is there any way for WestFax to determine,

13    through searching its business records, the number of

14    unique fax numbers to which M3 sent faxes during the

15    period in question?

16        A.    WestFax is not able to determine by our

17    business records how the specific recipients of the

18    faxes that were sent to M3 customers or attempted

19    recipients.

20        Q.    Okay.  So there's no list, there's no Excel

21    spreadsheet listing the fax numbers of the intended

22    recipients to which M3 sent faxes; is that correct?

23        A.    That's correct.  There's not a list.

24        Q.    Okay.  And does WestFax have, in the ordinary

25    course of business, any records showing the names of

Comprehensive Health Care Systems          30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                        April 20, 2017

Page 93

1    **the subscribers of the fax numbers to which M3 sent**

2    **faxes?**

3         A.   No.

4         **Q.   So just again on the -- on the "Quantity"**

5    **column of the invoice -- and again, we'll just use**

6    **Exhibit 17 as an example -- where it says "14,035," is**

7    **it possible that while the "Quantity" column says four**

8    **thousand -- 14,035 -- excuse me -- would it be possible**

9    **that 14,035 unique individuals did not actually receive**

10   **the fax transmission?**

11        MR. COHEN:  Before you answer, I object to the

12   term "receive" as being vague and ambiguous in the

13   context of all of the testimony that's gone before.

14        Subject to that, if you know what it means, go

15   ahead and answer.

16        A.   I do know what it means.  And there -- it --

17   yes, you can make a determination that 14,035 faxes

18   have -- have given us a tone that indicates that a fax

19   was received.  But that doesn't -- so, yeah.

20        **Q.   (BY MR. POELL)  But that number does not**

21   **necessarily reflect whether the intended recipient**

22   **actually picked up that fax and physically looked at**

23   **that fax?**

24        A.   That's true.

25        **Q.   I just have a couple questions about the**

Comprehensive Health Care Systems          30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                         April 20, 2017

Page 94

 1    opt-out services.

 2              Now, in the regular course of business, does

 3    every WestFax customer have to sign up for opt-out

 4    services?

 5        A.    No.

 6        Q.    And I guess I should preface that with when we

 7    mean "opt-out services," I mean customers have the

 8    ability -- strike that.

 9              When we say "opt out," I mean fax recipients

10    have the option of calling a number and informing

11    WestFax that they would no longer like to receive fax

12    transmissions sent by one of WestFax's customers; is

13    that correct?

14              MR. COHEN:  Before you answer, I just want to

15    object to the use of the term "no longer" in that it

16    assumes facts not in evidence; namely, that the

17    customers previously wanted to and now no longer want

18    to.

19              Subject to that, you can go ahead and answer.

20        Q.    (BY MR. POELL)  Let me rephrase.

21              Mr. Clark, could you describe WestFax's

22    opt-out services?

23        A.    Yes.  A customer may decide that for

24    convenience sake, they would like to have an opt-out

25    number that would enable someone -- a -- a recipient or

Comprehensive Health Care Systems          30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                        April 20, 2017

Page 95

1    anyone; it doesn't have to be a fax recipient, it can

2    be anyone that calls the number -- can enter a

3    ten-digit phone or fax number that would be suppressed

4    from future faxes via an automated service.

5         Q.    Okay.  And based on your review of WestFax's

6    business records, did M3 sign up for opt-out services

7    as you've just described?

8         A.    Yes.

9         Q.    I'm going to refer, just briefly, to -- it

10   could really be any of the exhibits that have a fax on

11   them.  We'll just take --

12        A.    This is 17.

13        Q.    I don't think that has -- do you have 12 with

14   you?

15        A.    Yes.

16        Q.    Now, at the bottom of Exhibit 12, the first

17   page of Exhibit 12, there's a line that says, "If you

18   would like your fax number removed, please call

19   800.222.9268 or fax 215.689.3706."

20              Do you see that?

21        A.    Yes.

22        Q.    So based on your prior testimony, is it your

23   understanding that if somebody who received this fax,

24   Exhibit 12 of this deposition, if they no longer wanted

25   to receive faxes sent by M3, they would have to call

Page 96

 1    **either that telephone number or send a fax to the**

 2    **designated fax number?**

 3              MR. COHEN:  Before you answer, same objection

 4    to the presupposition assuming facts not in evidence as

 5    to quote, unquote, "no longer."

