UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BRIAN LYNGAAS, D.D.S.,
individually and as the
representative of a class of
similarly situated persons,

        Plaintiff,

Case No. 17-10910

v

HON. MARK A. GOLDSMITH

CURADEN AG, et al.,

        Defendants.
_____/

## OPINION & ORDER
## CONTAINING FINDINGS OF FACT AND CONCLUSIONS OF LAW FOLLOWING BENCH TRIAL AND DIRECTING SUBMISSION OF PROPOSED JUDGMENT

## I. INTRODUCTION

In this class action, Plaintiff Brian Lyngaas, D.D.S., on behalf of himself and similarly situated class members, asserts that on March 8 and March 28, 2016, he received unsolicited fax advertisements from Defendants Curaden AG and Curaden USA, in violation of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227. The Court conducted a non-jury trial on September 18 and September 19, 2019. The parties have submitted post-trial briefs and proposed findings of fact and conclusions of law (Dkts. 118, 119, 120), as well as responses to the post-trial briefing (Dkts. 123, 124). Defendants contend that Lyngaas did not meet his burden of proving the total number of unsolicited faxes allegedly sent class-wide. They also contend that Lyngaas did not establish that Curaden AG was a sender of faxes within the meaning of the TCPA.

As discussed below, Lyngaas has established that Curaden USA violated the TCPA by sending two unsolicited fax advertisements to him individually and by broadcasting the advertisements in two mass fax campaigns. However, because Lyngaas has not established the total number of faxes successfully sent class-wide, the Court requires a claims administration process that affords potential class members the opportunity to establish their receipt of Curaden USA's unsolicited fax advertisements. As for Curaden AG, Lyngaas has failed to establish its liability under the TCPA. In accordance with the direction set forth below, a judgment will be entered embodying these rulings.

## II. BACKGROUND FACTS

On March 8 and March 28, 2016, Lyngaas, a dentist whose practice is located in Livonia, Michigan, received faxes advertising the Curaprox Ultra-Soft CS 5460 toothbrush. Joint Final Pretrial Order ("JFPO"), Stipulation of Fact ("SoF") ¶ 1 (Dkt. 114). Lyngaas owns and operates a fax machine for use within his dental practice, and he did not expressly invite or permit either Defendant to send him any advertisement by fax. Id. at ¶¶ 11-12.

Curaden AG is a Swiss entity that manufactures toothbrushes, including the Curaprox Ultra-Soft 5460. Id. at ¶ 2. Curaden USA is a subsidiary of Curaden AG. Patrice LeMaire Dep. at 30.[1] Curaden USA is authorized to promote Curaden AG products, including the Curaprox Ultra-Soft 5460, throughout the United States, SoF ¶ 5. While Curaden AG has a form Distribution Agreement, which it uses as a template for written agreements with its subsidiary distributors, it never executed such a written agreement with Curaden USA. Id. at ¶ 20. At all times relevant, Curaden USA has operated on an oral agreement with Curaden AG. Id. at ¶ 21.

[1] The depositions of Patrice LeMaire, Clifford Zur Nieden, Dale Johnson, and Chad Komniey – including the page and line designations relied upon by the parties during trial – have not been filed on the Court's docket. The Court has directed the parties to file these depositions, along with their respective page and line designations. 11/19/19 Order (Dkt. 128).

Although Curaden USA and Curaden AG have an oral agreement, many of the tenets of the written Distribution Agreement that was exchanged—but not executed—have been observed by the parties.  Id.  For example, Curaden USA acted as Curaden AG's exclusive distributor of Curaden products within the United States, consistent with § 2.1 of the Distribution Agreement. Trial Tr. II at 78 (Dkt. 116).  However, some of the provisions of the Distribution Agreement were not observed.  Clifford Zur Nieden Dep. at 13; LeMaire Dep. at 53-54.  Under the Distribution Agreement, Curaden AG had the right to approve all marketing materials developed by its distributors.  Distribution Agreement at §§ 5.7, 5.8, Pl. Trial Ex. 9 (Dkt. 121-5).  However, this right was never enforced, and Curaden USA never presented its advertising materials to Curaden AG for review or approval.  Zur Nieden Dep. at 16-17, 46; Trial Tr. II at 83-84, 123-124.

Richard Thomas is the managing director of Curaden UK, Curaden AG's distributor in the United Kingdom.  Zur Nieden Dep. at 21; Trial Tr. II at 97-98.  Thomas served as an advisor to Curaden AG subsidiaries, including Curaden USA.  Dale Johnson Dep. at 83; Trial Tr. II at 98, 103.  Curaden USA did not seek Thomas's approval on marketing or business plans, nor did it seek Thomas's approval of the advertisements before directing that they be sent.  Trial Tr. II at 98, 103, 135; 3/8/16 E-mails, Pl. Trial Ex. 19 (Dkt. 121-11).

Curaden USA purchased a database, or "target list," of fax numbers to be used in a fax campaign.  SoF ¶ 9.  The target lists contain tens of thousands of fax numbers connected to dental professionals.  Target Lists, Pl. Trial Exs. 17, 18, 20, 21 (Dkts. 121-9, 121-10, 121-12, and 121-13).  Curaden USA did not send the faxes itself, but instead hired a company called AdMax Marketing ("AdMax") to do so.  SoF ¶ 8.  AdMax Marketing's primary business is "fax

blasting," or fax broadcasting.  Id. at ¶ 24.  AdMax, in turn, had hired a company called WestFax to send the faxes but did not disclose to Curaden USA that it had hired WestFax.  Id. at ¶ 9.

Curaden USA employee Diane Hammond created the two fax advertisements at issue in this case.  Id. at ¶¶ 4, 30.  Both advertisements promoted the Curaprox Ultra-Soft CS 5460 toothbrush, were directed to "dental professionals," and provided Curaden USA's contact information, including a fax number, phone number, e-mail address, website, and social media accounts.  3/8/16 Fax, Pl. Trial Ex. 2 (Dkt. 121-1); 3/28/16 Fax, Pl. Trial Ex. 3 (Dkt. 121-2).  This contact information was connected to and was exclusively maintained by Curaden USA.  Trial Tr. II at 86-88, 91-93.  The advertisements did not mention Curaden AG and referred all communications to Curaden USA.  SoF ¶ 39.  Curaden USA did not provide these advertisements to Curaden AG for review before directing that the faxes be sent.  Trial Tr. II at 105-106; Zur Nieden Dep. at 45-46.

On February 23, 2016, Dale Johnson, Curaden USA's vice president and managing director, approved the advertisement and directed Hammond to arrange to have the faxes broadcasted; Hammond, in turn, instructed Curaden USA employee Magen James to have the faxes sent to the attached target list of "close to 46,000" fax numbers purchased by Curaden USA.  3/8/16 E-mails, Pl. Trial Ex. 19.  On March 8, James directed AdMax to send the faxes that day.  Id.  Likewise, on March 23, 2016, Hammond instructed James to send out an updated version of the advertisement to an attached list of over 46,000 fax numbers.  3/28/16 E-mails, Pl. Trial Ex. 38 (Dkt. 121-15).  James again directed AdMax to broadcast the faxes the following Monday, March 28, 2016.  Id.  Accordingly, the faxes were sent at the direction of Curaden USA.  SoF ¶ 3.  Once the faxes were transmitted, AdMax invoiced Curaden USA, and Curaden

USA paid the invoices.  Id. at ¶ 38.  All communications regarding the creation and transmission of the advertisements were between Curaden USA and AdMax.  Id.

### III.  DISCUSSION

#### A.  Jurisdiction

As an initial matter, Curaden AG contends that this Court lacks personal jurisdiction over it under either Michigan's long-arm statute or Federal Rule of Civil Procedure 4(k)(2), as the elements of due process are not met.  Specifically, Curaden AG argues that (1) it did not purposely avail itself of the privilege of acting in Michigan because it did not require that Curaden USA target its marketing efforts toward dental practices in Michigan; (2) Lyngaas's claims do not arise out of Curaden AG's alleged contacts with Michigan because Curaden AG was not involved in sending the faxes; and (3) it is unreasonable to exercise jurisdiction over Curaden AG because Curaden AG was not involved in sending the faxes.

Curaden AG has previously advanced the same arguments before the Court in its motion to dismiss for lack of personal jurisdiction, see Def. Mot. to Dismiss at 18-21 (Dkt. 16), and in its motion for summary judgment, see Def. Mot. Summ. J. at 18-25 (Dkt. 60).  The Court rejected these arguments in its opinions resolving these motions, holding that its exercise of personal jurisdiction over Curaden AG comports with due process.  See 3/12/18 Op. at 8-15 (Dkt. 44); 5/23/19 Op. at 7-9 (Dkt. 89).  For the reasons set forth in those opinions, the Court's exercise of jurisdiction over Curaden AG does not violate principles of due process.