 6              Subject to that, you can answer.

 7         A.   So I would say that that's not correct.  I

 8    would say perhaps a more precise description would be

 9    that there are, presumably, several ways that they

10    could opt out, including calling the customer directly.

11    So -- but this is a mechanism for opt out.  If somebody

12    received a fax and wanted to opt out of future faxes,

13    they could call this number to opt out.

14         Q.   **(BY MR. POELL)  Okay.  And what happens if --**

15         A.   If -- I'm sorry.  Let me just rephrase.

16         Q.   **Sure.**

17         A.   I haven't verified that this is a number that

18    was provided by WestFax.  So -- but I'll assume that it

19    is.

20         Q.   **Okay.**

21         A.   Sorry.

22         Q.   **Totally all right.**

23              **I'm then going to represent to you, Mr. Clark,**

24    **that the opt-out removal list which was provided by**

25    **your counsel pursuant to the subpoena that was served**

Comprehensive Health Care Systems                30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                       April 20, 2017

Page 97

 1   **by plaintiff's counsel, it has two columns. Column A**

 2   **says "fax" and Column B is for "date added."**

 3           **Now, I'll represent to you that this Excel**

 4   **spreadsheet has a total of 45,639 rows. Of course, if**

 5   **you exclude the first row, which designates fax and**

 6   **date added, that would mean that there are 45,638 rows**

 7   **of what appear to be ten-digit numbers in Column A, and**

 8   **-- as well as a time stamp in Column B, which includes**

 9   **the month, the day, the year, and what appears to be a**

10   **-- a time in a -- designated in military time.**

11           MR. POELL:  I just want to -- if we can have a

12   stipulation with plaintiffs' counsel and with WestFax's

13   counsel that I've accurately described the content of

14   the removal list.

15           MR. COHEN:  I have no reason to doubt your

16   calculation.  But I can't stipulate to it because I

17   never calculated the number of individual lines.

18           MR. POELL:  Well, you can look at it right

19   here.

20           MR. HAYES:  I think that -- again, what we

21   sent you was accurate and complete.  What it is is what

22   it is.  So I think we should stipulate that whatever we

23   sent you speaks for itself.

24           MR. COHEN:  And I agree with that, and I don't

25   intend to create obstructions.  But I want to look at

Comprehensive Health Care Systems                30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                            April 20, 2017

Page 98

 1    it in my own Excel thing.  But I'm not -- I'm not going

 2    to challenge a mathematical reality.

 3              MR. POELL:  Understood.  I think that should

 4    suffice for our present purposes.

 5         **Q.   (BY MR. POELL)  Now, Mr. Clark, assuming, as**

 6    **we've just stipulated, that this spreadsheet contains**

 7    **45,638 lines of ten-digit numbers and corresponding**

 8    **dates, is it correct to say that -- well, I guess my**

 9    **question to you would be what exactly -- what is the**

10    **type of information that is represented on this**

11    **spreadsheet?**

12         A.   Well, without -- I mean, I'm assuming that

13    it's the removal list.  So it's a number that has been

14    added to a removal list and the date and time.

15         **Q.   Okay.  And what would be the mechanism by**

16    **which WestFax would acquire this data and then add that**

17    **data to this list?**

18         A.    It's important to note that the data is always

19    in complete control of the customer, in this case M3.

20    But it -- there -- the file can be appended by somebody

21    calling the number.  It can be appended by a customer

22    uploading data to the file as well.  So it can -- but

23    those are the most common mechanisms.

24         **Q.   Does this opt-out list include every single**

25    **fax number that requested not to be faxed by M3 during**

Comprehensive Health Care Systems                    30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                                    April 20, 2017

Page 99

1    the time period?

2        A.   As far as I know, yes.

3        Q.   **Would there be any reason to believe that --**

4    **if somebody opted out and requested not to receive**

5    **additional faxes from M3, is there any reason why their**

6    **fax number would not appear on this list?**

7        A.   No, not that I can think of.

8        Q.   **So if somebody utilized WestFax's opt-out**

9    **services and made a request through WestFax not to**

10   **receive faxes from M3, that fax number would appear on**

11   **this removal list, correct?**

12       A.   It -- correct, with a couple of important

13   distinctions.  I mean, the customer always has control

14   of the data.  So that in this case, M3 is the person

15   that is dictating how that list is appended.