Additionally, Defendants contend that under Bristol-Myers Squibb Co. v. Cal. Superior Court, ---U.S.---, 137 S. Ct. 1773 (2017), the Court lacks jurisdiction over the claims of any class members residing outside of Michigan.  Again, Defendants advanced the same argument in their opposition to Lyngaas's motion for class certification.  Defs. Resp. to Mot. for Class

Certification at 6-10 (Dkt. 73). The Court rejected that argument in its opinion granting Lyngaas's motion for class certification, stating that it "has jurisdiction over the claims brought by unnamed class members, whether they received faxes in Michigan or out-of-state." 5/23/19 Op. at 34-37. For the reasons set forth in that opinion, the Court has jurisdiction over the claims of all unnamed class members.

**B. The TCPA**

Lyngaas's and the unnamed class members' claim arises from Defendants' alleged violation of the TCPA, 47 U.S.C. § 227.[2] Under the TCPA,

>  It shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States –
> . . . .
>  (C) to use any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement . . . .

47 U.S.C. § 227(b)(1)(C). An "unsolicited advertisement" is defined as "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission, in writing or otherwise." § 227(a)(5).

**1. The Faxes Were Advertisements**

It is uncontested by Defendants that the two faxes at issue in this case qualify as "advertisements." The parties stipulate that "[t]he faxes depict products which Curaden USA sells in the United States" and that Lyngaas "received faxes advertising the Curaprox Ultra-Soft CS 5460 toothbrush." SoF ¶¶ 1, 28; 3/8/16 Fax, Pl. Trial Ex. 2 (Dkt. 121-1); 3/28/16 Fax, Pl.

---

[2] Lyngaas has withdrawn his Count II conversion claim, leaving only the Count I claim alleging violation of the TCPA. See JFPO, 3 n.1 (Dkt. 114). The Court, therefore, dismisses Count II of Lyngaas's complaint.

Trial Ex. 3 (Dkt. 121-2). Consistent with the above definition, the faxes advertise the commercial availability of the Curaprox toothbrush and are, therefore, subject to the TCPA.

### 2. The Established Business Relationship Exemption And The Express Permission Defense Do Not Apply

The TCPA sets forth an exemption to its restrictions where the following conditions are met: (1) a fax was sent to a recipient with whom the sender has an established business relationship, (2) the sender obtained the recipient's fax number either through a voluntary communication of the number or through a public source on which the recipient voluntarily made the number available, and (3) the fax contained an opt-out notice meeting the requirements of 47 U.S.C. § 227(b)(2)(D). § 227(b)(1)(C). This exemption, however, does not apply in this case. First, the parties stipulate that the notices contained within the two faxes at issue do not meet the requirements of § 227(b)(2)(E), SoF ¶ 36, compliance with which is necessary to apply the exemption under § 227(b)(2)(D)(iii). Second, Defendants do not contend they had established business relationships with any class members.

As for the defense of express permission, although Defendants previously indicated their intent to present such a defense, see JFPO at 12, they advanced no argument during trial or in their post-trial briefing regarding any class member granting express permission to receive the faxes. Therefore, neither the established-business-relationship exemption nor the express-permission defense applies in the present case.

### 3. "E-Faxes" Are Actionable

Defendants dispute whether a TCPA violation may be established if an advertisement is received by a computer as an "e-fax," as opposed to receipt by a traditional fax machine. Under the TCPA, it is unlawful "to use any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement . . . ." 47 U.S.C.

§ 227(b)(1)(C) (emphasis added).  Relying on this language, Defendants maintain that Lyngaas cannot establish that each class member received the faxes on a fax machine as opposed to a computer.  The Court previously rejected this argument, stating that "the Court agrees with Lyngaas that the TCPA covers claims brought by individuals who received an unsolicited e-fax advertisement."  5/23/19 Op. at 30.  For the reasons set forth in that opinion, the Court again holds that e-faxes are actionable under the TCPA.

### 4. Receipt Of A Fax May Be Established Through Evidence Of Successful Transmission

The parties dispute whether a plaintiff must demonstrate that a fax was received to succeed on a TCPA claim.  Case law on this question is mixed.  In Holtzman v. Turza, 728 F.3d 682, 684 (7th Cir. 2013), the defendant objected to class certification on the ground that individual issues predominated, as each putative class member "must prove that his fax machine or computer received the fax."  The Seventh Circuit stated that the defendant was "right on the law but wrong on the facts," because the fax broadcasting service supplied logs reporting which faxes were delivered successfully.  Id. at 685 (emphasis added).  Thus, electronic confirmation of a successful fax transmission sufficed as proof of receipt.  Id.  Similarly, the Sixth Circuit evaluated a defendant's challenge to a class definition incorporating "[a]ll persons who were successfully sent a facsimile . . . ."  Am. Copper & Brass, Inc. v. Lake City Indus. Prods., Inc., 757 F.3d 540, 542 (6th Cir. 2014).  The defendant argued that "a fax might be 'successfully sent' without being received by its intended recipient."  Id. at 545.  The Sixth Circuit held that the evidence adduced by the plaintiff did not support such a distinction, as the plaintiff's expert opined that "successful transmissions of a complete fax were successfully sent to and received by 10,627 unique fax numbers."  Id.  Likewise, the Sixth Circuit has since found that an expert

report establishing the number of successful fax transmissions was adequate to establish receipt of the faxes.  Imhoff Investment, L.L.C. v. Alfoccino, Inc., 792 F.3d 627, 634 (6th Cir. 2015).

Other cases have expressly held that "[t]he TCPA 'does not specifically require proof of receipt.'"  City Select Auto Sales, Inc. v. David Randall Assocs., Inc., 296 F.R.D. 299, 309 (D.N.J. 2013) (quoting CE Design Ltd. v. Cy's Crabhouse N., Inc., 259 F.R.D. 135, 142 (N.D. Ill. 2009)).  But ultimately City Select and CE Design premised their conclusions on the same ground as the case law cited above—fax logs indicating successful transmission provided circumstantial evidence that the plaintiffs received the faxes.  Id.; CE Design Ltd., 259 F.R.D. at 142.  Similarly, another case states, "[G]iven the plain reading and statutory intent of the TCPA, a violation of the TCPA simply requires that an unsolicited fax be sent, not that Plaintiff must prove that it was received," as Congress intended to make evidence of transmission of a fax sufficient to state a claim under the statute.  Bridgeview Health Care Ctr. Ltd. v. Clark, No. 09 C 5601, 2013 WL 1154206, at *3 (N.D. Ill. Mar. 19, 2013) (internal quotation marks omitted).  The court rejected the defendant's contention that a plaintiff was required to prove receipt to demonstrate injury-in-fact and noted that "the attempt to transmit an unsolicited facsimile can be injurious either by tying up the recipient's phone or fax line or, for repeated attempts, by prompting a potential recipient to turn off the fax machine altogether when it would otherwise remain on."  Id. at *3 nn.3-4; see also Am. Copper, 757 F.3d at 544 ("[U]nsolicited fax advertisements impose costs on all recipients, irrespective of ownership and the cost of paper and ink, because such advertisements waste the recipients' time and impede the free flow of commerce.").

The authority, therefore, is mixed regarding whether a plaintiff must prove actual receipt of a fax.  However, the case law uniformly holds that a plaintiff may establish receipt of a fax

through evidence of its successful transmission. Because Lyngaas established his claim through receipt of faxes, as class members will have to do as well, the Court need not determine whether proof of actual receipt is necessary.

### C. Curaden AG Is Not Liable As A "Sender"

The parties dispute whether Curaden AG is subject to liability under the TCPA as a "sender" of the faxes, as defined by an FCC regulation: "the person or entity [1] on whose behalf a facsimile unsolicited advertisement is sent or [2] whose goods or services are advertised or promoted in the unsolicited advertisement." 47 C.F.R. § 64.1200(f)(10). Lyngaas contends that (1) Curaden AG is strictly liable for the transmission of the faxes because the faxes advertised a toothbrush manufactured by Curaden AG, or alternatively, that (2) the faxes were sent on behalf of Curaden AG, given its involvement in Curaden USA's advertising.