16       Q.   **But based on your -- your records search of**

17   **WestFax's business -- business records, these are all**

18   **the opt-out numbers that you were able to locate in the**

19   **course of that search?**

20       A.   Yes.

21            MR. POELL:  I think I'm done.  Just give me

22   one second here.

23            MR. COHEN:  I just have a few follow-ups, just

24   so you know.

25            MR. HAYES:  Do you want me to give you a ride

Comprehensive Health Care Systems                    30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                              April 20, 2017

Page 100

 1   back?

 2              THE DEPONENT:  Sure.  Thank you.

 3              MR. COHEN:  I thought we'd do Uber together.

 4              MR. HAYES:  Yeah, but he's not going to the

 5   airport.

 6              MR. POELL:  That's all I have.

 7                        EXAMINATION

 8   BY MR. COHEN:

 9       Q.   Mr. Clark, I'll try to be very brief about

10   this.

11              There's a -- a non sequitur that it could just

12   be my not understanding the way this works.  M3's

13   counsel just went through with you earlier in his

14   questioning about the book-ended dates when M3 used

15   WestFax's platform to send its fax broadcasts.  And I

16   believe it was January 2nd of 2015 through June 2nd of

17   2016.  But then he also had questions for you more

18   recently about what we see on the opt-out removal list

19   produced by WestFax for the opt-out number assigned by

20   WestFax to M3 at M3's request.

21              And what I'm seeing -- and I'm just skimming

22   through -- I see dates for opt out in 2014, 2012, 2011,

23   and 2009.  And rather than throw suspicions at you and

24   say, "Is this what's going on," I'll just ask you what

25   -- if you have an explanation for why the M3 opt-out

Comprehensive Health Care Systems          30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                          April 20, 2017

Page 101

1    removal list for the opt-out number assigned by WestFax

2    to M3 has opt-out dates when they became part of the

3    opt-out list that span years well before the January

4    2nd, 2015, date, which is the only -- the earliest

5    record that WestFax has of broadcasting activity with

6    M3.  Is -- do you have an explanation for that?

7          A.   Well, there are several ways that -- I -- I

8    don't have a general explanation, but I can tell you

9    that, specifically, people can -- so for -- for a fact

10   -- a date that might appear after, they could certainly

11   call the number after or M3 could call the number

12   after.  They could have also provided us with data

13   prior to their using us that said that these are people

14   that we don't want to fax.  So there -- I don't know

15   why there would be a date prior to the first broadcast.

16         Q.   And I appreciate that.  What I want to ask

17   you, if it's possible -- I'm not saying it is -- I'm

18   asking you is it possible that because of the way

19   WestFax stores data, the way WestFax deletes data, that

20   is it possible WestFax participated in providing fax

21   broadcasting services to M3 or MDLinx before January

22   2nd, 2015, but WestFax simply doesn't have -- any

23   longer have available records of that?

24         A.   I don't think so.

25         Q.   Why do you say that?

Comprehensive Health Care Systems                30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                        April 20, 2017

Page 102

 1       A.   Because we searched our records and found --

 2  and produced what we found.

 3            MR. HAYES:  Again, we can look again.  I'll

 4  look again and let you know.

 5            MR. COHEN:  And I appreciate that.  And -- and

 6  that's -- I'll take you up on that.  I'm never going to

 7  turn down an offer.

 8       **Q.   (BY MR. COHEN)  I'm just -- and I'm being very**

 9  **serious about this.  We talked earlier about the way**

10  **stuff is deleted off your system, that you don't need**

11  **it anymore, that it takes up room, that you want to**

12  **make more space.  When I wanted to get into more**

13  **detail, you didn't -- you refused to answer.  I'm not**

14  **arguing with you about that.  I'm just saying since I**

15  **didn't get to go into detail with you about how, when,**

16  **and why you delete --**

17       A.   I answered those questions.  I disagree with

18  your characterization.  But go ahead.