Lyngaas relies heavily on Siding & Insulation Co. v. Alco Vending, Inc., 822 F.3d 886 (6th Cir. 2016), in arguing that the FCC definition of "sender" imposes strict liability on defendants whose goods or services are advertised in a fax, regardless of whether the defendant was responsible in some capacity for sending the fax. In Alco, the Sixth Circuit considered whether retroactive application of the FCC's definition of "sender"—promulgated in 2006— would impermissibly expand a party's liability for conduct occurring prior to 2006. Id. at 892. Before 2006, TCPA liability for sending unsolicited faxes was limited to parties "on whose behalf facsimiles [were] transmitted." Id. at 893 (internal quotation marks omitted). Under the new FCC definition, the Sixth Circuit determined that a party whose goods or services were advertised could be held strictly liable, thus expanding TCPA liability. Id. at 892. Because retroactive application of the FCC regulation would have increased the defendant's liability, the Sixth Circuit concluded, "Alco therefore cannot be held liable simply because its goods or

services were advertised in the offending faxes." Id. at 896.  Applying the interpretation set forth in Alco, Lyngaas maintains that Curaden AG may be considered a "sender" simply because the faxes advertised its product.

The Sixth Circuit, however, reevaluated the scope of TCPA liability under the FCC definition in Health One Medical Center v. Mohawk, Inc., 889 F.3d 800 (6th Cir. 2018).  In that case, a pharmaceutical wholesaler sent to the plaintiff unsolicited faxes advertising discount prices on various drugs, including one manufactured by Bristol-Meyers Squibb ("Bristol") and another manufactured by Pfizer.  Id. at 801.  Although Bristol and Pfizer knew nothing about the faxes, the plaintiff argued they were liable as senders under the TCPA because the faxes "advertised or promoted" their drugs.  Id.  The Sixth Circuit rejected this argument, explaining "the regulation does not purport to impose liability upon parties that did not 'send' the fax at all." Id. at 802 (emphasis in original).  Rather, "the regulation purports to allocate liability in cases where the party that physically sends (i.e., dispatches) the fax and the party that causes it to be sent are not one and the same."  Id. (emphasis in original).  Because Bristol and Pfizer "neither dispatched the faxes nor caused them to be sent," they could not be held liable under the TCPA. Id.

The Sixth Circuit distinguished the outcome reached in Health One from that reached in Alco by reasoning that Alco involved the liability of a defendant that hired a third-party fax broadcaster to transmit faxes advertising the defendant's goods or services.  Health One, 822 F.3d at 802.  The Sixth Circuit clarified that it did not hold in Alco that an "innocent party" could be held liable under the TCPA "by some legal alchemy."  Id.  Thus, Health One rejected the notion that an entity may be held strictly liable under the TCPA for the transmission of a fax simply because it advertises that party's goods or services.  Rather, the case implies that courts

must evaluate whether an entity whose goods or services are advertised bears some responsibility for the "conveyance or dispatch" of an unsolicited fax.

Determining whether a party is a "sender" because its "goods or services are advertised or promoted," therefore, involves consideration of factors also relevant to whether faxes were sent "on behalf of" a party. Specifically, in determining on whose behalf a fax was sent, the Sixth Circuit approved the following standard:

> Circumstances to be considered include, but are not limited to, the degree of input and control over the content of the fax(es), the actual content of the fax(es), contractual or expressly stated limitations and scope of control between the parties, privity of the parties involved, approval of the final draft of the fax(es) and its transmission(s), method and structure of payment, overall awareness of the circumstances (including access to and control over facsimile lists and transmission information), and the existence of measures taken to ensure compliance and/or to cure non-compliance with the TCPA.

Alco, 822 F.3d at 899 (quoting Cin-Q Autos. Inc. v. Buccaneers Ltd. Partnership, No. 13-1592, 2014 WL 7224943, at *6 (M.D. Fla. Dec. 17, 2014)). Indeed, the parties to this action rely on the same factual evidence in their analyses of both prongs of the FCC's definition of "sender."

In support of its position that it is not a "sender," Curaden AG has emphasized its utter lack of involvement in creating or sending the faxes. The parties stipulate that Curaden USA created both advertisements, acquired the distribution list of targeted fax numbers, hired AdMax, and ultimately directed AdMax to fax the advertisements. SoF ¶ 37 (Dkt. 114). Curaden USA paid AdMax's invoices, and all communication regarding the creation and transmission of the faxes was between Curaden USA and AdMax. Id. at ¶¶ 38, 39. Johnson testified during trial that Curaden USA sought no input or approval from anyone at Curaden AG before sending the faxes. Trial Tr. II at 105-106 (Dkt. 116). Likewise, Curaden AG's managing director, Clifford Zur Nieden, testified that the advertisements were never presented to Curaden AG for its review

and that Curaden AG had no knowledge of the faxes' existence until the present lawsuit was filed. Zur Nieden Dep. at 45-46.

With respect to the content of the faxes, Curaden AG observes that they do not refer to Curaden AG. See 3/8/16 Fax, Pl. Trial Ex. 2 (Dkt. 121-1); 3/28/16 Fax, Pl. Trial Ex. 3 (Dkt. 121-2). In both faxes, the phone number, fax number, and e-mail address to be used for placing orders are connected to Curaden USA, while the website and social media accounts are maintained exclusively by Curaden USA—Curaden AG has no access to or control over the website. 3/8/16 Fax, Pl. Trial Ex. 2; 3/28/16 Fax, Pl. Trial Ex. 3; Trial Tr. II at 86-88, 91-93. According to Johnson's testimony, any orders placed by customers within the United States would be filled by Curaden USA from its own inventory located in Ohio. Trial Tr. II at 88-89. Further, LeMaire testified that if a customer in the United States attempted to place an order through the Curaden AG website, that customer would be automatically redirected to the separate website operated by Curaden USA. LeMaire Dep. at 41-44.

Lyngaas, however, presented evidence supporting his theory that Curaden AG had a certain degree of control over Curaden USA and its marketing efforts. Curaden USA is a fully owned subsidiary of Curaden AG and has the exclusive right to market and distribute Curaden AG's products within the United States. Zur Nieden Dep. at 12, 25-26; LeMaire Dep. at 28-30. Curaden USA purchases its inventory from Curaden AG and takes possession of it when the goods are picked up from Curaden AG in Switzerland. Trial Tr. II at 80. Curaden USA, however, has not paid for any of the inventory it has ordered since it began its operations; rather, Curaden USA carries the purchases as long-term debt owed to Curaden AG. Id. at 88. There is no written loan agreement between Curaden AG and Curaden USA, and the outstanding debt is unsecured. Zur Nieden Dep. at 53; Johnson Dep. at 88. Nor is there any formal payment

schedule, as Curaden USA was to repay the debt when the company became profitable. Zur Nieden Dep. at 27.

Although Curaden AG and Curaden USA did not formally execute the template Distribution Agreement, they generally operated under the provisions of that agreement with certain exceptions. Zur Nieden Dep. at 13; LeMaire Dep. at 53-54. For example, as noted above, under the terms of the template Distribution Agreement, Curaden AG had the right to review and approve the advertising materials developed by its subsidiaries. See Distribution Agreement at §§ 5.7, 5.8, Pl. Trial Ex. 9 (Dkt. 121-5). However, both Zur Nieden and Johnson testified that this right was never enforced, and Curaden USA never presented its advertising materials to Curaden AG for review or approval. Zur Nieden Dep. at 16-17, 46; Trial Tr. II at 83-84, 123-124.

Nevertheless, Lyngaas maintained at trial that Curaden USA did seek approval from Curaden AG of its marketing materials—including the two faxes at issue—through a Curaden employee named Richard Thomas. Thomas is the managing director of Curaden UK, Curaden AG's distributor in the United Kingdom, and "act[s] as an area manager for different countries." Zur Nieden Dep. at 21; Trial Tr. II at 97-98. Patrice LeMaire, the former president of Curaden USA, stated that Thomas served as his primary contact regarding general questions and that he and Thomas had quarterly meetings to discuss progress on sales. LeMaire Dep. at 16, 55-56, 58. Although LeMaire stated that Thomas was his contact at Curaden AG, he repeatedly indicated he was uncertain of the entity for which Thomas worked. Id. at 55, 58. During his deposition, Johnson described Thomas' involvement with Curaden USA similarly: "[H]e was kind of like an advisor, had been with the company for a number of years, he was running the operation in the UK and kind of oversaw, you know, the U.S. as well on behalf of Curaden AG." Johnson Dep.

at 83. During trial, Johnson denied that Thomas formally "oversaw" Curaden USA and clarified that his previous statement referred only to a "standpoint of marketing ideas" as opposed to financial reporting. Trial Tr. II at 118-119. Johnson further stated that Thomas served as a mentor and that he could not recall any instance in which he sought Thomas's approval on business plans for Curaden USA. Id. at 98, 103.