19            MR. HAYES:  Well, let's leave it at this, so

20  we can -- if there are some invoices that we didn't

21  produce for MDLinx through inadvertence, we'll go back

22  and look and produce them.  We don't have any qualms

23  about whether they were deleted.  And if they're there,

24  we'll give them to you.  First pass, we did a careful

25  search; that's what we found.

Comprehensive Health Care Systems                    30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                                    April 20, 2017

                                                                              Page 103

 1              MR. COHEN:  I -- I don't think I can really --

 2   under this current state of the record -- push either

 3   one of you more on that right now.

 4              MR. HAYES:  Okay.

 5              MR. COHEN:  There are some things we need to

 6   take up.

 7              THE DEPONENT:  Okay.

 8              MR. COHEN:  But we can do that later.

 9        **Q.   (BY MR. COHEN)  I guess one thing I wanted to**

10   **check --**

11              MR. COHEN:  And since you didn't mention this,

12   I'm assuming we're all in agreement on this.

13        **Q.   (BY MR. COHEN)  -- WestFax wouldn't assign an**

14   **opt-out number -- you know, a call-in number for a**

15   **recipient to become part of the opt-out list, wouldn't**

16   **assign that to Customer A for 2009 through June 2nd of**

17   **2015 and then that customer says, "I'm no longer a**

18   **customer and I'll never be a customer," and then**

19   **WestFax assigns that same number to new Customer B who**

20   **starts broadcasting January 2nd, 2015, and unbeknownst**

21   **to everybody, Customer B is carrying the last six years**

22   **of opt-out call-ins from Customer A's opt outs.**

23        A.   I'm not saying it would never happen.  It

24   could happen, but it's unlikely.  We certainly wouldn't

25   do it intentionally.

Page 104

1        Q.    Sometimes when I get to sit and listen to the

2    question and answer, I hear things and I don't know

3    whether there's a significance to them.

4              M3's counsel was asking you questions about

5    whether there are any lists available, any this, any

6    that.  And your question -- your answers to the

7    questions seemed very narrow to the fact that WestFax

8    and WestFax's business records would not have any of

9    those documents or any of that information.  To your

10   knowledge, would any third party that has any

11   contractual relationship with WestFax have any such

12   information or documentation still accessible to it?

13       A.    No.

14       Q.    When we went through some of plaintiffs'

15   Exhibits 3 through 17 that had some WestFax invoices in

16   there -- and I understand you're looking at an invoice

17   out of nowhere, and you're saying, "It looks like ours

18   but I can't vouch for it."  If, in fact, each of those

19   invoices came from what your attorney produced on your

20   behalf, would you agree that we can all reliably know

21   that those are genuine?

22       A.    Yeah.  I previously testified to and answered

23   it, yes.

24       Q.    And we can take the information you gave us

25   earlier about how to interpret those specific WestFax

Comprehensive Health Care Systems                    30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                              April 20, 2017

Page 105

1    invoices, and we can apply it to the big group that

2    your attorney produced to us?

3         A.   Sure.

4         Q.   Last thing.  We received from M3 some

5    Bates-labeled documents.  It's M3 USA006629, 6630, and

6    6631.  And they are e-mails between one or more people

7    at M3 or MDLinx and one or more people at WestFax.  And

8    what I'm looking at is an e-mail sent by somebody --

9    Jennifer Jensen, presumably, with either M3 or

10   MDLinx -- to the recipient Lisa Roe at

11   lisa@westfax.com.

12            Do you recall that in the period of time,

13   October 20, 2015, Lisa Roe was an employee of WestFax?

14            MR. POELL:  Just a point of clarification.

15   Are you offering this as an exhibit?  I don't believe

16   it's been marked as an exhibit.

17            MR. COHEN:  I don't have a paper copy.  I got

18   it here by -- by e-mail.

19            MR. POELL:  I mean, do we want to stipulate

20   that this is Exhibit 18, just so it's clear for the

21   record?