With respect to the two faxes at issue, Lyngaas contends that Curaden USA sought Thomas's approval before sending them. During trial, Lyngaas introduced an e-mail from Johnson to LeMaire stating, "Diane is not getting an answer from Magen on if this fax was sent. Please look into it and give us word. This was discussed on the call with Richard Thomas on February 29." 3/8/16 Johnson E-mail, Pl. Trial Ex. 41(d) (Dkt. 121-16) (emphasis added). When questioned regarding this conversation with Thomas, Johnson testified that "[w]hat would be typical that we would discuss is . . . that we were doing these because he does the marketing for Curaden in the UK. Many times he's interested in what we're doing here and how successful it is here so that he can look at maybe implementing a similar type program in the UK." Johnson Dep. at 84. However, Johnson had already approved the fax and directed a Curaden USA employee to have it broadcasted in an e-mail sent the previous day, February 28, 2016. 3/8/16 E-mails, Pl. Trial Ex. 19 (Dkt. 121-11); Trial Tr. II at 135.

The evidence presented during trial weighs in favor of finding that Curaden AG is not a "sender." The mere fact that under the Distribution Agreement Curaden AG required Curaden USA to promote and advertise its products is insufficient to sustain a finding that it is a sender under the TCPA. See Garner Props. & Mgmt., LLC v. Marblecast of Mich., Inc., No. 17-11439, 2018 WL 6788013, at *1, 3 (E.D. Mich. Dec. 26, 2018) (holding that a manufacturer was not a "sender" where its distributor sent unsolicited fax advertisements without the manufacturer's

involvement or knowledge). The evidence demonstrates that Curaden AG had no involvement whatsoever in creating or approving the faxes. Zur Nieden and Johnson both testified that the provision in the Distribution Agreement granting Curaden AG the right to review its subsidiaries' advertising materials was never enforced between itself and Curaden USA. They further testified that Curaden USA never offered its advertising materials, including the two faxes at issue here, to Curaden AG for its review or approval.

The evidence demonstrating Thomas's knowledge of Curaden USA's intent to broadcast the fax advertisements is thin—it is premised solely on one e-mail from Johnson referencing a "discussion" with Thomas on February 29, 2016. Even assuming Thomas was aware that Curaden USA planned to send the faxes, his approval was not necessary. Johnson testified that he did not recall any time he sought Thomas's approval of Curaden USA's business decisions, a statement that is borne out by Johnson's authorization to broadcast the fax before discussing the matter with Thomas. Accordingly, the evidence does not establish that either Curaden AG or Thomas had any actual authority over Curaden USA's marketing efforts.

Moreover, the evidence does not establish how Thomas's knowledge of Curaden USA's intent to broadcast advertisements via fax could be imputed to Curaden AG. Thomas was the managing director of Curaden UK. To be sure, Zur Nieden described Thomas as an "area manager for different countries," while Johnson stated that Thomas "oversaw" Curaden USA on behalf of Curaden AG. However, the bulk of the testimony describes Thomas as an advisor with significant experience in the industry, with whom new subsidiaries could consult regarding their business strategies or marketing plans. Simply put, Thomas served merely as a resource to new subsidiaries within the family of Curaden affiliates and not as an agent of Curaden AG. Further,

no evidence establishes that Thomas informed any representative of Curaden AG that Curaden USA planned to send the faxes.

Finally, Lyngaas relies heavily on innuendo to be drawn from evidence concerning certain informalities between Curaden AG and Curaden USA, such as the unexecuted Distribution Agreement and the unsecured long-term debt arrangement. The Court agrees that this evidence demonstrates not only a close relationship between the parent and subsidiary, but also that Curaden USA is not a financially independent company. However, this Court has previously considered and rejected Lyngaas's theory that Curaden USA is a mere instrumentality of Curaden AG such that the Court may impose alter-ego liability on Curaden AG. 5/23/19 Op. at 16-18. Ultimately, the close relationship between Curaden AG and Curaden USA fails to demonstrate any affirmative involvement on the part of Curaden AG in creating or sending the faxes at issue. Accordingly, Curaden AG cannot be considered a "sender" under either prong of the FCC definition.

### D. The Number Of Faxes Successfully Transmitted Class-Wide Was Not Established

To establish the number of unsolicited faxes received by class members, Lyngaas relies primarily on the following evidence: (1) Curaden USA's "target lists" of fax numbers to which the faxes were to be sent, Pl. Trial Exs. 17, 18, 20, 21 (Dkts. 121-9, 121-10, 121-12, and 121-13); (2) summary report logs listing attempted fax transmissions and whether those transmissions were successful or unsuccessful, Pl. Trial Exs. 22, 25 (Dkts. 122-1 and 122-3); (3) invoices from AdMax to Curaden USA referencing the number of successful fax transmissions, Pl. Trial Exs. 26, 27 (Dkts. 122-4 and 122-5); (4) e-mails containing job summaries reporting the total numbers of successful and failed fax transmissions, Pl. Trial Exs. 24, 36, 37 (Dkts. 121-14, 122-2, and 122-6); and (5) the testimony of Lyngaas's expert witness, Lee Howard.

Defendants challenge the admissibility of much on this evidence, and their objections fall into two main categories. First, Defendants contend that the summary report logs constitute inadmissible hearsay and are unauthenticated, as Lyngaas has provided no evidence establishing the accuracy or reliability of the records. And because the invoices and e-mails referencing the number of successful transmissions derive these figures from the summary report logs, Defendants contend these documents also constitute inadmissible hearsay. Second, Defendants argue that Howard's testimony is inadmissible because his opinions are speculative and are not based on reliable or trustworthy information, given his lack of knowledge regarding WestFax or the accuracy of the summary report logs.

### 1. The Summary Report Logs Are Inadmissible

Summary report logs are documents in spreadsheet format that list, among other information, a job name, a date and time, a fax number, and a result (e.g., sent, busy, connection interrupted, invalid number, no answer). See, e.g., Pl. Trial Ex. 25. Chad Komniey, the owner of AdMax, testified that when a fax broadcast was completed, he would generally receive an e-mail from WestFax summarizing the transmission results. Komniey Dep. at 86-87. Additionally, a full summary report log would be generated, which Komniey would download from the WestFax website. Id. at 85, 87-88. Thus, AdMax did not create the summary report logs but rather obtained them from WestFax.[3] Defendants contend that the summary report logs, Pls. Trial Exs. 22, 25, constitute inadmissible hearsay because they represent out-of-court

---

[3] Defendants maintain that it has not been established whether WestFax created the summary report logs, as Komniey could not verify the origin of the documents, see Komniey Dep. at 176, while Howard could not verify whether WestFax sent either of the fax broadcasts or hired a third-party, see Trial Tr. I at 80 (Dkt. 115). Lyngaas, however, refers to the summary report logs as "WestFax logs" and implies that they were created by WestFax. See Pls. Proposed Findings of Fact & Conclusions of Law at 33 n.3 (Dkt. 120-1) ("After successfully sending Defendants' fax ads, WestFax made summary logs . . . available to AdMax.").

statements, allegedly made by WestFax, offered for the truth of the matter asserted therein—namely, the total number of successful fax transmissions.  Lyngaas responds that the summary report logs are not hearsay because they are computer-generated statements.[4]

Hearsay is generally inadmissible under Federal Rule of Evidence 802 unless it falls within an exception.  "Hearsay" is a statement that "the declarant does not make while testifying at the current trial or hearing," that is offered "to prove the truth of the matter asserted in the statement."  Fed. R. Evid. 801(c).  A "statement," in turn, is defined as "a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion."  Fed. R. of Evid. 801(a) (emphasis added).  In recognition of the emphasis placed on a statement being made by a person, courts have held that "statements" made by machines are not considered hearsay.  See, e.g., United States v. Lamons, 532 F.3d 1251, 1263-1264 (11th Cir. 2008) (computer-generated spreadsheet of telephone billing data reporting calls received was not considered hearsay); United States v. Washington, 498 F.3d 225, 231 (4th Cir. 2007) (printed results of blood toxicology data generated by diagnostic machines were not hearsay); United States v. Hamilton, 413 F.3d 1138, 1142 (10th Cir. 2005) (header information automatically generated by a computer hosting a newsgroup was not hearsay); United States v. Khorozian, 333 F.3d 498, 506 (3d Cir. 2003) (fax header automatically generated by fax machine was not hearsay).  Accordingly, Lyngaas correctly asserts that because "statements" made by machines or computers are not considered hearsay, they are not subject to exclusion under Rule 802.