22            MR. COHEN:  Yeah, we can -- we can do that.

23            MR. POELL:  I don't think he has a copy of it.

24            THE DEPONENT:  Okay.

25            MR. COHEN:  And you know what?  What I did was

Page 106

 1    put it on the thumb drive and thought we'd mark that as

 2    an exhibit.  And then we didn't do that.  But I have no

 3    problem.  We all know what these Bates-labeled exhibits

 4    are.  We can get that to the court reporter as 18.

 5              MR. POELL:  Sure.  Okay.

 6              (Deposition Exhibit 18 was marked.)

 7         Q.   (BY MR. COHEN)  Do you know, was Ms. Roe an

 8    employee of WestFax in that time period?

 9         A.   Yes.

10         Q.   Does she still work for WestFax?

11         A.   No.

12         Q.   And the reason I was even inquiring about any

13    of this is because it's got -- at Bates page 6630, it's

14    got one of those order -- broadcast fax order things

15    that you and I talked about.  We looked at one of my

16    exhibits.  You said, "I really don't know what this is,

17    but this is coming from the customer."  And it

18    indicates that it is attaching a document file, which

19    is a .doc format and then a database file, which ends

20    in an extension .xlsx.  Do you know what format that

21    would be?

22         A.   Excel.

23         Q.   And I'll represent to you that the -- M3 then

24    produced to us in native form as the attached -- the

25    Excel attachment to that e-mail from --

Comprehensive Health Care Systems          30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                        April 20, 2017

                                                                    Page 107

 1      A.    Okay.

 2      **Q.    -- they produced to us a list that had an**

 3   **invitation code and a first and the last name and then**

 4   **a fax number.**

 5      A.    Okay.

 6      **Q.    Assuming that I'm understanding what those**

 7   **documents are and, say -- we'll end up getting to take**

 8   **depositions of M3 people to see if I know what I'm**

 9   **talking about, but if that's what that was, an e-mail**

10   **from somebody at M3 or MDLinx to Ms. Roe at WestFax**

11   **around that date attaching this Excel file containing**

12   **the information of the type I showed you in the fields,**

13   **would that be the kind of database of information in a**

14   **format that the WestFax platform can then use to send**

15   **out a customized merged broadcast?**

16            MR. POELL:  I'm just going to object on form

17   and vagueness.

18      A.    I suppose it could.  I'd have to look,

19   specifically, at the more detailed information.

20            MR. COHEN:  Subject to the reservation from

21   before, I thank you for your time, sir.  I have nothing

22   further.

23            THE DEPONENT:  Thanks.

24            THE VIDEOGRAPHER:  No questions?

25            This is the end of Media Unit Number 2 and

Comprehensive Health Care Systems                    30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                              April 20, 2017

Page 108

1     testimony of Wex -- WestFax, Incorporated, 30(b)(6)

2     corporate designee Barry Clark.  We are going off the

3     record.  The time is 1:12.

4              WHEREUPON, the within proceedings were

5     concluded at the approximate hour of 1:12 p.m. on the

6     20th day of April, 2017.

7                    *      *      *      *      *      *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Comprehensive Health Care Systems                    30(b)(6) of WESTFAX, INC., BARRY CLARK
M3 USA Corporation, et al.                                              April 20, 2017

Page 109

```
 1                    REPORTER'S CERTIFICATE

 2   STATE OF COLORADO          )
                                )    ss.
 3   CITY AND COUNTY OF DENVER )

 4            I, DOREEN GIRDEEN, Registered Merit Reporter

 5   and Notary Public, State of Colorado, do hereby certify

 6   that previous to the commencement of the examination,

 7   the said BARRY CLARK was duly sworn by me to testify to

 8   the truth in relation to the matters in controversy

 9   between the parties hereto; that the said deposition

10   was taken in machine shorthand by me at the time and

11   place aforesaid and was thereafter reduced to

12   typewritten form, consisting of 109 pages herein; that

13   the foregoing is a true transcript of the questions

14   asked, testimony given, and proceedings had.  I further

15   certify that I am not employed by, related to, nor of

16   counsel for any of the parties herein, nor otherwise

17   interested in the outcome of this litigation.

18            IN WITNESS WHEREOF, I have affixed my

19   signature and seal this 27th day of April, 2017.

20   My commission expires March 16, 2019.

21

22   _____
                       Doreen Girdeen
23                  Registered Merit Reporter

24

25
```