Lyngaas, however, still must surmount the hurdle of authentication. When statements generated by machines are "mostly a product of mechanical measurement or manipulation of

---

[4] In Lyngaas's post-trial briefing, he abandons the position asserted at trial, Trial Tr. I at 181, that the summary report logs are admissible as business records under Federal Rule of Evidence 803(6).  See Pl. Resp. to Defs. Post-Trial Br. at 1 (Dkt. 124) ("The WestFax logs are not hearsay, so Rules 801 to 803 are irrelevant.").

data by well-accepted scientific or mathematical techniques," courts are encouraged to "assure accuracy by requiring the proponent to lay a proper foundation by showing that the machine and its functions are reliable, that it was correctly adjusted or calibrated, and that basic data put into the machine are accurate." 4 Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence § 8:13 (4th ed. 2013). Laying a proper foundation typically requires authenticating the evidence under Federal Rule of Evidence 901(b)(9). Id. at § 8:13 n.1; see also Lamons, 532 F.3d at 1265 ("The best way to advance the truth-seeking process with respect to such statements is not through cross-examination of the machine operator but through the process of authentication as provided for in Federal Rule of Evidence 901(b)(9) . . . ."); Washington, 498 F.3d at 231 (stating that concerns regarding the reliability of machine-generated information are addressed by requiring the proponent to authenticate the evidence as provided under Rule 901(b)(9)).

Federal Rule of Evidence 901(a) generally requires a proponent of evidence to produce evidence "sufficient to support a finding that the item is what the proponent claims it is." Rule 901(b) provides a non-exhaustive list of means by which evidence may be authenticated. Rule 901(b)(9), in particular, states that evidence may be authenticated through "[e]vidence describing a process or system and showing that it produces an accurate result." Authentication under Rule 901(b)(9) can be accomplished through introducing evidence establishing the following factors:

> (1) the computer equipment is accepted in the field as standard and competent and was in good working order; (2) qualified computer operators were employed; (3) proper procedures were followed in connection with the input and output of information; (4) a reliable software program was utilized; (5) the equipment was programmed and operated correctly; and (6) the exhibit is properly identified as the output in question.

5 Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence § 9:20 (4th ed. 2013); see also 5 Jack B. Weinstein, et al., Weinstein's Federal Evidence § 901.12 (2d ed. 2018) ("[I]t is common for the proponent to provide evidence of the input procedures and their accuracy, and

evidence that the computer was regularly tested for programming errors. At a minimum, the proponent should present evidence sufficient to warrant a finding that the information is trustworthy and provide the opponent with an opportunity to inquire into the accuracy of the computer and of the input procedures.").

In practice, courts admitting computer-generated evidence as non-hearsay have evaluated evidence describing the "process or system" by which the data was generated, consistent with Rule 901(b)(9). For example, with respect to the printed results of blood toxicology testing, evidence was offered describing the exact type of testing performed, the type of machine, computer, and software used to perform the testing, and the process by which the testing was performed. Washington, 498 F.3d at 228. With respect to telephone billing data listing received calls, detailed evidence was presented regarding the process by which the billing records were created by an automated system, as well as how that raw data was decrypted and read using particular software. Lamons, 532 F.3d at 1262. The evidence included testimony from a representative of the software development company responsible for formatting and decrypting the data. Id. Given this information, the Eleventh Circuit stated it had "no difficulty concluding that the statements in question are the statements of machines, not statements of persons," and that "no human intervened at the time the raw billing data was 'stated' by the machine." Id. at 1263-1264. In United States v. Channon, spreadsheet data recording transactions by thousands of fraudulent retail store accounts was authenticated through evidence that "[t]he data was created at the point of sale, transferred to OfficeMax servers, and then passed to the third-party database maintained by SHC." 881 F.3d 806, 809, 811 (10th Cir. 2018). An SHC representative testified regarding this process and stated that the spreadsheets reflected the same information maintained in the database. Id. at 810.

Lyngaas relies on Komniey's testimony to authenticate the summary report logs. However, Komniey's testimony demonstrates that he had no personal knowledge of the process by which the summary report logs were generated or whether the information contained in the logs was accurate. Komniey did not testify regarding the system or process by which WestFax created the summary report logs. Although he stated the summary report logs were generated "automatically" when the fax broadcasting was complete, he did not testify regarding <u>how</u> they were automatically generated. Komniey Dep. at 85. Indeed, Komniey agreed that he had "no personal knowledge as to the origin or production of that spreadsheet because that's something that WestFax does . . . ." <u>Id.</u> at 175-176. This Court previously held with respect to the same testimony that Komniey was unable to authenticate the summary report logs under Rule 901(b)(9) because he did not testify regarding the process by which the reports were generated. 5/23/19 Op. at 21 n.6 (Dkt. 89). Given Komniey's unfamiliarity with how the summary report logs were generated, let alone whether WestFax actually created them, his testimony is insufficient to establish that the system or process by which those statements are made is reliable and accurate, as required under Rule 901(b)(9).

Lyngaas contends that the faxes can be authenticated by Komniey, as a witness with knowledge or familiarity, under Rules 901(b)(1), (b)(2) and (b)(6), as his testimony establishes that the summary report logs are what they are claimed to be. Lyngaas maintains that an authenticating witness need not have personal knowledge of the sending fax machine to authenticate a fax generated by it. In support, he relies on <u>Khorozian</u>, in which the Third Circuit held that a fax header indicating a transmission date was a non-hearsay statement by a machine. 333 F.3d at 506. The panel acknowledged that "ordinarily a fax's sender would authenticate the document by testifying to such foundational facts as that the fax machine [automatically] date-

stamps transmissions, that it was in proper working order, that she did not tamper with it, etc." Id. However, the court held that the receiver of the fax authenticated the document by testifying that she received it on the date indicated in the header. Id. Thus, the receiver of the fax confirmed that the date reflected on the header was the date she actually received the fax. This testimony, therefore, authenticated the header by confirming that the sending fax machine was in proper working order, given the independent confirmation by a person with personal knowledge that the date reflected in the header was accurate.

Komniey's testimony, by contrast, cannot verify the accuracy of the summary report logs based on his general familiarity with similar documents. Komniey testified regarding his belief that the summary report logs reflected accurate information, stating that the information "should all be correct," and that "[t]he only possible thing that could make them incorrect is if—were WestFax's reporting system was in error." Komniey Dep. at 137-138. He also stated that he "routinely" used WestFax over his eighteen years of operating AdMax and staked his personal reputation on the accuracy of the "standardized" reporting of successful faxes. Id. at 12-13, 134, 138-139. Accordingly, Lyngaas argues that Komniey knew from personal experience that the summary report logs accurately reported successful fax transmissions. However, Komniey also admitted that defense counsel was correct in stating, "If a WestFax piece of information says a number failed, you don't know, as you sit here today, when it failed or not; you just know that's what WestFax told you; right?" Id. at 175-176. Komniey, therefore, admitted his lack of personal knowledge regarding the summary report logs' origins or accuracy. Regardless of his personal experience and familiarity with using WestFax, Komniey cannot independently verify that the results of the summary report logs are accurate.

Finally, Lyngaas contends that the Sixth Circuit permits evidence to be authenticated through circumstantial evidence. Pl. Resp. to Defs. Post-Trial Br. at 7 (Dkt. 124). For example, the Sixth Circuit held that a letter offered as evidence against the defendant need not have been authenticated by the sender. United States v. Crosgrove, 637 F.3d 646, 658 (6th Cir. 2011). In Crosgrove, the panel explained that the letter was authenticated based on evidence that it was seized from the offices of the defendant's employer and based on testimony from the defendant's predecessor stating that he received a similar letter and informed the sender that the letter should be directed to the defendant. Id. Lyngaas maintains that the circumstantial evidence here supports authentication, as it is undisputed that Curaden USA purchased the target list, that it paid AdMax to send the faxes, and that AdMax, in turn, hired WestFax to send the faxes. As discussed above, however, a number of courts have held that the key factor in authenticating statements made by machines is Rule 901(b)(9), which requires evidence describing the "process or system and showing that it produces an accurate result." Lyngaas has supplied no authority relying on circumstantial evidence to authenticate computer-generated statements under Rule 901(b)(9).

Consequently, in view of the deficiencies in Komniey's testimony identified above, Lyngaas has presented no evidence describing the process or system by which the summary report logs were created. Nor is there any verification by an individual with personal knowledge that the result of each attempted fax transmission recorded in those logs is accurate. Lyngaas has presented no evidence describing the reliability of the software and equipment used to create the logs—or indicating that the software and equipment were in proper working order on March 8 and March 28, 2016, the dates of the fax broadcasts. The summary report logs, therefore, must be excluded based on a lack of adequate authentication under Rule 901(b)(1).

Several additional exhibits are likewise inadmissible because they contain information that is derived from the summary report logs. First, Lyngaas seeks to introduce two invoices from AdMax to Curaden USA, for the broadcast of 33,226 fax transmissions sent on March 8, 2016, Pl. Trial Ex. 26 (Dkt. 122-4), and for the broadcast of 32,678 fax transmissions sent on March 28, 2016, Pl. Tr. Ex. 27 (Dkt. 122-5). During trial, Lyngaas's counsel admitted that the information reported in these invoices "derived" from the automatic computer process used to generate the summary report logs. Trial Tr. II at 49 (Dkt. 116). Second, Lyngaas seeks to introduce an e-mail from WestFax to AdMax containing a job summary generated on March 9, 2016 and reporting the number of successful and failed fax transmissions. Pl. Exs. 24, 36 (Dkts. 121-14, 122-2). AdMax copied similar job summaries into an e-mail sent to Curaden USA, which Lyngaas also seeks to introduce into evidence. Pl. Ex. 37 (Dkt. 122-6). Lyngaas's counsel again conceded during trial that these e-mails containing job summaries and stating the total number of successful transmissions were the "result" of the automatically-generated computer records. Id. at 45, 49-50. Because these documents report information premised on the inadmissible summary report logs, they too must be excluded for the purpose of establishing the number of faxes received by class members.

### 2. Lee Howard's Testimony Is Inadmissible

Lyngaas's alternative route to establish the number of successful fax transmissions is via his proffered expert, Lee Howard. He testified regarding the number of faxes sent based on his evaluation of the summary fax reports, his understanding of faxing technology, and his review of prior statements from WestFax president Barry Clark. As explained below, Howard's testimony does not meet the standards of reliability under Daubert, nor is the testimony persuasive.

The admissibility of expert testimony is governed by Federal Rule of Evidence 702. Under Rule 702, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise" if the following criteria are met:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed R. Evid. 702.

Rule 702 places a special obligation on the trial court to act as a gatekeeper, ensuring that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 589 (1993). In Kumho Tire Company v. Carmichael, 526 U.S. 137, 147 (1999), the Supreme Court clarified that the "gatekeeping obligation" is not limited to "scientific" expert testimony, but applies to all expert testimony. In other words, Rule 702 requires a district court to satisfy itself that the proposed expert testimony will assist the trier of fact, before permitting the trier of fact to assess such testimony. Id. at 148-149. The proponent of the expert must establish admissibility by a preponderance of the evidence. Nelson v. Tenn. Gas Pipeline, Co., 243 F.3d 244, 251 (6th Cir. 2001).

In Daubert, the Supreme Court provided a non-exclusive checklist for trial courts to consult in evaluating the reliability of expert testimony. 509 U.S. at 593. In this way, "Daubert attempts to strike a balance between a liberal admissibility standard for relevant evidence on the one hand and the need to exclude misleading 'junk science' on the other." Best v. Lowe's Home Ctrs., Inc., 563 F.3d 171, 176-177 (6th Cir.2009). The factors include: "testing, peer review, publication, error rates, the existence and maintenance of standards controlling the technique's

operation, and general acceptance in the relevant scientific community." In re Scrap Metal Antitrust Litig., 527 F.3d 517, 529 (6th Cir. 2008); Daubert, 509 U.S. at 593-594. The test for reliability is flexible, and the Daubert factors are neither definitive nor exhaustive. Nelson, 243 F.3d at 251 (citing Kumho, 526 U.S. at 141). Rather, the factors "may be tailored to the facts of a particular case," and "should be applied only where they are reasonable measures of the reliability of expert testimony." In re Scrap Metal, 527 F.3d at 529 (quotation marks and citations omitted).

Under Federal Rule of Evidence 703, experts are permitted to testify "without personal knowledge of the underlying facts or data and . . . on the basis of hearsay or unadmitted evidence, as long as the evidence is of a kind reasonably relied upon by experts in the particular field." United States v. Bonds, 12 F.3d 540, 566 (6th Cir. 1993) (internal quotation marks omitted). Nevertheless, a court must ensure that an expert's testimony "rests on a reliable foundation." Daubert, 509 U.S. at 597. Indeed, "[b]y permitting the use of otherwise inadmissible evidence (such as hearsay about studies or experiments conducted by others), the Rule [703] clearly contemplates a foundational requirement that the underlying data which supports an expert's opinion be reliable." Isely v. Capuchin Province, 877 F. Supp. 1055, 1064 (E.D. Mich. 1995).

Defendants argue that Howard's testimony is inadmissible because it is speculative and is not based on reliable or trustworthy information. Howard's opinion regarding the successful number of fax transmissions is premised entirely on the summary report logs, and Defendants observe that he lacks any knowledge regarding the exact system or process used to create the logs or the accuracy of the results. As such, Defendants contend that Howard's testimony does not meet the requirement under Daubert that an expert's "knowledge" be premised on "'good

grounds' based on what is known," rather than on "subjective belief or unsupported speculation." Daubert, 509 U.S. at 590.

During trial, Howard opined that the summary report logs were reliable because WestFax used T.30 faxing protocol in determining whether a fax transmission was successful. Trial Tr. I at 69 (Dkt. 115). In arriving at this conclusion, Howard testified that every fax machine employs the T.30 protocol and that he has never encountered any fax software or faxing device that does not employ T.30. Id. at 40-41. He described that the T.30 protocol has five distinct phases:

> Phase A is the initial call placement. Phase B is a negotiation period, also you could call it handshaking. Phase C is the message communication or the image data being communicated. Phase D is the post-page message or the post-message completion information and phase E is a disconnection or a hang-up period.

Trial Tr. I at 39. Howard explained that a successful transmission of a fax is determined "during phase D if the MCF [tone] or confirmation signal is received by the sender from the receiver, then the sender knows that the fax page was communicated properly." Id. Howard explained that an MCF tone is a "message complete signal sent by the receiver to the sender so that the sender is aware that the receiver completely received the document." Id. at 70-71. Thus, the T.30 protocol "requires the recipient of the information to confirm that it positively received the data . . . ." Id. at 40. In Howard's experience, a record of a successful fax transmission signifies the successful completion of all five phases of the T.30 protocol. Id. at 39-40. Finally, Howard opined, based on "common sense," that the fax broadcasts were sent using faxing software, as software would normally be used on the fax servers in situations involving large volumes of fax transmissions. Id. at 46-47.

Howard stated that he reviewed an affidavit and deposition testimony of Barry Clark, WestFax's president, confirming that WestFax not only employs the T.30 protocol but also that

the WestFax records reflect accurate results.[5]  Id. at 69.  Barry Clark stated as follows in his

affidavit:

> 8.  Westfax performs high-volume fax communications using a proprietary
> fax broadcasting platform which, as a part of Westfax's regular business practice,
> creates certain confirmatory records at or near the time the service is performed.
>
> 9.  These records include documentation of the faxing activity.  When a
> fax transmission is successfully sent, the recipient fax machine issues a tone to
> indicate that the transmission was completed, which Westfax's proprietary fax
> broadcasting platform receives and contemporaneously records.  This
> documentation of the received tones creates a comprehensive record of the faxing
> activity at the time of the fax transmissions as a regular part of Westfax's faxing
> business.
> . . .
> 11.  Based on my personal knowledge and five-plus (5+) years of personal
> experience using Westfax's proprietary fax broadcasting platform, the Westfax
> computer system accurately records the number of faxes successfully sent and
> recorded as completed, and accurately reflects that number on its invoices.

Clark Aff. ¶¶ 8-9, 11, App. 10 to Expert Report (Dkt. 102-10).  During his deposition, Clark

stated that WestFax relies on the receipt of a tone indicating "that the fax has been received by

the recipient's fax machine or fax server or fax process," and that WestFax's "system works

correctly" and provides reliable information.  Clark Dep. at 54, 68, App. 9 to Expert Report (Dkt.

102-10).  In reviewing the Clark affidavit and deposition testimony, Howard stated as follows:

> Those various testimonies of Barry Clark helped confirm with me that Westfax
> uses a computer-based fax broadcasting system using ITU T.30 fax protocols, that
> that system is reliable and that Westfax relies on the records that the system
> creates, that Mr. Clark had no reason to believe that the records were inaccurate,
> that Westfax uses the system or the system that Westfax uses follows T.30 in
> determining a successful fax transmission and that Westfax has found that the
> system works correctly.

---

[5] The affidavit was produced in connection with America's Health & Res. Ctr. v. Saratoga
Diagnostics, et al., No. 16-cv-05608 (N.D. Ill.), and concerned fax broadcasts that took place in
2015 and 2016.  Clark Aff. ¶ 4, App. 10 to Expert Report (Dkt. 102-10).  The deposition was
taken in connection with Comprehensive Health Care Sys. v. M3 USA Corp., et al., No. 16-cv-
80967 (S.D. Fla.), and concerned fax broadcasts that took place between October 2015 and June
2016.  Clark Dep. at 52, 84, App. 9 to Expert Report (Dkt. 102-10).

Trial Tr. I at 69.  Accordingly, Howard concluded that "the transmission of Westfax's fax software for all mass fax broadcasts and in particular the identification of successful transmissions of such faxes is accurate and reliable."  Id. at 74.

Neither Lyngaas nor Howard established how Clark's affidavit and deposition testimony is relevant to the present action.  Lyngaas has not established that the faxes were sent by WestFax or that the summary report logs were created by WestFax, as opposed to an unknown third party.  Howard admitted during trial that he had never heard of WestFax prior to his work on the present case, nor could he be certain that WestFax did not use a third party to send the faxes in this case.  Trial Tr. I at 80, 118.  As discussed above, Komniey was similarly unable to determine the origin of the summary report logs.  Komniey Dep. at 175-176.  Given this uncertainty regarding WestFax's role in sending the faxes at issue, Lyngaas has not demonstrated that Clark's testimony regarding the WestFax system is relevant.

Even assuming that WestFax is the entity responsible for sending the faxes and creating the summary report logs, Clark's testimony did not provide an adequate foundation for Howard to conclude that the logs at issue in this case were accurate and reliable.  Clark's statements in his affidavit concerned both the overall reliability of WestFax's system and the reliability of the specific data at issue in the case in which the affidavit was produced.  See Clark Aff. ¶ 23 ("There were no reported problems identified by the Westfax broadcasting platform relating to the fax broadcasts performed on behalf of Saratoga and the records relating to those fax broadcasts on behalf of Saratoga produced pursuant to subpoena in this case, are accurate.").  In contrast, Howard did not review any information establishing that the WestFax software and equipment was in good working order on March 8 and March 28, 2016; that the proper

procedures were implemented in programming and operating the equipment on those dates; or that the software was regularly tested for programming errors.

Although Howard also relied on his understanding of the T.30 protocol in rendering his opinion, T.30 describes how faxes are <u>transmitted</u> but not how summary report logs are <u>created</u>. At most, the T.30 protocol describes how a computer system determines whether a transmission was successful; however, it does not describe how a successful transmission is recorded and whether that process is reliable. In concluding that the summary report logs were accurate, Howard also referenced the fact that he has never encountered a situation involving a falsified summary report log, speculating that it would make no business sense to create an inaccurate report. Trial Tr. I at 71-72.[6] This reasoning is unpersuasive, as it relies on Howard's speculation and his general experience with summary report logs as opposed to evidence regarding the reliability of the logs presently at issue.

Lyngaas contends that Howard's reliance on the summary report logs was proper under Rule 703, as they are a type of document commonly relied upon by experts in Howard's field. <u>Id.</u> at 47-51. However, even if an expert is entitled to rely on otherwise inadmissible evidence, courts must nevertheless ensure that the data underlying the expert's opinion is reliable. <u>Isely</u>, 877 F. Supp. at 1064. A summary report log is not inherently reliable simply because that type of document is commonly relied upon by experts. Lyngaas cites several other TCPA cases in which the plaintiff's expert witness relied upon summary report logs in rendering an opinion. <u>See, e.g.</u>, <u>Am. Copper</u>, 757 F.3d 540, 543, 545 (6th Cir. 2014) ("American Copper's expert witness, analyzed B2B's fax records in his report. Based on those records, Biggerstaff opined

---

[6] Defendants objected to Lyngaas's question regarding why Howard has never encountered falsified summary report logs as calling for speculation. Though the Court references this response, Defendants are not prejudiced because it is found to be unpersuasive.

that 'a total of 10,627 successful transmissions of a complete fax were successfully sent to and received by 10,627 unique fax numbers.'"); <u>Imhoff</u>, 792 F.3d at 630 ("According to Avio's expert, Robert Biggerstaff, B2B's fax logs show that Alfoccino's advertisements were successfully sent 13,980 times to 7,625 unique fax numbers."); <u>Holtzman v. Turza</u>, No. 08 C 2014, 2009 WL 3334909, at *3 (N.D. Ill. Oct. 14, 2009) (the expert "reviewed data on two separate CDs . . . contain[ing] records consistent with records produced by a typical computer-based fax broadcasting system . . . ."). However, there is no indication in <u>American Copper</u> or <u>Imhoff</u> that the summary report logs relied upon by the expert were not established to be reliable. Moreover, in <u>Holtzman</u>, the summary report logs on which the expert relied upon were properly authenticated by a qualified witness. <u>See</u> 2009 WL 3334909, at *3.

In light of the foregoing discussion, Lyngaas has not established by a preponderance of the evidence that Howard's testimony satisfies the requirement under Federal Rule of Evidence 702 that "the testimony is the product of reliable principles and methods" and is premised on "good grounds." Accordingly, Howard's expert testimony is inadmissible.

### 3. Howard's Testimony Is Not Persuasive

Even if Howard's testimony were admissible, it would not be persuasive. During trial, Howard testified regarding the summary report log purportedly generated in connection with the March 28, 2016 fax broadcast. Trial Tr. I at 46. Howard stated that this document represented "a list of 48,389 records detailing job, name, Curaprox toothbrush chal [sic], Curaprox 48390 . . . <u>being successfully sent to . . . 32,678 numbers</u>." <u>Id.</u> (emphasis added). Howard stated that he was able to match successful recipients identified in the summary report log to entries on the target list identifying 48,389 total fax numbers that were to be targeted in the March 28, 2016 fax broadcast, Pl. Ex. 21, for a total of 32,678 successful transmissions. Trial Tr. I at 59.

With respect to the March 8, 2016 fax broadcast, Howard testified regarding an exception report, which represents "a list of fax recipients from the target list where a fax was not successful." Id. at 52. The exception report listed "15,168 records detailing fax transmission failures for job name Curaprox pricing update, 8011 Curaprox dated the 9th of March, 2016." Id. at 55. A target list identified 48,397 total fax numbers that were to be sent the March 8, 2016 fax broadcast. Id. at 50, 57; Pl. Trial Ex. 18 (Dkt. 121-10). Because no document existed identifying the successful transmissions for the March 8, 2016 broadcast, Trial Tr. I at 118, Howard arrived at the number of successful transmissions by removing the 15,168 entries included on the exception report that matched entries on the target list of 48,397 fax numbers, for a total of <u>33,226 successful transmissions</u>. Id. at 52, 57.[7]

Howard's conclusions regarding the number of faxes successfully sent are premised entirely on his evaluation of the summary report logs. For the reasons discussed above, the accuracy and reliability of these documents have not been verified such that the Court is persuaded they may be relied upon to establish the number of successfully transmitted faxes. It is puzzling, to say the least, that Lyngaas failed to come forward with any evidence that was both admissible and meaningful to demonstrate the reliability of the summary report log—a critical component of any "junk fax" claim brought under the TCPA. This failure is even more astonishing given that Lyngaas sought to recover class-wide damages exceeding $30,000,000.

---

[7] As noted by Defendants, the result of subtracting 15,168 from 48,397 is 33,229, leaving a discrepancy of three faxes. Howard explained that this discrepancy represents the invalid or duplicate numbers he subtracted from the target list in addition to the entries listed on the exception report. Trial Tr. I at 58. Howard did not include in his expert report a separate list of the fax numbers he determined to be invalid or duplicative. Id. at 113-114.

### E. Lyngaas Has Established His Individual Claim And That Two Mass Fax Broadcasts Took Place

The parties have stipulated that on March 8 and March 28, 2016, Lyngaas received faxes advertising a Curaden product. SoF ¶ 1 (Dkt. 114). Lyngaas confirmed in his testimony during trial that he received the two fax advertisements from Curaden USA that are the subject of the present litigation, and that he did not give Defendants his permission to send him these advertisements. Trial Tr. I at 23-24 (Dkt. 115). Lyngaas has, therefore, established his individual receipt of two unsolicited faxes sent by Curaden USA in violation of the TCPA.

With respect to the class claim, although Lyngaas has not offered admissible evidence establishing the exact number of faxes sent class-wide, he has established through circumstantial evidence that two mass fax broadcasts took place at Curaden USA's behest. The parties stipulate that Curaden USA purchased a database or "target list" of fax numbers used in the fax campaigns. SoF ¶ 9. These target lists, which were introduced into evidence, contain tens of thousands of fax numbers connected to dental professionals. See Pl. Trial Exs. 17, 18, 20, 21 (Dkts. 121-9, 121-10, 121-12, and 121-13).

A set of e-mails demonstrates that on February 23, 2016, Johnson approved the first fax advertisement and directed Curaden USA employee Diane Hammond to send the faxes; Hammond, in turn, instructed Curaden USA employee Magen James to have the faxes sent to an attached list of "close to 46,000" fax numbers. 3/8/16 E-mails, Pl. Trial Ex. 19 (Dkt. 121-11). On March 8, 2016, James directed AdMax to send the faxes that day. Id. Johnson testified during trial that it was his understanding that faxes were broadcasted on March 8, 2016: "I believe that [Hammond] then sent the graphic and the database to [James]. [James] forwarded those to Admax and evidently Admax did some other things with sending them on, loading them somewhere, but . . . our understanding was that Admax sent the faxes out." Trial Tr. II at 96

(Dkt. 116). A second set of e-mails demonstrates that on March 23, 2016, Hammond instructed James to send out a newer version of the advertisement to an attached list of over 46,000 fax numbers. 3/28/16 E-mails, Pl. Trial Ex. 38 (Dkt. 121-15). James, in turn, directed AdMax to broadcast the faxes the following Monday, March 28, 2016. Id. Consistent with this evidence, Johnson testified that Curaden USA created a second advertisement, which was transmitted to AdMax to send to dental professionals. Trial Tr. II at 104-105. The evidence is clear that Curaden USA sent two mass-fax transmissions.

Although Lyngaas has not established the aggregate number of faxes sent, he has successfully established all other elements necessary to demonstrate Curaden USA's violation of the TCPA. Thus, the only question remaining is how many faxes were sent class-wide. In similar instances where a defendant's statutory violation has been established, courts have afforded plaintiffs the opportunity to establish potential class members' identities through a claims administration process. See Krakauer v. Dish Network, LLC, No. 1:14-CV-333, 2017 WL 3206324, at *5 (M.D.N.C. July 27, 2017) ("[T]he trial already established all of the elements necessary to prove a violation . . . . Whether a claimant is a class member is a question that can be more appropriately, fairly, and efficiently resolved through a claims administration process as authorized by Rule 23."); Six Mexican Workers v. Arizona Citrus Growers, 641 F. Supp. 259, 260-261 (D. Ariz. 1986) (finding the defendants liable following a bench trial and subsequently authorizing a claims administration process to identify class members).

### F. Relief

The TCPA creates a private cause of action enabling fax recipients "to receive $500 in damages for each such violation [of the TCPA]." 27 U.S.C. § 227(b)(3)(B). Thus, Curaden USA violated the TCPA each time its faxes were successfully transmitted. Because Lyngaas

established two such violations by Curaden USA against him individually, the Court awards him statutory damages in the amount of $1,000.00.  Because Lyngaas failed to establish the liability of Curaden AG, Curaden AG is entitled to a determination of no cause of action as to it.  These awards shall be embodied in a judgment, to be presented to the Court as described below.

In addition, the judgment will establish, with respect to the class claims, a claims administration process that will afford potential class members the opportunity to establish their receipt of unsolicited fax advertisements from Curaden USA.  In class actions, "courts must use their discretion, and in many cases their ingenuity, to shape decrees or to develop procedures for ascertaining damages and distributing relief that will be fair to the parties but will not involve them in an unduly burdensome administration of the award."  7AA Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 1784 (3d ed. 2017)).  The manner of a claims administration process is to be driven by the particular needs of an individual case, id., with the ultimate goal of distributing "as much of the available damages remedy to class members as possible and in as simple and expedient a manner as possible," 4 William B. Rubenstein, Newberg on Class Actions § 12:15 (5th ed. 2017).  If a claim form is necessary, "the claiming process should be as simple, straightforward, and nonburdensome as possible."  Id. at § 12:21.

This Court will employ a claims administration process similar to that used in Krakauer to resolve uncertainties in data regarding class membership.  See 2017 WL 3206324, at *5.  The parties are to confer regarding the details of the claims process, including the individual who will serve as the claims administrator.  The claims administrator shall distribute claim forms to potential class members in the same manner class notice was disseminated.  See 7/3/19 Order at 5-6 (Dkt. 100) (approving dissemination of class notice by sending the notice "to each of the fax

numbers identified as having been sent one or more of the faxes at issue in this case; for each fax that cannot be sent successfully after three attempts, notice shall be sent by U.S. Mail to the address last known or suspected to have been associated with that fax number ").

The claim form shall summarize the legal proceedings, prominently state the deadline for submission, and require claimants to submit sworn affidavits attesting to the following information: (1) their name, (2) their contact information, including fax number and address, (3) their receipt of a fax from Curaden USA on March 8, 2016 and/or on March 28, 2016, and (4) that they did not expressly invite or permit Curaden USA to send them faxes. Given that claimants demonstrated to be class members will be entitled to receive $500 or $1000 before costs and attorney fees, it is not unduly burdensome that they be required to supply an affidavit setting forth this basic information. The parties shall confer regarding the exact format of the claim form and any other communication instructing potential class members on how to submit a claim, as well as an appropriate deadline for submission of claims. The claim form should be as clear and straightforward as possible.

The claims administrator shall receive completed forms and affidavits and shall make copies available to the parties. After verifying the information contained in each claimant's affidavit with the information reflected on the target lists, the parties shall confer regarding disputes or agreement with respect to each claimant's status as a class member. If the parties dispute a claimant's status as a class member, a summary decision process will be established by the claims administrator. Although Curaden USA will be entitled to participate in the claims administration process and to review claims, it is not entitled to discovery or trial regarding a claimant's status as a class member. See Krakauer, 2017 WL 3206324, at *4-5, 10; see also Six Mexican Workers, 641 F. Supp. at 261 (declining to impose rigorous means of verifying class

members' identities and instead ordering plaintiffs to establish "reasonable measures" of verifying identities).  If a claim form is complete and consistent with the information reflected in the target lists, it will be granted.  If a claim form is inconsistent with the information in the target lists or is incomplete or otherwise facially deficient, it will be denied.  The claims administrator, however, shall afford an individual claimant a second chance to fill out an incomplete form, and under appropriate circumstances, the claims administrator may seek additional specific information from a particular claimant.  Each claimant who is deemed to be a class member shall be entitled to receive $500 per unsolicited fax received from Curaden USA.  See 27 U.S.C. § 227(b)(3)(B).

The parties shall also confer regarding how to address the issues of attorney fees, how the parties shall share the cost of the claims administration process, and any other issue that should be resolved or identified for resolution in the judgment.

If the parties are able to reach agreement on all points discussed above, they shall submit a proposed judgment on or before December 5, 2019.  If they are not able to reach agreement on all points, Lyngaas shall file a motion for entry of judgment on or before December 5, 2019.  The motion must include as an attachment a proposed judgment.  The supporting brief, which may not exceed fifteen pages, must identify points of agreement and disagreement and cite authorities in support of Lyngaas's positions on disputed points.  Curaden USA must file an opposition to the motion on or before December 16, 2019, attaching a proposed judgment.  Curaden USA must also file a supporting brief, not to exceed fifteen pages, citing authorities in support of its position on disputed points.

## IV. CONCLUSION

The Court finds for Lyngaas on his individual claim for Curaden USA's two violations of the TCPA and awards damages in the amount of $1,000.00. With respect to the class claims, the Court requires a claims administration process as described above to afford potential class members an opportunity to establish their receipt of Curaden USA's unsolicited fax advertisements. Lyngaas, however, has failed to establish liability on the part of Curaden AG.

Both parties filed motions in limine (Dkts. 95, 96), which are dismissed as they have been rendered moot by the Court's conclusions of law. Additionally, at the close of Lyngaas's proofs at trial, Defendants made an oral motion for judgment on partial findings under Federal Rule of Civil Procedure 52(c). This motion is likewise dismissed, as it has been rendered moot by the present ruling. Finally, the Court dismisses Lyngaas's Count II conversion claim, which was voluntarily withdrawn.

SO ORDERED.

Dated: November 21, 2019                        s/Mark A. Goldsmith
       Detroit, Michigan                           MARK A. GOLDSMITH
                                          United States District Judge