# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Deborah S. Hunt
Clerk

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed:  March 24, 2021

Mr. Phillip Andrew Bock
Mr. David Max Oppenheim
Bock & Hatch
134 N. LaSalle Street
Suite 1000
Chicago, IL 60602

Mr. Brian S. Sullivan
Dinsmore
255 E. Fifth Street
Suite 1900
Cincinnati, OH 45202

Re:  Case Nos. 20-1199/20-1200/20-1243, *Brian Lyngaas v. Curaden AG, et al*
Originating Case No. : 2:17-cv-10910

Dear Counsel,

The court today announced its decision in the above-styled cases.

Enclosed is a copy of the court's opinion together with the judgment which has been entered
in conformity with Rule 36, Federal Rules of Appellate Procedure.

Yours very truly,

Deborah S. Hunt, Clerk

Cathryn Lovely
Deputy Clerk

cc: Ms. Kinikia D. Essix

Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0069p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

———————————

BRIAN LYNGAAS, D.D.S., individually and as the
representative of a class of similarly situated persons,
      *Plaintiff-Appellee/Cross-Appellant* (20-1199/20-1200),
      *Plaintiff-Appellant/Cross-Appellee* (20-1200/20-1243),

    *v.*

CURADEN AG,
    *Defendant-Appellee/Cross-Appellant* (20-1200/20-1243),

CURADEN USA, INC.,
    *Defendant-Appellant/Cross-Appellee* (20-1199/20-1200).

> Nos. 20-1199/1200/1243

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:17-cv-10910—Mark A. Goldsmith, District Judge.

Argued: January 13, 2021

Decided and Filed: March 24, 2021

Before: CLAY, GILMAN, and THAPAR, Circuit Judges.

———————————

## COUNSEL

**ARGUED:** Brian S. Sullivan, DINSMORE & SHOHL LLP, Cincinnati, Ohio, for Curaden AG
and Curaden USA, Incorporated. David M. Oppenheim, BOCK, HATCH, LEWIS &
OPPENHEIM, LLC, Chicago, Illinois, for Brian Lyngaas, D.D.S. **ON BRIEF:** Brian S.
Sullivan, DINSMORE & SHOHL LLP, Cincinnati, Ohio, for Curaden AG and Curaden USA,
Incorporated. David M. Oppenheim, Phillip A. Bock, BOCK, HATCH, LEWIS &
OPPENHEIM, LLC, Chicago, Illinois, for Brian Lyngaas, D.D.S.

    GILMAN, J., delivered the opinion of the court in which CLAY, J., joined. THAPAR, J.
(pp. 33–44), delivered a separate opinion concurring in part and dissenting in part.

_____

## OPINION

_____

RONALD LEE GILMAN, Circuit Judge.  This case involves two unsolicited fax advertisements received by Brian Lyngaas, D.D.S., in March 2016.  Lyngaas asserts, on behalf of himself and all similarly situated class members, that Curaden AG and its U.S. subsidiary, Curaden USA, violated the Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227, by sending the advertisements.

At the summary-judgment stage of the case, the district court ruled that Lyngaas could not pierce the corporate veil to hold Curaden AG liable for Curaden USA's action, that faxes received by a computer over a telephone line (in addition to faxes received by traditional fax machine) violated the TCPA, and that it had personal jurisdiction over both defendants. Following a bench trial, the district court held that Curaden USA violated the TCPA by sending the two unsolicited fax advertisements to Lyngaas, but that Curaden AG was not liable as a "sender" under the TCPA.  The court further held that Lyngaas's evidence and expert-witness testimony as to the total number of faxes successfully sent by Curaden USA were inadmissible due to unauthenticated fax records.  It therefore established a claims-administration process for class members to verify their receipt of Curaden USA's unsolicited fax advertisements.

Both Lyngaas and Curaden USA appeal the judgment of the district court, and both Lyngaas and Curaden AG cross-appeal.  For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I.  FACTUAL BACKGROUND

Lyngaas is a dentist who practices in Livonia, Michigan.  On March 8 and again on March 28, 2016, Lyngaas received on his workplace fax machine unsolicited faxes advertising the Curaprox Ultra Soft CS 5460 toothbrush.  The toothbrush in question is manufactured by Curaden AG, a privately owned Swiss entity.  Curaden USA, an Ohio corporation headquartered in Arizona, is a subsidiary of Curaden AG that promotes Curaden AG products, including the Curaprox Ultra Soft CS 5460 toothbrush, throughout the United States.

Although a standard written distribution agreement typically governs the practices of Curaden AG's subsidiary distributors, Curaden AG and Curaden USA operated instead under an oral agreement. This is because the written distribution agreement was exchanged but never formally executed. But since "[e]verybody ha[d] assumed it ha[d] been signed," according to the managing director of Curaden AG, many of the tenets of the standard written distribution agreement have been observed in practice by both entities. For example, Curaden USA was the exclusive distributor of Curaden AG products within the United States, consistent with § 2.1 of the distribution agreement, and Curaden USA "use[d] its best endeavours to promote the sale of the [Curaden AG] [p]roducts throughout the Territory," consistent with § 5.1.

Some of the terms of the standard distribution agreement, however, were not observed by Curaden USA. As relevant to this case, Curaden USA never presented its advertising materials to Curaden AG for review or approval, even though § 5.7 and § 5.8 of the distribution agreement gave Curaden AG the right to approve all marketing materials developed by its distributors.

Curaden USA planned a fax campaign as part of its marketing efforts. It purchased a target list of thousands of dental professionals' fax numbers, and Curaden USA employee Diane Hammond created the two fax advertisements at issue in this case. Both advertisements promoted the Curaprox Ultra Soft CS 5460 toothbrush and were directed to "dental professionals." Displayed on the advertisements was Curaden USA's contact information, including a fax number, phone number, email address, website, and social media accounts, all of which were connected to and exclusively maintained by Curaden USA. The advertisements made no mention of Curaden AG, instead referring all communications to Curaden USA.

Curaden USA did not provide the advertisements for review to either Curaden AG or to Richard Thomas, the managing director of Curaden UK and an advisor to all Curaden AG subsidiaries. Rather, on February 23, 2016, Curaden USA's vice president and managing director Dale Johnson approved the advertisement and directed Hammond to broadcast the faxes. Hammond in turn instructed Curaden USA employee Magen James to send the advertisement to the purchased target list of over 46,000 fax numbers. Curaden USA hired AdMax Marketing, a fax broadcasting company, to send the faxes. AdMax then hired another company, WestFax, to complete the job.

The first fax advertisement was sent, at James's direction, on March 8, 2016 to the target list. Hammond then instructed James to send out a newer version of the advertisement to an attached list of the 46,000-plus fax numbers, updated to exclude those who had opted out after the first fax blast. This second advertisement was sent out, at James's direction, on March 28, 2016. After the faxes were transmitted, AdMax invoiced Curaden USA, and Curaden USA paid the invoices.

## II. PROCEDURAL BACKGROUND

Lyngaas, on behalf of himself and all similarly situated class members, filed suit in March 2017, alleging violations of the TCPA. Curaden USA answered the complaint, whereas Curaden AG moved to dismiss the complaint based on a lack of personal jurisdiction over it. The district court denied Curaden AG's motion.

After a two-year discovery period, Curaden AG moved for summary judgment, arguing again that the court lacked personal jurisdiction over it, while Lyngaas moved both for summary judgment and to certify the class. Both Curaden AG and Curaden USA opposed class certification, arguing that Lyngaas had failed to support his motion with admissible evidence to establish the elements necessary for class certification, and that the court lacked personal jurisdiction over them as to the proposed out-of-state class members under *Bristol-Myers Squibb Company v. Superior Court of California, San Francisco County*, 137 S. Ct. 1773 (2017). The district court denied Lyngaas's summary-judgment motion, denied in part and granted in part Curaden AG's summary-judgement motion, and granted class certification.

After a two-day bench trial in September 2019, the court reviewed post-trial briefings and issued its opinion two months later. At the outset of the opinion, the court affirmed its reasoning from the earlier motion-to-dismiss and summary-judgment rulings, holding once again that it had personal jurisdiction over both defendants. The court also found that Curaden USA violated the TCPA by sending two unsolicited fax advertisements to Lyngaas as part of the two mass-fax campaigns. It thus awarded Lyngaas statutory damages of $500 for each unsolicited fax, *see* 47 U.S.C. § 227(b)(3)(B), for a total of $1,000. As for Curaden AG, however, the court held that Lyngaas had failed to establish that Curaden AG qualified as a "sender" under the TCPA.

The district court next held that Lyngaas had not established the total number of faxes successfully sent classwide, ruling that the summary-report logs (documents that purportedly list each successful recipient) were inadmissible due to inadequate authentication, and that testimony from Lyngaas's expert witness was inadmissible and unpersuasive. This caused the court to establish a claims-administration process to afford class members the opportunity to verify their receipt of Curaden USA's unsolicited fax advertisements.

Curaden USA timely appealed. Lyngaas responded with a cross-appeal and filed his own separate appeal, to which Curaden AG cross-appealed. Specifically, Lyngaas argues that the district court erred by finding that Curaden AG was not a "sender" for purposes of TCPA liability, by failing to admit key evidence at trial, and by granting summary judgment in favor of the defendants on the question of piercing the corporate veil. Curaden AG in turn asserts that the district court totally lacked personal jurisdiction over it, whereas Curaden USA argues that the district court did not have personal jurisdiction over it with regard to non-Michigan class members, and that the court improperly established a claims-administration process to award relief. Both Curaden AG and Curaden USA further argue that the district court erroneously found, when certifying the class, that a "telephone facsimile machine" includes faxes routed to computers, and that the district court improperly relied on inadmissible evidence when certifying the class.

## III. ANALYSIS

### A.     Standard of review

We review *de novo* a district court's denial of a motion to dismiss for lack of personal jurisdiction and its denial of a motion for summary judgment. *AlixPartners, LLP v. Brewington*, 836 F.3d 543, 548 (6th Cir. 2016). But we review a district court's decision of whether to certify a class under the abuse-of-discretion standard. *Hicks v. State Farm Fire & Cas. Co.*, 965 F.3d 452, 457 (6th Cir. 2020).

In an appeal from a bench trial, we review the district court's conclusions of law *de novo,* but review its findings of fact under the clear-error standard. *Overton Distribs., Inc. v. Heritage Bank,* 340 F.3d 361, 366 (6th Cir. 2003). "A finding is 'clearly erroneous' when although there

*Lyngaas v. Curaden AG, et al.*

is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Mabry*, 518 F.3d 442, 449 (6th Cir. 2008) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)).  "When factual findings rest upon credibility determinations, this Court affords great deference to the findings of the district court." *Schroyer v. Frankel*, 197 F.3d 1170, 1173 (6th Cir. 1999).

**B.     Personal jurisdiction over Curaden AG**

In resolving Curaden AG's motions to dismiss and for summary judgment, the district court found that it had specific personal jurisdiction over Curaden AG based on Curaden AG's contacts with the state of Michigan and that, in the alternative, jurisdiction was proper under Rule 4(k)(2) of the Federal Rules of Civil Procedure based on Curaden AG's contacts with the United States as a whole.  But the court then granted summary judgment in favor of Curaden AG on the question of whether Curaden USA served as an "alter ego" of Curaden AG, holding that the court should not pierce the corporate veil to exercise personal jurisdiction over Curaden AG on the basis of Curaden USA's actions.  Lyngaas renews his "alter ego" theory on appeal, whereas Curaden AG again argues that the district court lacked personal jurisdiction over it on any basis.

**1.     *Curaden USA as an alter ego of Curaden AG***

We agree with the district court's conclusion that Curaden USA is not Curaden AG's alter ego.  The alter-ego theory can subject a parent company to personal jurisdiction where "the parent company exerts so much control over the subsidiary that the two do not exist as separate entities but are one and the same for purposes of jurisdiction."  *Indah v. S.E.C.*, 661 F.3d 914, 921 (6th Cir. 2011) (citation omitted).  In the present case, both parties correctly rely on Michigan law in determining whether alter-ego liability applies.  *See Bd. of Trustees, Sheet Metal Workers' Nat'l Pension Fund v. Courtad, Inc.*, No. 12-2738, 2014 WL 3613383, at *3–4 (N.D. Ohio July 18, 2014) ("Outside of labor law or ERISA claims, courts tend not to supplant state corporate liability doctrine with federal common law.").

To pierce the corporate veil under Michigan law, "first, the corporate entity must be a mere instrumentality of another; second, the corporate entity must be used to commit a fraud or

wrong; and third, there must have been an unjust loss or injury to the plaintiff." *In re RCS Eng'rd Prods. Co., Inc.*, 102 F.3d 223, 226 (6th Cir. 1996) (citing *Nogueroas v. Maisel & Assocs. of Mich.*, 369 N.W.2d 492, 498 (Mich. 1985)).  Lyngaas argues that the district court erred, first, by not taking Curaden USA's undercapitalization into full account in the "mere instrumentality" analysis and, second, by using the incorrect standard in requiring Lyngaas to show that Curaden AG "engage[d] in deliberate wrongful conduct that was either designed to or actually did produce injury."

Regarding undercapitalization, that factor indeed provides at least prima facie weight in favor of finding that Curaden USA was a "mere instrumentality" of Curaden AG because Curaden USA was not profitable, and the evidence is unclear as to what extent Curaden USA paid Curaden AG for the products it purchased.  But undercapitalization is just one factor in the analysis.  Whether the corporate entity is a "mere instrumentality of another" is determined by analyzing

> (1) whether the corporation is undercapitalized, (2) whether separate books are kept, (3) whether there are separate finances for the corporation, (4) whether the corporation is used for fraud or illegality, (5) whether corporate formalities have been followed, and (6) whether the corporation is a sham.

*Lim v. Miller Parking Co.*, 560 B.R. 688, 706 (E.D. Mich. 2016) (quoting *Glenn v. TPI Petrol., Inc.*, 854 N.W.2d 509, 520 (Mich. 2014)).

Lyngaas does not dispute the district court's findings that "[t]he two companies keep separate books . . . and follow corporate formalities," nor that "Curaden USA has its own employees and its own offices."  Because the evidence further shows that the plan was for Curaden USA, launched in 2014, to be profitable within eight years, the district court did not err in finding that Curaden USA's "undercapitalization" was outweighed by the other five factors, none of which supported the finding of an alter-ego relationship.  *See Needa Parts Mfg., Inc. v. PSNet, Inc.*, 635 F. Supp. 2d 642, 647 (E.D. Mich. 2009) ("While it may be true that PSNet was an undercapitalized start-up company, it does not follow that the court must rule as a matter of law that PSNet is a mere alter ego of PSNet Communications.").

Lyngaas also fails to point to any other telling signs of undercapitalization, such as leaving creditors unpaid or using Curaden USA as the parent company's bank account. *Cf. Laborers' Pension Trust Fund v. Sidney Weinberger Homes, Inc.,* 872 F.2d 702, 705 (6th Cir. 1988) (piercing the corporate veil where the individual defendant paid corporate expenses out of his own pocket, the corporation paid the individual's personal expenses, the individual withdrew money from the corporation and left creditors unpaid, and the financial records were inadequate); *Grass Lake All Seasons Resort v. United States,* 2005 WL 2095890, at *13 (E.D. Mich. Aug. 29, 2005) (piercing the corporate veil where the individual defendant looted the corporation for personal use, did not have his own bank account or property in his own name, and used the company to avoid paying taxes for over ten years).

As to whether "the manner of use effected a fraud or wrong on the complainant . . . , it is not necessary to prove that the owner caused the entity to directly harm the complainant; it is sufficient that the owner exercised his or her control over the entity in such a manner as to wrong the complainant." *Green v. Ziegelman*, 873 N.W.2d 794, 807 (Mich. Ct. App. 2015). Lyngaas states the correct standard, but points to no evidence showing how Curaden AG exercised its control over Curaden USA in such a manner as to wrong him or to pursue some unlawful end. *See Seasword v. Hilti, Inc.,* 537 N.W.2d 221, 224 (Mich. 1995) (holding that the corporate veil "may be pierced only where an otherwise separate corporate existence has been used to subvert justice or cause a result that is contrary to some other clearly overriding public policy") (alterations, citation, and internal quotation marks omitted).

"[E]stablishing an entity for the purpose of avoiding personal responsibility is not by itself a wrong that would warrant disregarding the entity's separate existence." *Ziegelman*, 873 N.W.2d at 807. The lack of "some form of culpable conduct," in short, dooms Lyngaas's theory. *See Chrysler Corp. v. Ford Motor Co.*, 972 F. Supp. 1097, 1105 (E.D. Mich. 1997). We will thus follow "[t]he general principle . . . that separate corporate identities will be respected." *In re RCS Eng'rd Prods. Co., Inc.*, 102 F.3d 223, 226 (6th Cir. 1996) (quoting *Wodogaza v. H&R Terminals, Inc.*, 411 N.W.2d 848, 852 (Mich. Ct. App. 1987)).

> **2.    Personal jurisdiction over Curaden AG due to its contacts with the United States**

This leads us to the question of whether there is some other basis for personal jurisdiction over Curaden AG.  The district court held that, pursuant to Rule 4(k)(2) of the Federal Rules of Civil Procedure, it had personal jurisdiction over Curaden AG due to Curaden AG's contacts with the United States as a whole.  Notably, Curaden AG does not offer any argument to the contrary.  Rule 4(k)(2) "acts as a sort of federal long-arm statute," *Sunshine Distrib., Inc. v. Sports Auth. Mich., Inc.*, 157 F. Supp. 2d 779, 788 (E.D. Mich. 2001) (internal citation and quotation marks omitted), and provides as follows:

> For a claim that arises under federal law, serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant if:
>
> A.  the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and
>
> B.  exercising jurisdiction is consistent with the United States Constitution and laws.

We have yet to apply Rule 4(k)(2) in a published opinion, likely because defendants rarely have the requisite relationship with the United States as a whole, but not with any individual state.  Other circuits have addressed the application of Rule 4(k)(2), however, and we adopt their analyses here.

To establish that jurisdiction is proper under Rule 4(k)(2), "(1) the cause of action must arise under federal law; (2) the defendant must not be subject to the personal jurisdiction of any state court of general jurisdiction; and (3) the federal court's exercise of personal jurisdiction must comport with due process."  *Plixer Int'l, Inc. v. Scrutinizer GmbH*, 905 F.3d 1, 6 (1st Cir. 2018); *see also Cent. States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 940 (7th Cir. 2000) (similar).  There is no dispute that the first two requirements are met here: this is a federal-question case and Curaden AG has pointed to no state where it could properly be sued.  *See Adams v. Unione Mediterranea Di Sicurta*, 364 F.3d 646, 651 (5th Cir. 2004) ("[S]o long as a defendant does not concede to jurisdiction in another state, a court may use 4(k)(2) to confer jurisdiction." (citing *ISI Int'l, Inc. v. Borden Ladner Gervais LLP*,

256 F.3d 548, 552 (7th Cir. 2001))).   The remaining question is whether personal jurisdiction comports with due process.

Because this is a federal-question case in federal court, the due process requirements emanate from the Fifth rather than the Fourteenth Amendment.  *Sunshine Distrib.*, 157 F. Supp. 2d at 788.  But they "are the same as with any other personal jurisdiction inquiry, *i.e.* relatedness, purposeful availment, and reasonableness, only in reference to the United States as a whole, rather than a particular state."  *Id.* (citing *Cent. States,* 230 F.3d at 941–42).

Curaden AG purposefully availed itself of the American market by launching Curaden USA here.  And it mandated that Curaden USA "use its best endeavours to promote the sale of the Products throughout the [United States]."  Finally, although it did not exercise its right of prior approval over Curaden USA's marketing materials in this case, Curaden AG nevertheless retains such a right.  Curaden AG, in short, made a deliberate decision to target and exploit American markets, thus showing purposeful availment.  *See Sunshine Distrib.,* 157 F. Supp. 2d at 789 (holding that the defendant purposefully availed itself of the American market where it "not only sought out and negotiated a licensing agreement with Razor U.S.A. to distribute its products throughout North America, including the United States," but also "essentially created Razor U.S.A. for this sole purpose"); *see also J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 885 (2011) (noting that J. McIntyre directed marketing and sales efforts at the United States when it contracted with a U.S. distributor to sell its machines in the country).

The next consideration is whether Lyngaas's TCPA claims arise out of—or relate to— Curaden AG's contacts with the United States.   This court's standard for meeting that requirement is "lenient."  *See Bird v. Parsons*, 289 F.3d 865, 875 (6th Cir. 2002).  "If a defendant's contacts with the forum state are related to the operative facts of the controversy, then an action will be deemed to have arisen from those contacts."  *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1267 (6th Cir. 1996).

Lyngaas's alleged injuries caused by the fax advertisements "relate to" Curaden AG's creation of its U.S. subsidiary and its direction for the subsidiary to promote Curaden AG's products throughout the United States.  Curaden AG is correct, as we discuss later, that it was not

the "sender" of the faxes for purposes of TCPA liability. But the standard here is not so stringent, and it is met when "the operative facts are at least marginally related to the alleged contacts" between the defendant and the forum. *Bird*, 289 F.3d at 875. That standard is clearly met here.

The final consideration is whether the exercise of jurisdiction over Curaden AG would be reasonable, such that it would "comport with traditional notions of fair play and substantial justice." *CompuServe*, 89 F.3d at 1268 (citation and internal quotation marks omitted). An inference arises that the third factor is satisfied if, as here, the first two factors are met. *Id.* But where the case involves a "non-resident *alien* defendant," the court must give "special weight to the 'unique burdens placed upon one who must defend oneself in a foreign legal system.'" *Theunissen v. Matthews*, 935 F.2d 1454, 1460 (6th Cir. 1991) (emphasis in original) (quoting *Asahi Metal Indus. Co. v. Superior Court of Cal.*, 480 U.S. 102, 114 (1987)).

We recognize that the burden on Curaden AG is high because it had no prior contact with the U.S. federal-court system. But that burden is nonetheless outweighed by other factors. First, the United States has an interest in enforcing federal laws. Second, Lyngaas's interest in obtaining relief is particularly high given that Curaden USA is not profitable and is unlikely to be profitable in the immediate future. *Cf. City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 666 (6th Cir. 2005) (finding the interests of the United States and class plaintiffs to be "relatively light" where the court's jurisdiction over the key defendants was already conceded and "the marginal addition of [one of the defendants] would add little or nothing to the potential recovery should the plaintiffs ultimately prevail on the merits and be awarded damages"). We therefore conclude that the district court's exercise of personal jurisdiction over Curaden AG is reasonable, and that it comports with due process. And because the district court properly exercised personal jurisdiction over Curaden AG due to Curaden AG's contacts with the United States as a whole, we need not reach the question of whether the court has personal jurisdiction over Curaden AG due to the latter's contacts with Michigan alone.

**C.     Curaden AG's liability under the TCPA**

Having decided that personal jurisdiction over Curaden AG exists, we will now examine whether the district court erred in concluding that Curaden AG was not a "sender" for purposes of TCPA liability.  The TCPA makes it "unlawful for any person within the United States . . . to use any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement."  47 U.S.C. § 227(b)(1)(C).  In 2006, the Federal Communications Commission ("FCC") promulgated regulations that defined the "sender" of a fax as "the person or entity on whose behalf a facsimile unsolicited advertisement is sent or whose goods or services are advertised or promoted in the unsolicited advertisement." 47 C.F.R. § 64.1200(f)(10).

Lyngaas argues on appeal that the "whose goods or services are advertised or promoted" prong of the FCC regulation creates a strict-liability standard that the district court improperly rejected.  He argues that, even though Curaden AG did not itself send the faxes at issue, it is nonetheless strictly liable under the TCPA because the faxes "advertised or promoted" its toothbrush.  Lyngaas relies on two Sixth Circuit cases in support of his strict-liability theory: *Siding & Insulation Co. v. Alco Vending, Inc.*, 822 F.3d 886 (6th Cir. 2016), and *Imhoff Inv., L.L.C. v. Alfoccino, Inc.*, 792 F.3d 627 (6th Cir. 2015).

As the district court reasoned, however, both cases are inapplicable here because each involved defendants that, unlike Curaden AG, knowingly hired fax broadcasters for the purposes of fax advertising.  *See Siding & Insulation*, 822 F.3d at 888 ("Alco acknowledged that it had paid B2B to provide advertising services by broadcasting faxes"); *Imhoff*, 792 F.3d at 630 ("[Defendants] directed B2B to send out 20,000 faxes to local businesses on behalf of the two Alfoccino restaurants.").  The distinction is critical.  This court has underscored the difference between (1) defendants that either dispatch the faxes themselves or "cause the fax[es] to be conveyed" by hiring a fax broadcaster (like the *Siding & Insulation* and *Imhoff* defendants, and, here, Curaden USA), *see Health One Med. Ctr., Eastpointe P.L.L.C. v. Mohawk, Inc.*, 889 F.3d 800, 802 (6th Cir. 2018), and (2) defendants who do neither of the above and thus do not "send" the faxes at all.  *Id.*  The former are "senders" for purposes of TCPA liability and fit within the TCPA and the FCC regulation, whereas the latter fall outside the scope of the TCPA entirely.  *Id.*

("Read in the context of the statute itself, the regulation does not strip the 'send' out of 'sender.'").  In sum, the TCPA does not impose strict liability on a manufacturer simply because its products wind up on the face of an unsolicited fax advertisement; the manufacturer must independently fit the role of a "sender."  *See id.*

Because Curaden AG did not dispatch the faxes itself, the issue becomes whether Curaden AG "caused" the faxes to be sent.  *Id.*  In *Health One*, this court held that the two defendant manufacturers in question did not cause the faxes advertising their products to be sent because the pharmaceutical wholesaler that broadcasted the faxes acted entirely on its own.  *Id.* at 801 ("Bristol and Pfizer neither caused the subject faxes to be conveyed, nor dispatched them in any way.  Instead only Mohawk did those things.  Bristol and Pfizer therefore did not 'send' the faxes and thus have no liability for them.").

But the present case differs slightly from *Health One* because, although Curaden AG did not hire a fax broadcaster to advertise its products, it did enter into a distribution agreement with Curaden USA to "use its best endeavours to promote the sale of the Products throughout the Territory."  The determinative question, therefore, is whether entering into such a distribution agreement "caused" the sending of the fax advertisements.

As the district court noted, a case with a nearly identical agreement and factual scenario was resolved by this court just months before the district court's decision.  In *Garner Properties & Management, LLC v. Marblecast of Michigan, Inc.*, No. 17-11439, 2018 WL 6788013 (E.D. Mich. Dec. 26, 2018), defendant American Woodmark entered into a distribution agreement with defendant Marblecast that obligated Marblecast to "use its best efforts to promote, maintain and increase sales of [American Woodmark] products."  *Id.* at *3.  The district court, relying on *Health One*, found that American Woodmark was not a sender for purposes of the TCPA because, "[m]aterially, the Agreement neither explicitly requests nor authorizes Marblecast to advertise American Woodmark's products via fax.  Moreover, Marblecast hired jBlast, the fax broadcaster, without the consent or direction of American Woodmark."  *Id.*  In June 2020, this court affirmed the district court's holding.  *Garner Properties & Mgmt., LLC v. Marblecast of Michigan, Inc.*, 810 F. App'x 454, 456 (6th Cir. 2020) (concluding that, "[i]n short, some level of

knowledge that an unsolicited fax has been sent is required for an entity to qualify as a sender under the TCPA").

The distribution agreement in this case mirrors the agreement in *Garner Properties*. Further, the undisputed evidence shows that Curaden AG did not even know that Curaden USA planned to use faxes as a method of advertisement, much less that Curaden USA had hired a fax broadcaster or created the fax advertisements at issue. Curaden USA, not Curaden AG, paid AdMax's invoices and communicated with AdMax. *Cf. Garner Properties*, 2018 WL 6788013, at *3 ("Marblecast did not discuss the Fax with anyone at American Woodmark before it was sent . . . . American Woodmark had no independent knowledge that Marblecast was sending the Fax."). Indeed, all of the contact and social media information listed on the faxes directed consumers to Curaden USA and not to Curaden AG.

Lyngaas correctly notes that *Garner Properties* differs from the case at hand in one respect: "Marblecast would have sent the Fax even had it never agreed to sell American Woodmark's products," *id.*, whereas Curaden USA is unlikely to have sent the two faxes had the distribution agreement not existed. But this distinction does not change the fact that Curaden AG did not possess even "some level of knowledge that an unsolicited fax ha[d] been sent." *See Garner Properties*, 810 F. App'x at 456. Because Curaden AG clearly lacked knowledge of and involvement in the fax advertisements, we agree with the district court's conclusion that Curaden AG was not a "sender" and thus not liable under the TCPA.

**D.    Whether faxes received by computers fall within the scope of the TCPA, 47 U.S.C. § 227(b)(1)(C)**

We next address the reach of the TCPA as applied to the facts before us. The TCPA prohibits the "use [of] any telephone facsimile machine, computer, or other device to send, to a *telephone facsimile machine*, an unsolicited advertisement . . . ." 47 U.S.C. § 227(b)(1)(C) (emphasis added). Curaden AG and Curaden USA argue on appeal that a TCPA claim is not actionable if the unsolicited advertisement is received by any device (such as a computer through an "efax") other than a traditional fax machine. Thus, they argue, Lyngaas failed to satisfy the requirements of Rule 23(b) of the Federal Rules of Civil Procedure because he failed to establish which proposed class members received faxes on a traditional fax machine versus another

device, such as a computer.  We are unpersuaded by the defendants' attempt to limit a "telephone facsimile machine" to only traditional fax machines, however, because such a narrow definition does not comport with the plain language of the TCPA.

The TCPA defines a "telephone facsimile machine" as "equipment which has the capacity (A) to transcribe text or images, or both, from paper into an electronic signal and to transmit that signal over a regular telephone line, or (B) to transcribe text or images (or both) from an electronic signal received over a regular telephone line onto paper."  47 U.S.C. § 227(a)(3).  This definition makes clear that a "telephone facsimile machine" encompasses more than traditional fax machines that automatically print a fax received over a telephone line.  In particular, it includes "equipment" that has the "*capacity . . . to transcribe text or images,*" *id.* (emphasis added), from or onto paper—as long as the electronic signal is transmitted or received over a telephone line.  The statutory text alone, therefore, rebuts the defendants' argument.

The FCC reinforced this point.  In 2003, after a period of notice-and-comment, the FCC issued an order explaining that "developing technologies permit one to send and receive facsimile messages in a myriad of ways," and concluding that "faxes sent to personal computers equipped with, or attached to, modems and to computerized fax servers are subject to the TCPA's prohibition on unsolicited faxes."  *In Re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C. Rcd. 14014, 14133 ¶ 200 (2003).  It reasoned that

> the purpose of the requirement that a "telephone facsimile machine" have the "capacity to transcribe text or images" is to ensure that the prohibition on unsolicited faxing not be circumvented.  Congress could not have intended to allow easy circumvention of its prohibition when faxes are (intentionally or not) transmitted to personal computers and fax servers, rather than to traditional stand-alone facsimile machines.

*Id.* ¶ 201.  But, the FCC stated, the statute's prohibition "does not extend to facsimile messages sent as email over the Internet."  *Id.* at ¶ 200.

This last caveat prompted WestFax, the same company that transmitted the faxes at issue here, to seek clarification from the FCC as to whether an "efax" that is received on a fax server and then converted to an email is a "fax, an email or both."  *In the Matter of Westfax, Inc. Petition for Consideration & Clarification*, 30 F.C.C. Rcd. 8620, 8622 ¶ 5 (2015).  In response,

the Consumer and Governmental Affairs Bureau (the Bureau) of the FCC issued a declaratory ruling in August 2015 "mak[ing] clear that a type of fax advertisement—an efax, a document sent as a conventional fax then converted to and delivered to a consumer as an electronic mail attachment—is covered by the consumer protections in the [TCPA]." *Id.* at 8620 ¶ 1. The Bureau reasoned that because efaxes, as defined by WestFax, were sent over telephone lines, it satisfied "the statutory requirement that the communication be a fax on the originating end." *Id.* at 8623 ¶ 9. And the "statutory requirements to be a fax on the receiving end" were satisfied because "[t]he definition of 'telephone facsimile machine' sweeps in the fax server and modem, along with the computer that receives the efax because together they by necessity have the capacity to 'transcribe text or images (or both) from an electronic signal received over a telephone line onto paper.'" *Id.* (quoting 47 C.F.R. § 64.1200(f)(13)).

We are not persuaded by the dissent's disagreement with the Bureau's analysis because the dissent assumes that a computer receiving a fax exists in isolation, without the high probability that such a computer is connected to a printer and to a modem capable of receiving faxes, which as a whole is fully capable of receiving electronic signals over a telephone line and printing out a fax. (Indeed, a traditional fax machine is composed of a modem, scanner, and printer, and thus parallels the computer set-up mentioned above). Nor are we persuaded by the dissent's analysis based on the fact that the word "computer" appears in only part of the TCPA's prohibitory language, 47 U.S.C. § 227(b)(1)(C), because (1) a computer is not excluded from the statutory definition of a "telephone facsimile machine," *id.* § 227(a)(3), and (2) Congress presumably understood that a computer, as a stand-alone device, can be distinct from a telephone facsimile machine and yet part of one as an integrated piece of "equipment."

The Bureau also clarified its earlier email caveat: "By contrast, a fax *sent as an email* over the Internet—*e.g.*, a fax attached to an email message or a fax whose content has been pasted into an email message—is not subject to the TCPA." 30 F.C.C. Rcd. 8623–24 ¶ 10 (emphasis in original). In other words, with an efax "[t]here is an end-to-end communication that starts when the faxed document is sent over a telephone line and ends when the converted document is received on a computer," whereas emails originate not as a fax over a telephone line, but "over the Internet." *Id.*

In sum, the defendants' argument is overbroad. They ask us to hold that a fax received by any device (such as a computer) that is not a traditional fax machine falls outside the scope of the TCPA. The statutory definition, however, encompasses more than a traditional fax machine. Notably, it does not require the actual printing of the advertisement, which dispels the defendants' argument that Congress was concerned only with the burdensome ink-and-paper costs of fax advertising.

For the sake of completeness on this issue, we note our awareness that the Bureau issued a declaratory ruling in December 2019 that efaxes sent through an "online fax service" are not covered by the TCPA. *In re Amerifactors Fin. Group, LLC Pet. for Expedited Declaratory Ruling*, CG Docket Nos. 02-278, 05-338, 2019 WL 6712128, *1, *3 ¶¶ 2, 11 (Dec. 19, 2019). But an application for review of the Bureau's ruling is currently pending before the FCC, *see Applicant Career Counseling Services, Inc.'s Application for Review*, CG Docket Nos. 02-278, 05-338 (Jan. 8, 2020), the *Amerifactors* ruling is not mentioned by either party, and the ruling in any event would have no bearing on the case before us because the operative facts here took place more than three years earlier, *see Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) ("Retroactivity is not favored in the law. Thus, congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result."); *see also Maple Drive Farms Ltd. P'ship v. Vilsack*, 781 F.3d 837, 857 (6th Cir. 2015) (holding that because, "[g]enerally, [r]etroactive application of policy is disfavored," the federal agency had to apply the version of its guidance that was in effect at the time of the incident in question) (citation and internal quotation marks omitted).

**E.      Whether class certification must be based on admissible evidence**

We now turn to the issue of class certification. A district court's decision of whether to certify a class is reviewed under the abuse-of-discretion standard. *Hicks v. State Farm Fire & Cas. Co.*, 965 F.3d 452, 457 (6th Cir. 2020). "An abuse of discretion occurs if the district court relies on clearly erroneous findings of fact, applies the wrong legal standard, misapplies the correct legal standard when reaching a conclusion, or makes a clear error of judgment." *In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*, 722 F.3d 838, 850 (6th Cir. 2013) (quoting *Young v. Nationwide Mut. Ins. Co.,* 693 F.3d 532, 536 (6th Cir. 2012)).

The defendants argue that the district court abused its discretion by relying on inadmissible evidence to certify the class. Specifically, they argue that, because Lyngaas failed to put forth admissible evidence showing which individuals actually received the fax advertisements, the district court should not have found that the "predominance" and "ascertainabilty" requirements of Rule 23(b) of the Federal Rules of Civil Procedure were satisfied. The defendants, however, did not move to decertify the class after the district court found at the bench trial that Lyngaas's evidence of the summary-report logs was inadmissible; rather, they argue now that the district court improperly certified the class and, as discussed later, improperly established a claims-administration process based on the inadmissible evidence.

A plaintiff seeking class certification must show that the class satisfies "all four of the Rule 23(a) prerequisites—numerosity, commonality, typicality, and adequate representation—and fall[s] within one of the three types of class actions listed in Rule 23(b)." *Young*, 693 F.3d at 537. The relevant Rule 23(b) requirement here is that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). Moreover, although not explicitly stated in Rule 23 "the class definition must be sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member of the proposed class." *Young*, 693 F.3d at 537–38 (citation omitted). In this case, the district court found that the predominance and ascertainability requirements were met based on summary-report logs that purportedly listed each successful recipient of the two fax advertisements by fax number. It noted that, although Lyngaas had yet to authenticate the logs, the court could still consider them at the class-certification stage.

This court has never required a district court to decide conclusively at the class-certification stage what evidence will ultimately be admissible at trial. Nor does any binding precedent impose such a requirement. *See Hicks*, 965 F.3d at 465 ("We have yet to settle this matter."). We conclude that, on this issue of first impression, the district court is correct.

As an initial matter, the Supreme Court has helpfully shed some light on this subject. In deciding whether to certify a class, the trial court must undertake a "rigorous analysis" to ensure

"that the prerequisites of Rule 23(a) have been satisfied." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982). Although this analysis sometimes requires the trial court to "probe behind the pleadings," at other times, "the issues are plain enough from the pleadings"— suggesting that admissible evidence is not always required. *Id.* at 160. Either way, a party seeking to maintain a class action must "satisfy through evidentiary proof at least one of the provisions of Rule 23(b)." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (explaining that "the same analytical principles govern Rule 23(b).").

We hold, as have the Eighth and Ninth Circuits, that such "evidentiary proof" need not amount to admissible evidence, at least with respect to nonexpert evidence. *See In re Zurn Pex Plumbing Prod. Liab. Litig.*, 644 F.3d 604, 611, 614 (8th Cir. 2011) (holding that a district court need not "decide conclusively at the class certification stage what evidence will ultimately be admissible at trial"); *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1004 (9th Cir. 2018) ("Inadmissibility alone is not a proper basis to reject evidence submitted in support of class certification.").

The Eighth and Ninth Circuits have persuasively explained that the differences between Rule 23, summary judgment, and trial "warrant greater evidentiary freedom at the class certification stage." *Sali*, 909 F.3d at 1005. Because class certification must occur at "an early practicable time after a person sues or is sued as a class representative," Fed. R. Civ. P. 23(c)(1)(A), "[l]imiting class-certification-stage proof to admissible evidence risks terminating actions before a putative class may gather crucial admissible evidence . . . [a]nd transform[s] a preliminary stage into an evidentiary shooting match," *Sali*, 909 F.3d at 1004; *Zurn Pex*, 644 F.3d at 613 ("As class certification decisions are generally made before the close of merits discovery, the court's analysis is necessarily prospective and subject to change, and there is bound to be some evidentiary uncertainty.") (internal citation omitted).

Summary judgment and class certification occurred simultaneously in this case, but the district court nevertheless relied on the natural progression of litigation and evidentiary discovery. It noted that, although the summary-report logs were not admissible evidence, "Lyngaas has indicated that he will be able to admit the evidence at trial."

Further, unlike a summary-judgment decision or a judgement after trial, a class-certification order is "inherently tentative." *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469 n.11 (1978); Fed. R. Civ. P. 23(c)(1)(C) ("An order that grants or denies class certification may be altered or amended before final judgment."). Therefore, "[a]pplying the formal strictures of trial to such an early stage of litigation makes little common sense." *Sali*, 909 F.3d at 1004; *see also Zurn Pex*, 644 F.3d at 613–14 ("Because a decision to certify a class is far from a conclusive judgment on the merits of the case, it is 'of necessity not accompanied by the traditional rules and procedure applicable to civil trials.'") (quoting *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974)) (alterations omitted)).

Numerous district courts in our circuit have indeed depended on the concept that the "manner and degree of evidence required" shifts through "successive stages of the litigation," *see Sali*, 909 F.3d at 1006, and have thus considered evidence at the class-certification stage that is reliable but that might ultimately be deemed inadmissible. In *Serrano v. Cintas Corp*, No. 04-40132, 2009 WL 910702 (E.D. Mich. Mar. 31, 2009), *aff'd sub nom. Davis v. Cintas Corp.*, 717 F.3d 476 (6th Cir. 2013), for example, both parties submitted employee declarations in support of and in opposition to the plaintiffs' motions to certify the classes. *Id.* at *2–3. The district court denied both parties' motions to strike the declarations, explaining that "[a]t this stage of litigation, the Court should consider all the evidence presented in support of and in opposition to class certification, and grant to the evidence the weight that the Court finds is most appropriate." *Id.* at *3; *see also Stephenson v. Family Solutions of Ohio, Inc.*, No. 1:18cv2017, 2020 WL 6485106, at *6 (N.D. Ohio Nov. 4, 2020) (rejecting the defendants' motion to strike the plaintiffs' unauthenticated exhibits, reasoning that the court's inquiry at the class-certification stage is "tentative, preliminary, and limited") (citation and internal quotation marks omitted); *Tedrow v. Cowles*, No. 2:06-cv-637, 2007 WL 2688276, at *2–3 (S.D. Ohio Sept. 12, 2007) (finding that "the rules of evidence are not to be applied strictly in deciding a motion for class certification," and thus rejecting a motion to strike where the defendants disputed the authenticity of the exhibit).

The cases that the defendants rely on are unpersuasive. They first cite to *Sandusky Wellness Center, LLC v. ASD Specialty Healthcase, Inc.*, 863 F.3d 460 (6th Cir. 2017), in which

this court upheld the district court's denial of class certification. The district court in that case had concluded that the plaintiff could not satisfy the predominance and ascertainability requirements when she had evidence that the fax in question was successfully transmitted to 75 percent of the individuals targeted, but lacked the fax logs to show which individuals actually received the fax. *Id.* at 470. Because "no circuit court has ever mandated certification of a TCPA class where fax logs did not exist," this court affirmed the district court's decision. *Id.* at 473. In the present case, however, the fax logs do exist. The only remaining question before the district court was whether they could be authenticated. In short, the requisite evidentiary proof was lacking in *Sandusky*, but was present here.

Defendants next cite to *Unger v. Amedisys Inc.*, 401 F.3d 316 (5th Cir. 2005), the only circuit case to explicitly state that "findings must be made based on adequate admissible evidence to justify class certification." *Id.* at 319. *Unger* is unhelpful, however, because the question of admissibility played no part in that court's disposition of the case. Although the *Unger* court indeed made the statement in its introductory paragraph, it later noted that "[c]lass certification hearings should not be mini-trials" and proceeded to focus on whether the proffered evidence was adequate—not whether it was admissible. *Id.* at 321, 325. It ultimately decertified the class because the district court had failed to consider, in a complex fraud case, several factors relevant to whether a proposed investor class satisfied Rule 23(b)(3)'s predominance requirement. *Id.* at 323–25.

By contrast, the district court here undertook the rigorous analysis required of it and correctly found sufficient evidence for class certification. The court had before it summary-report logs that detailed which fax numbers had purportedly received the faxes at issue, as well as other corroborating evidence, such as Curaden USA's target lists of fax numbers and numerous emails detailing the transmissions. All that was left was authentication of the summary-report logs. Requiring the court to "rely[ ] on formalistic evidentiary objections" at this stage would have been inappropriate, particularly given Lyngaas's assurance that he would be able to authenticate the logs at trial. *See Sali*, 909 F.3d at 1006 ("By relying on admissibility alone as a basis to strike the Ruiz declaration, the district court rejected evidence that likely could have been presented in an admissible form at trial."). The court therefore did not abuse its

discretion in granting class certification when it relied on evidence that had yet to be authenticated.

## F.     The district court's evidentiary rulings

We next examine the district court's evidentiary rulings.  Decisions by a district court to admit or exclude evidence are reviewed under the abuse-of-discretion standard and reversed "only if we are firmly convinced of a mistake that affects substantial rights and amounts to more than harmless error."  *United States v. Baldwin*, 418 F.3d 575, 579 (6th Cir. 2005) (internal quotation marks omitted).  Lyngaas argues that the district court abused its discretion by excluding the summary-report logs and the opinions of his expert witness, Lee Howard, from evidence.

Regarding the summary-report logs, we agree with the district court's conclusion that the logs at issue do not constitute hearsay.  The hearsay rule applies only to out-of-court statements, Fed. R. Evid. 801(c)(1), and the rule defines a "statement" as "a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion," Fed. R. Evid. 801(a).  The "written assertion" here was not made by a "person"; the court instead found, and the defendants do not contest, that the logs were data compilations automatically generated by a computer.  This means that the logs are not hearsay.  *See Patterson v. City of Akron*, 619 F. App'x 462, 479–80 (6th Cir. 2015) (holding that a Taser Report was "merely a report of raw data produced by a machine" and thus did not constitute hearsay) (collecting similar cases); *United States v. Lamons*, 532 F.3d 1251, 1263–64 (11th Cir. 2008) (concluding that a computer-generated spreadsheet of telephone billing data was not hearsay).

But overcoming the defendants' hearsay objection was not sufficient to make the summary-report logs admissible.  A computer-generated compilation might still "present evidentiary concerns. A machine might malfunction, produce inconsistent results or have been tampered with."  *United States v. Lizarraga-Tirado*, 789 F.3d 1107, 1110 (9th Cir. 2015).  "[S]uch concerns are addressed by the rules of authentication," *id.*, and Lyngaas thus had the burden of authenticating the logs.

Federal Rule of Evidence 901(a) requires a proponent of evidence to produce proof "sufficient to support a finding that the item is what the proponent claims it is." Rule 901(b) in turn provides a nonexhaustive list of means by which to authenticate evidence. By not presenting anyone to attest as to how the logs at issue were created or to personally vouch for their accuracy, Lyngaas failed to satisfy the requirements of Rule 901. Accordingly, the district court did not abuse its discretion in ruling that the logs were inadmissible as evidence.

Nor did the district court abuse its discretion in concluding that Howard's testimony was both unreliable under *Daubert* and unpersuasive. The court found that Howard's opinions regarding the successful number of fax transmissions were premised entirely on the unauthenticated summary-report logs, as well as by an affidavit from the president of WestFax that was filed in another case and thus did not address the specific data at issue in the present case. Howard's opinions, therefore, did not meet the *Daubert* requirement that an expert's "knowledge" be premised on "'good grounds' based on what is known" and not on "subjective belief or unsupported speculation." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590 (1993). And again, because of the lack of testimony describing how the report logs were created or having anyone vouch for their accuracy, Howard's opinions regarding the logs were both speculative and unpersuasive. We will thus not disturb the district court's evidentiary rulings.

**G.     The district court's use of a claims-administration process**

Because we find that the district court did not abuse its discretion in making its evidentiary rulings, we next consider the claims-administration process imposed by the court. Curaden USA does not dispute, and the court correctly found, that "Curaden USA sent two mass-fax transmissions." Nor is there any dispute that Lyngaas was one of the recipients of the fax advertisements. Nevertheless, Curaden USA argues that, because Lyngaas failed to establish the precise number of individuals who received the faxes, the claims-administration process established by the court to afford class members relief is inappropriate.

As the district court aptly noted, "courts [in class actions] must use their discretion, and in many cases their ingenuity, to shape decrees or to develop procedures for ascertaining damages and distributing relief that will be fair to the parties." (quoting 7AA Charles Alan

Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 1784 (3d ed. 2017)). The manner of a claims-administration process is to be driven by the particular needs of an individual case, *id.*, with the ultimate goal of distributing "as much of the available damages remedy to class members as possible and in as simple and expedient a manner as possible," 4 William B. Rubenstein, Newberg on Class Actions § 12:15 (5th ed. 2017).

Contrary to Curaden USA's argument, the situation at hand—where there exists a target list of fax numbers that were sent the unsolicited fax advertisement—is precisely the type best handled through a claims-administration process. *See, e.g.*, *Krakauer v. Dish Network, LLC*, No. 1:14-CV-333, 2017 WL 3206324, at *5 (M.D.N.C. July 27, 2017) ("[T]he trial already established all of the elements necessary to prove a violation . . . . Whether a claimant is a class member is a question that can be more appropriately, fairly, and efficiently resolved through a claims administration process as authorized by Rule 23."); *Booth v. Appstack, Inc.*, No. C13-1533JLR, 2016 WL 3620798, at *2 (W.D. Wash. June 28, 2016) ("Whether a given claimant is a rightful class member is an inquiry common to every consumer class action that reaches the claims administration stage."); *Boundas v. Abercrombie & Fitch Stores, Inc.*, 280 F.R.D. 408, 417 (N.D. Ill. 2012) (recognizing that a court need not ascertain "absent class members' actual identities . . . before a class can be certified," so long as the class members can be identified in the claims-administration process).

The class here consists of "[a]ll persons who were successfully sent one or more facsimiles in March 2016 offering the Curaprox '5460 Ultra Soft Toothbrush' for '.98 per/brush' to 'dental professionals only.'" To secure relief, claimants must submit sworn affidavits attesting to the following information: "(1) their name, (2) their contact information, including fax number and address, (3) their receipt of a fax from Curaden USA on March 8, 2016 and/or on March 28, 2016, and (4) that they did not expressly invite or permit Curaden USA to send them faxes." The claims administrator will then "verify[ ] the information contained in each claimant's affidavit with the information reflected on the target lists" and the parties will "confer regarding disputes or agreement with respect to each claimant's status as a class member."

Curaden USA's concern that those who did not receive the fax will erroneously be afforded damages is alleviated by the claims-administration process designed by the district court

to weed out those who do not fit within the class definition.  We therefore conclude that the district court's establishment of a claims-administration process was proper.

## H.      Personal jurisdiction over Curaden USA as to non-Michigan class members

Curaden USA's final argument is that, "pursuant to the Supreme Court's decision in *Bristol-Myers Squibb*," the "district court's exercise of jurisdiction over out-of-state plaintiffs violated Curaden USA's due process rights and should be reversed."  In short, Curaden USA asks us to extend *Bristol-Myers Squibb Company v. Superior Court of California, San Francisco County*, 137 S. Ct. 1773 (2017)—which held that a state court in a *mass* action must have personal jurisdiction over the defendant as to each plaintiff—to federal *class* actions.  This would require the district court to have personal jurisdiction over the defendant as to each unnamed class member.

We decline to extend *Bristol-Myers Squibb* in this manner.  Long-standing precedent shows that courts have routinely exercised personal jurisdiction over out-of-state defendants in nationwide class actions, and the personal-jurisdiction analysis has focused on the defendant, the forum, and the *named plaintiff*, who is the putative class representative.  Besides being well established, this rule has a well-reasoned basis for its existence.

As the Seventh Circuit highlighted in *Mussat v. IQVIA, Inc.*, 953 F.3d 441 (7th Cir. 2020), the argument made by Curaden USA would constitute "a major change in the law of personal jurisdiction and class actions."  *Id.* at 448.  There has long been a "general consensus that due process principles did not prohibit a plaintiff from seeking to represent a nationwide class in federal court, even if the federal court did not have general jurisdiction over the defendant."  *Id.* at 445.  "For cases relying on specific jurisdiction over the defendant, minimum contacts, purposeful availment, and relation to the claim were assessed only with respect to the named plaintiffs . . . .  Once certified, the class as a whole is the litigating entity."  *Id.*

This historical practice is not confined to the lower courts.  The Supreme Court has "regularly entertained cases involving nationwide classes where the plaintiff relied on specific, rather than general, personal jurisdiction in the trial court, without any comment about the supposed jurisdictional problem" raised by Curaden USA.  *Id.* (citing *Wal-Mart Stores, Inc. v.*

*Dukes*, 564 U.S. 338 (2011)), a nationwide class action brought in a federal court in California in which the defendant was headquartered in Arkansas and incorporated in Delaware, and *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985), a nationwide class action brought in a state court in Kansas in which the defendant was headquartered in Oklahoma and incorporated in Delaware). In sum, "[d]ecades of case law show that . . . the practice of federal courts"—i.e., precedent—has not required any contacts, let alone "minimum" contacts in the specific-jurisdiction sense, between absent class members and the forum. *Id.*

The facts at issue in *Bristol-Myers Squibb* reside outside the class-action context. *Bristol-Myers Squibb* involved not a class action in federal court, but a mass-tort action in state court. *Bristol-Myers Squibb*, 137 S. Ct. at 1777. Hundreds of individual plaintiffs (86 from California, and 592 from 33 other states) filed eight separate complaints in California state courts, asserting state-law claims based on injuries allegedly caused by Plavix, a blood-thinning drug. *Id.* at 1778. The separate complaints were assigned as a coordinated action to a state trial-court judge. *See Bristol-Myers Squibb Co. v. Superior Court*, 377 P.3d 874, 878 (2016). Such a coordinated mass action is "authorized under section 404 of the California Civil Procedure Code, but . . . has no analogue in the Federal Rules of Civil Procedure." *Mussat*, 953 F.3d at 446.

Bristol-Myers Squibb contested the state court's jurisdiction over the out-of-state plaintiffs' claims, arguing that those plaintiffs had no connection to the state of California. *Bristol-Myers Squibb*, 137 S. Ct. at 1777–78. The California Supreme Court rejected the argument, holding instead that the out-of-state plaintiffs could bring their state-law claims in California court based on California's "sliding scale approach to specific jurisdiction." *Bristol-Myers Squibb,* 377 P.3d at 889 (citation omitted). That approach allowed the required "connection between the forum contacts and the claim" to be reduced depending on how "wide ranging the defendant's forum contacts" were. *Id.* at 885.

The United States Supreme Court reversed. It first examined precedent, noting that "the primary focus of our personal jurisdiction inquiry is the defendant's relationship to the forum State." *Bristol-Myers Squibb*, 137 S. Ct. at 1779. Should general jurisdiction not exist, the court turns to specific jurisdiction, under which "the *suit* must arise out of or relate to the defendant's

contacts with the *forum*." *Id.* at 1780 (alterations, citation, and internal quotation marks omitted) (emphasis in original). "[T]here must be an affiliation between the forum and the underlying controversy, principally, an activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Id.* (alterations, citation, and internal quotation marks omitted).

Against this backdrop, the Supreme Court held that California's "sliding scale approach" contravened these "settled principles regarding specific jurisdiction" because that approach relaxed "the strength of the requisite connection between the forum and the specific claims at issue." *Id.* at 1781. Critically, there was no "adequate link between the State and the nonresidents' claims." *Id.* That some plaintiffs were allegedly injured in California "does not allow the State to assert specific jurisdiction over the nonresidents' claims," even if the "third parties (here, the plaintiffs who reside in California) can bring claims similar to those brought by the nonresidents." *Id.*

The Supreme Court stated that its decision was nothing more than a "straightforward application . . . of settled principles of personal jurisdiction." *Id.* at 1783. And the Court was careful to cabin the scope of its decision. Because the Court had mentioned "federalism interests" and "the due process limits on the exercise of specific jurisdiction by a State," its final words noted that the decision did not address "whether the Fifth Amendment imposes the same restrictions on the exercise of personal jurisdiction by a federal court." *Id.* at 1780–84. It also did not touch on whether the same result would apply to a class action under Rule 23 of the Federal Rules of Civil Procedure. *See id.* at 1789 n.4 (Sotomayor, J., dissenting) ("[T]he Court today does not confront the question whether its opinion here would also apply to a class action.").

Despite the pains that the Supreme Court took to limit is decision, litigants have rushed to argue that *Bristol-Myers Squibb* renders many nationwide class actions constitutionally invalid for lack of specific personal jurisdiction over the defendant with respect to the claims of unnamed class members. The vast majority of lower courts have rejected their arguments, as has the only circuit court to have so far addressed the issue. *See Chernus v. Logitech, Inc.*,

No. 17-673(FLW), 2018 WL 1981481, at *7 (D.N.J. Apr. 27, 2018) (collecting cases); *Mussat*, 953 F.3d 441.

We follow their lead in holding that *Bristol-Myers Squibb* does not extend to federal class actions. There are at least two related reasons supporting the long-standing rule. First, a class action is formally one suit in which, as a practical matter, a defendant litigates against only the class representative. Second and relatedly, precedent shows that absent class members are not considered "parties," as a class representative is, for certain jurisdictional purposes.

The different procedures underlying a mass-tort action and a class action demand diverging specific personal jurisdiction analyses. *See Mussat*, 953 F.3d at 446–47. A class action is the product of the certification procedures set forth in Rule 23, and these "[p]rocedural formalities matter," as they result in practical differences. *Id.* at 446. The Seventh Circuit persuasively points out that the Supreme Court, in *Taylor v. Sturgell,* 553 U.S. 880 (2008),

> stressed the importance of class certification as a pre-requisite for binding a nonparty (including an unnamed class member) to the outcome of a suit. *Id.* at 894. With that in mind, it rejected the notion of "virtual representation" as an end-run around the careful procedural protections outlined in Rule 23. *Id.* at 901. Class actions, in short, are different from many other types of aggregate litigation, and that difference matters in numerous ways for the unnamed members of the class.

*Id.* at 446–47.

In a coordinated mass action, each plaintiff is a named party. That means that the defendant must defend against each plaintiff and their individualized claims. Although the statute at issue in *Bristol-Myers Squibb* allowed the trial court to "consolidate their cases for resolution of shared legal issues," the court would eventually "mov[e] on to individual issues." *Mussat*, 953 F.3d at 447. These individual issues might "present significant variations" such that a defense would require different legal theories or different evidence. *Sanchez v. Launch Tech. Workforce Sols., LLC*, 297 F. Supp. 3d 1360, 1366 (N.D. Ga. 2018).

In a class action, by contrast, "the lead plaintiffs earn the right to represent the interests of absent class members by satisfying all four criteria of Rule 23(a) and one branch of Rule 23(b)." *Mussat*, 953 F.3d at 447. The defendant "is presented with a unitary, coherent claim to which it

need respond only with a unitary, coherent defense." *Sanchez*, 297 F. Supp. 3d at 1366. In this sense, the only "suit" before the court is the one brought by the named plaintiff. Thus, when the court considers whether the suit "arise[s] out of or relate[s] to the defendant's contacts with the forum," *Bristol-Myers*, 137 S. Ct. at 1780 (alterations and citation omitted), the court need analyze only the claims raised by the named plaintiff, who in turn represents the absent class members, *see Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 155 (1982) ("The class-action device was designed as 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'") (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)).

The dissent's contrary view fails to concentrate on the "affiliation between the forum and the underlying controversy," the core of the specific-jurisdiction inquiry. *See Bristol-Myers Squibb*, 137 S. Ct. at 1780. Rather, the dissent hangs its hat on *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985). But the Supreme Court in *Shutts*, confronted with a personal-jurisdiction challenge by the out-of-state defendant, in fact *allowed* the nationwide class action to proceed.

In that case, one Kansas resident and two Oklahoma residents brought a nationwide class action in a Kansas state court for interest on delayed royalty payments stemming from natural gas operations in eleven states. *Id.* at 799–801. The defendant, a Delaware corporation with its principal place of business in Oklahoma, attempted to avoid its obligations to non-Kansas residents on personal-jurisdiction grounds. It asserted that the "Kansas trial court did not possess personal jurisdiction over absent plaintiff class members as required by *International Shoe Co. v. Washington*, 326 U.S. 310 (1945), and similar cases" because the absent class members "did not possess 'minimum contacts' with Kansas." *Id.* at 802. As such, the defendant argued, absent class members should be required to affirmatively request inclusion into the class. *Id.* at 812.

The Supreme Court in *Shutts* expressly rejected the defendant's attempt to impose the "minimum contacts" requirement of the Due Process Clause onto absent class members, finding that the defendant's argument was supported by "little, if any precedent." *Id.* at 812. Instead, the "minimal procedural due process protection" owed by the forum state to the absent class members was satisfied by a "fully descriptive" opt-out notice mailed to each class member, *id.* at 811–812, 814, as well as by class certification procedures requiring "that the named plaintiff at

all times adequately represent the interests of the absent class members," *id.* at 812. In other words, due to the opt-out and certification procedures, the Kansas trial court could exercise jurisdiction over the absent class members. *Id.* at 811.

The dissent makes an unjustified inferential leap from *Shutts*. It argues that because a court must provide due process protection to absent class members, a court must also have specific personal jurisdiction over the defendant as to those absent class members. (Dissent at p. 36) But as the *Shutts* Court emphasized, the Due Process Clause places different demands on the court as to each, and the jurisdictional inquiry changes precisely because of the unique posture of a class action. The dissent, like the defendant in *Shutts*, both conflates jurisdictional inquiries and "ignores the differences between class-action plaintiffs, on the one hand, and defendants in nonclass civil suits on the other," *id.* at 812, as well as the differences between named plaintiffs and absent class members, *id.* at 809–810. These practical differences are more than material to the due process inquiry in *Shutts*; they are decisive. The class-certification procedures ensure the "common nature of the named plaintiffs' and the absent plaintiffs' claims, the adequacy of representation, [and] the jurisdiction possessed over the class," thus fundamentally changing the nature of the suit and the jurisdictional analysis. *Id.* at 809.

Not only does the dissent read a new and unsupported holding into *Shutts* (that a court must have specific personal jurisdiction over the defendant as to each absent class member), but it then proceeds to read a new and unsupported holding into *Bristol-Myers Squibb* as well: that "a state court lacks the power to decide the absent class members' claims if they arise from wholly out-of-state activity." (Dissent at p. 37–38). What the dissent papers over is that *Bristol-Myers Squibb* involved a *mass* action rather than a *class* action, which, as we have already explained, is a very material distinction. In short, the dissent asserts that that our analysis rests upon the difference between the jurisdictional powers of a state court versus a federal court (it does not), and that both *Shutts* and *Bristol-Myers Squibb* have already answered the jurisdictional question presented in this case (they have not).

To put this issue another way, we are tasked, when determining whether a court may exercise specific personal jurisdiction over a defendant, to analyze the "relationship among the defendant, the forum, and the litigation," *Daimler AG v. Bauman*, 571 U.S. 117, 132–33 (2014),

and that relationship does not depend on the makeup of the unnamed class members. Curaden USA inflicted injuries in Michigan, and the resulting litigation—depositions, discovery, etc.— stemmed from those injuries. The litigation would not have changed had the absent class members been composed solely of Michiganders or of individuals spanning all fifty states. That is because class-action procedures allowed the district court to treat the class as a single litigating entity represented by one Michigander. Indeed, only after Lyngaas's claim was litigated and after judgment was rendered, were the absent class members brought into the picture to collect their due through an administrative process. To find, therefore, that the underlying suit changes depending on the diversity of absent class members is to ignore the practical realities of class-action litigation and the formal status of the class representative vis-à-vis the absent class members.

The Supreme Court has recognized as much, and has thus held that these procedures make "[n]onnamed class members . . . parties for some purposes and not for others." *Devlin v. Scardelletti*, 536 U.S. 1, 9–10 (2002); *see also Shutts*, 472 U.S. at 808 ("[A] 'class' or 'representative' suit [is] an exception to the rule that one could not be bound by judgment *in personam* unless one [is] made fully a party in the traditional sense."). The *Devlin* Court concluded, in determining whether absent class members could appeal a court-approved settlement, that "[t]he label 'party' does not indicate an absolute characteristic, but rather a conclusion about the applicability of various procedural rules that may differ based on context." *Devlin*, 536 U.S. at 10.

Regarding subject-matter jurisdictional inquires, the Supreme Court has held that absent class members are not considered parties at all. *See id.* at 10 (noting that absent class members are not considered parties for assessing whether the requirement of diverse citizenship under 28 U.S.C. § 1332 has been met); *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 566–67 (2005) (recognizing that, as long as the named representative meets the amount-in-controversy requirement, jurisdiction exists over the claims of the unnamed class members). And this is so even though subject-matter jurisdiction is a constitutional and statutory requirement, *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998), and is perhaps more fundamental than personal jurisdiction because it cannot be waived or forfeited, *Arbaugh v. Y&H*

*Corp.*, 546 U.S. 500, 514 (2006). As the *Mussat* court aptly concluded, we "see no reason why personal jurisdiction should be treated any differently from subject-matter jurisdiction . . . : the named representatives must be able to demonstrate either general or specific personal jurisdiction, but the unnamed class members are not required to do so." 953 F.3d at 447.

In sum, long-standing precedent regarding personal jurisdiction over defendants as to absent class members is well supported. We therefore reject Curaden USA's jurisdictional argument.

## IV. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.

---

### CONCURRING IN PART AND DISSENTING IN PART

---

THAPAR, Circuit Judge, concurring in part and dissenting in part.  While I agree with most of the majority's thoughtful opinion, I believe a federal rule and a federal statute require us to narrow the class.

Federal courts follow federal rules of procedure.  When those rules incorporate other restrictions, courts must comply with those restrictions as well.  Here, that means the federal district court must respect the due process principles that would apply in state court.  A Michigan state court could not resolve the claims of out-of-state class members (without violating the defendant's right to due process).  Because of the federal rules, neither can the federal court.  Since the court lacks personal jurisdiction over one of the defendants for the claims of out-of-state class members, I would exclude those plaintiffs from the class.

Federal courts also follow federal statutes.  Here, the statutory question is comparatively simple:  Does the Telephone Consumer Protection Act make it illegal to send unauthorized fax ads to computers?  The majority concludes that it does, because it considers a computer to be a type of "telephonic facsimile machine."  I respectfully disagree.

### I.

This is a nationwide class action filed in the Eastern District of Michigan.  The named plaintiff, a dentist in Michigan, sued Curaden USA, a toothbrush company incorporated and headquartered in Ohio.  The plaintiff claims that Curaden faxed toothbrush ads to hundreds of dentists across the country in violation of federal law.  Curaden argues that a Michigan court can resolve the dispute only for Michigan dentists; the ones from other states must sue elsewhere.

Curaden is right.  Courts do not have unlimited authority to bind parties to their judgments.  Here, a Michigan state court could not decide the claims of out-of-state dentists.  Although this case is in federal court, the state court rules are what matter.  Why?  Because the federal rules ordinarily require federal courts to "follow state law in determining the bounds of

their jurisdiction over persons." *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014); Fed. R. Civ. P. 4(k)(1)(A). (There are exceptions, but none apply here.) A Michigan court's jurisdiction is limited by Michigan law and by the Fourteenth Amendment to the Constitution. The parties agree that Michigan law does not pose an obstacle, so what follows is an analysis of the Fourteenth Amendment's constraints on a state court's jurisdiction.

Of course, the Fifth Amendment (not the Fourteenth) supplies the due process limits on jurisdiction in federal courts. *See Bristol-Myers Squibb Co. v. Super. Ct. of Cal.*, 137 S. Ct. 1773, 1783–84 (2017). But the crucial question is what the Fourteenth Amendment allows. That's because the federal rule authorizing jurisdiction over Curaden USA, Rule 4(k)(1)(A), incorporates the Fourteenth Amendment's protections. *See Daimler*, 571 U.S. at 121 ("The question presented is whether the Due Process Clause of the Fourteenth Amendment precludes the [federal] District Court from exercising jurisdiction over Daimler in this case . . . ."). The majority does not consider this aspect of Rule 4(k)(1)(A), and its analysis relies in part on the distinction between federal and state courts. But until the rules change, that's a distinction without a difference: The Fourteenth Amendment matters just as much in federal court.

## A.

State courts, like federal courts, have the authority to decide cases and issue binding judgments. But this power is limited. Under the Due Process Clause of the Fourteenth Amendment, a state court cannot bind citizens of another state (without their consent) unless those citizens had some relevant contact with the forum state. This requirement—called "personal jurisdiction"—is one of the constitutional guarantees of due process.

Three basic principles frame the personal jurisdiction analysis for corporations. First, a state court has personal jurisdiction to adjudicate any claims against corporations that are "at home" in the state. *Daimler*, 571 U.S. at 126–27. Second, it can also adjudicate claims against a corporation of another state, as long as the claims "arise out of or relate to" the corporation's contacts with the forum state. *Id.* (cleaned up). Third, any party can consent to a state court's exercise of personal jurisdiction. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473 n.14 (1985).

Take a simplified version of this case as an example.  If Curaden USA—an Ohio corporation—sent an unlawful fax to a dentist in Texas, the dentist could sue in Ohio or in Texas.  The Ohio state court could issue a judgment that binds the defendant because Curaden is at home in Ohio.  The Texas state court could too, because the claim arises out of Curaden's contacts in Texas.  And both courts could bind the dentist, who consented to jurisdiction by choosing the forum.

What if the Texan dentist sued in Michigan?  A Michigan state court would dismiss the case for lack of jurisdiction.  Curaden is not at home in Michigan, and the claim does not arise out of or relate to the company's contacts with Michigan.  *See Daimler*, 571 U.S. at 126–27.  So without Curaden's consent, the Michigan court would have no power to bind the company to its judgment.

Now suppose the company sent the same fax to thousands of dentists at the same time—the Texan dentist and a host of Michigan dentists too.  Since the company sent the fax to Michigan dentists in exactly the same way as it did the dentist in Texas, you might think that the Texan's claim "relates to" the company's contacts with Michigan.  *See id.* (affirming that state courts have specific personal jurisdiction over claims that "arise out of or *relate to* the defendant's contacts with the forum" (emphasis added) (cleaned up)); 2 William B. Rubenstein, Newberg on Class Actions § 6:26 (5th ed. 2020) (explaining the theory).  So could the Texan sue in Michigan?  No.  The Supreme Court recently rejected this precise argument.  *See Bristol-Myers Squibb*, 137 S. Ct. at 1781 ("The mere fact that *other* plaintiffs were prescribed, obtained, and ingested Plavix in California—and allegedly sustained the same injuries as did the nonresidents—does not allow the State to assert specific jurisdiction over the nonresidents' claims.").  The State of Michigan still has nothing to do with the dispute between a Texan dentist and an Ohio corporation, even if Michigan dentists were injured in the same way.

Brian Lyngaas, the class representative, is not a Texan.  He is a Michigan dentist who could have sued just for the faxes that Curaden sent to his Michigan office.  And if he had, the Michigan state court would have jurisdiction over Curaden for this claim.  But Lyngaas seeks redress for unlawful faxes sent to hundreds of dentists across the country.  If dentists from other

states joined Lyngaas's suit, the Michigan court would dismiss their claims—Curaden would have rightly argued that the court lacked personal jurisdiction.

On this much we all agree.

### B.

So where do we part ways? The majority believes that a court can resolve a class action even when it would lack personal jurisdiction to decide the claims of absent class members. I do not.

### 1.

A court cannot bind all parties to a class action unless it has personal jurisdiction over all parties for each claim—including the claims of absent class members. The Supreme Court said as much in *Phillips Petroleum Co. v. Shutts*, a nationwide class action brought by investors who alleged that Phillips Petroleum owed them interest on delayed royalty payments. 472 U.S. 797 (1985). Phillips, the defendant, argued that a Kansas state court lacked personal jurisdiction over the claims of the out-of-state plaintiffs. It's unusual for defendants to show solicitude for the due process rights of the opposing party. But as the Court explained, Phillips had a "great interest in ensuring that the absent plaintiff's claims [were] properly before the forum." *Id.* at 809. If the Kansas court had no personal jurisdiction over the absent class members on these claims, the plaintiff class would not be bound by the final judgment and could bring similar claims against Phillips in future lawsuits. *Id.* at 811–12. Phillips prevailed on the first premise of this argument: The Kansas court needed personal jurisdiction to adjudicate the claims of out-of-state class members.

Thanks to this analysis in *Shutts*, we know that in a class action as in all actions, a court must have personal jurisdiction to bind the parties to its judgment. Ultimately, the *Shutts* Court held that the Kansas court did have personal jurisdiction to adjudicate the claims of the absent class members. *Id.* at 811. Since the plaintiffs had a meaningful chance to opt out of the class, the choice not to opt out implied consent. *Id.* at 812–14. Thus, the exercise of jurisdiction satisfied the due process requirements of the Fourteenth Amendment. *Id.* The plaintiffs

consented by choosing not to opt out, and Phillips consented by failing to object to personal jurisdiction on its own behalf. (As I explain below, Phillips's failure to object was not as strange as it may seem.)

This reasoning follows the fundamental principle that a court's power to bind extends only as far as its jurisdiction. William Baude, *The Judgment Power*, 96 Geo. L.J. 1807, 1827–28 (2008). In a class action, a court resolves the claims of each class member, and its decision is binding. When the claims have merit, the court's judgment also requires the defendant to provide the class members with some relief. As a leading treatise has explained, "If the class prevails in the case, the goal is a binding judgment over the defendant as to the claims of the entire nationwide class—and the deprivation of the defendant's property accordingly." Rubenstein, *supra*, § 6:26. So it makes sense that the court must separately evaluate its personal jurisdiction for the claims of absent class members (if a party asks it to). Courts must have jurisdiction over the parties for each claim they conclusively resolve.

Although *Shutts* concerned the personal jurisdiction rights of the absent plaintiffs, and not those of the defendants present in the forum, there is no reason to think that the analysis is one-sided. The *Shutts* Court itself explained that a defendant's due process interests are even more acute than those of absent class members. 472 U.S. at 808–10; *see also id.* at 807 ("[T]he requirement that a court have personal jurisdiction comes from the Due Process Clause's protection of the defendant's personal liberty interest, and . . . represents a restriction on judicial power . . . as a matter of individual liberty." (citation omitted)). And more fundamentally, a court must be able to bind both parties to its decision. What use is a judgment binding on the plaintiffs if it is not also binding on the defendant?

## 2.

Thus, a court needs personal jurisdiction to bind the defendant with respect to the class claims. To find out whether the court has personal jurisdiction, we need to examine these claims—we cannot just assume that jurisdiction over the class representative's claims confers jurisdiction over the claims of the class. Why? Because a state court lacks the power to decide the absent class members' claims if they arise from wholly out-of-state activity. And that's true

even if they concern the same subject matter as a claim the court can decide—including the claim of the class representative. *See supra*, Part I.A; *Bristol-Myers Squibb*, 137 S. Ct. at 1781.

It doesn't matter that the defendant, unlike the absent class members, is already present in court to defend against the representative's claim. A defendant's due process interests do not vanish just because it has been haled into a forum. The Court has explained that "[n]othing" in its cases "suggests that a particular quantum of local activity should give a State authority over a far larger quantum of activity having no connection to any in-state activity." *Daimler*, 571 U.S. at 139 n.20 (cleaned up); *see also BNSF Ry. Co. v. Tyrrell*, 137 S. Ct. 1549, 1559 (2017). Indeed, that is the whole point of specific (rather than general) jurisdiction. A court might have specific jurisdiction to adjudicate particular claims against a company, but that does not give the court the power to decide all similar disputes involving that defendant. *Bristol-Myers Squibb*, 137 S. Ct. at 1781.

This case makes the point. A Michigan state court has jurisdiction to decide the claims of Michigan dentists. But without the defendant's consent, it lacks jurisdiction to decide the claims of dentists in other states. *See supra*, Part I.A; *Bristol-Myers Squibb*, 137 S. Ct. at 1781. Not individually, not jointly, and not as part of a class action.

## C.

The majority breaks with this precedent and writes a different rule: As long as the court has jurisdiction to adjudicate the claims of the class representative, it can bind the defendant for the claims of the whole class. That position means that a class action gives a court the power to exceed its ordinary jurisdictional reach. Because of the class action, a court without power to decide a claim between a Texan dentist and an Ohio corporation could do just that.

How come? In the majority's view, that's how it's always been done. It has a point. Courts have long adjudicated nationwide class actions against defendants in states where defendants are not subject to the general jurisdiction of the courts. *Shutts* itself is one example. Phillips, the defendant, was incorporated in Delaware and headquartered in Oklahoma, but the plaintiff class sued in Kansas state court. If my view of jurisdiction is correct, Phillips could

have simply refused to consent to the Kansas court's jurisdiction over it. Instead, it chased a creative jurisdictional argument all the way to the Supreme Court—on behalf of the plaintiffs!

Why didn't Phillips just contest jurisdiction on its own account? It probably thought there was no use. Phillips, a giant multinational corporation, had continuous and systematic contacts in all fifty states. At the time, the prevailing view was that a company with such pervasive contacts was subject to the general jurisdiction of courts in every state. But the Supreme Court has since explained that this view was wrong. "The general jurisdiction inquiry does not focus solely on the magnitude of the defendant's in-state contacts," for a "corporation that operates in many places can scarcely be deemed at home in all of them." *Daimler*, 571 U.S. at 139 n.20 (cleaned up); *see also id.* at 152–54 (Sotomayor, J., concurring) (describing "the new rule" as a departure from the "settled approach" to general jurisdiction that had been taught to generations of law students). Instead, a corporation with operations in every state is ordinarily subject to general jurisdiction in only two: its place of incorporation and its principal place of business. *BNSF*, 137 S. Ct. at 1559. We know now what Phillips did not.

I agree that after *Bristol-Myers Squibb*, it would be difficult to bring a nationwide class action in forums other than the defendant's home states. In the majority's view, this observation carries the day. After all, the *Bristol-Myers Squibb* Court said it was applying "settled principles of personal jurisdiction" when it decided the case. 137 S. Ct. at 1783; *see also Mussat v. IQVIA, Inc.*, 953 F.3d 441, 448 (7th Cir. 2020) (taking the same position and explaining that a contrary view would effect "a major change in the law of personal jurisdiction and class actions"). But any change in class-action practice largely stems from *general* jurisdiction cases decided before *Bristol-Myers Squibb*—in particular, *Daimler* and its precursor, *Goodyear Dunlop Tires Operations v. Brown*. 571 U.S. 117 (2014) (*Daimler*); 564 U.S. 915 (2011) (*Goodyear*). These cases clarified that the scope of general jurisdiction was narrower than many (including Phillips, most likely) had believed it to be.

That isn't to say that *Bristol-Myers Squibb* does not matter. It does. As explained above, before the *Bristol-Myers Squibb* decision, plaintiffs could have tried to argue that specific jurisdiction allowed nationwide class actions against a corporation running identical operations throughout the country. They would have said that a claim arising from activity in one state

"relates to" identical activity taking place in another state. But after *Bristol-Myers Squibb*, that doesn't cut it. *See* 137 S. Ct. at 1781; Rubenstein, *supra*, § 6:26. *Bristol-Myers Squibb* foreclosed this potential (but already tenuous) basis for specific jurisdiction.

In the end, this issue is not fundamentally about *Bristol-Myers Squibb*. That decision just clarified when a court has specific jurisdiction over a corporate defendant with regard to many identical claims. The question is whether a court must have personal jurisdiction over that defendant as to the claims of absent class members at all. Following *Shutts* and the basic principles of jurisdiction, the answer is yes.

The majority bases its contrary view on the theory that "absent class members are not considered parties at all" when it comes to "subject-matter jurisdictional inquiries"—so we should exclude them from the personal jurisdiction inquiry, too. Majority Op. at 31–32; *see also Mussat*, 953 F.3d at 447–48 ("We see no reason why personal jurisdiction should be treated any differently from subject-matter jurisdiction and venue . . . . [A] district court need not have personal jurisdiction over the claims of absent class members at all."). But the premise and its application to personal jurisdiction are flawed.

First, the premise. It is not true that courts may overlook absent class members for the purposes of subject matter jurisdiction. On the contrary—the claims of each absent class member must satisfy the constitutional and statutory prerequisites. *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 559 (2005) ("Once the court determines it has original jurisdiction over the civil action, it can turn to the question whether it has a constitutional and statutory basis for exercising supplemental [subject matter] jurisdiction over the other claims in the action."). If "the district court has no statutory basis for exercising supplemental jurisdiction over the additional claims" in a class action, those claims must be dropped. *Id.* at 558.

So what is the majority getting at? It correctly observes that some of the ordinary statutory constraints on subject matter jurisdiction in diversity cases do not apply to absent class members: They do not have to allege any particular amount in controversy, and they can be citizens of the same state as a defendant. *See id.* at 566–67; 28 U.S.C. § 1367.

But that's not because there's an unwritten class-action exception to jurisdictional requirements. It's because Congress can and did create exceptions to its own statutory prerequisites. (The amount-in-controversy and complete-diversity requirements are not constitutional. *See Exxon Mobil*, 545 U.S. at 566–67; *State Farm Fire & Cas. Co. v. Tashire*, 386 U.S. 523, 531 (1967).) A court can exercise jurisdiction over class claims that do not themselves meet these requirements because the supplemental jurisdiction statute authorizes them to. *See Exxon Mobil*, 545 U.S. at 566–67; 28 U.S.C. § 1367; *cf.* Class Action Fairness Act of 2005, Pub. L. No. 109-2, 119 Stat. 4 (codified in relevant part in 28 U.S.C. § 1332(d)) (also modifying the statutory prerequisites to diversity jurisdiction).

Personal jurisdiction, like subject matter jurisdiction, also has constitutional and statutory requirements. And Congress can lift or modify the statutory requirements for personal jurisdiction just the same. *See infra*, Part I.D. But nothing about the class action changes the basic rule—a court cannot adjudicate claims without jurisdiction. Contrary to the majority's position, invoking that device neither excuses nor satisfies the personal jurisdiction requirement.[1]

### D.

So does this spell the end of the nationwide class action? Certainly not. Typically, plaintiffs will have no problem bringing nationwide class actions against a corporation in its state of incorporation or in the state where it has its headquarters. Here, the plaintiffs sued in Detroit. But just sixty miles south is the great city of Toledo, where the plaintiffs could have sued without a problem. For a nationwide class action, is that really too much to ask?

If it is, Congress has an out. Remember, the plaintiffs sued in a federal court in Michigan. That court's personal jurisdiction is limited to the jurisdictional reach of a Michigan state court, but only by the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 4(k)(1)(A);

---

[1]The majority is correct that the procedures for certifying a class action satisfied the *Shutts* plaintiffs' due process interests in personal jurisdiction. But it is incorrect to infer that "the class-certification procedures . . . fundamentally chang[e] . . . the jurisdictional analysis." Majority Op. at 30. The basic personal jurisdiction framework remains the same: Litigants have always been able to consent to personal jurisdiction, and the *Shutts* Court's exercise of jurisdiction hinged on the plaintiffs' consent. *Shutts*, 472 U.S. at 812–14. The class-certification procedures are relevant because they let the plaintiffs opt out, and so the court could infer consent from those who chose not to opt out. *Id.* Class-action defendants who object on jurisdictional grounds have plainly not consented.

*Daimler*, 571 U.S. at 125.  Congress has created exceptions to this rule before and can do so again.

One exception even applies to Curaden USA's co-defendant and parent company, Curaden AG.  As the majority opinion correctly explains, Curaden AG is subject to the district court's jurisdiction under a different part of the federal rule.  Unlike Rule 4(k)(1)(A), Rule 4(k)(2) allows a federal court to exercise jurisdiction over the parent company for claims under federal law because that company has contacts with the United States and "is not subject to jurisdiction in any state's courts of general jurisdiction."  Since Curaden USA is subject to the jurisdiction of Ohio's courts, the rule doesn't apply.  But nothing prevents Congress from authorizing all federal courts to exercise personal jurisdiction over any corporation with sufficient contacts to the United States.

Since Congress has not done so yet, the Fourteenth Amendment analysis still governs here.  Curaden USA cannot be subject to the jurisdiction of a Michigan state court for claims concerning faxes sent to out-of-state dentists.  Because of Rule 4(k)(1)(A), the same goes for federal court.[2]

If a district court finds itself with a class of claims beyond its jurisdictional reach, what is it to do?  The simple answer, once the class has been certified, is to narrow the class to exclude the claims of out-of-state class members.

What about before certification?  That's a little more complicated.  Until the class has been certified, only the named plaintiff's claims are before the court.  *See* A. Benjamin Spencer, *Out of the Quandary:  Personal Jurisdiction over Absent Class Member Claims Explained*, 39 Rev. Litig. 31, 38 (2019); *see also Smith v. Bayer Corp.*, 564 U.S. 299, 313 (2011); *Devlin v. Scardelletti*, 536 U.S. 1, 16 n.1 (2002) (Scalia, J., dissenting) ("Not even petitioner, however, is willing to advance the novel and surely erroneous argument that a

---

[2]Although creative lawyers could argue that Rule 23 implicitly abrogates Rule 4(k)(1)(A) and makes the Fourteenth Amendment analysis irrelevant, neither the plaintiff nor the majority has suggested that it does.  In any case, that argument would be unpersuasive.  The constraints of Rule 4(k)(1)(A) do not hinder the operation of Rule 23.  All they do is require litigants to bring class actions in the appropriate forum.  Since the two rules are "capable of co-existence, it is the duty of the courts . . . to regard each as effective."  *Morton v. Mancari*, 417 U.S. 535, 551 (1974).

nonnamed class member is a party to the class-action litigation *before the class is certified*."). Thus, a pre-certification motion to dismiss for lack of personal jurisdiction would be premature. *See Molock v. Whole Foods Mkt. Grp., Inc.*, 952 F.3d 293, 298 (D.C. Cir. 2020). A court cannot dismiss claims that are not before it.

But that does not mean defendants are out of options at the pleading stage. A court may grant a motion to strike class allegations before certification. *See* Fed. R. Civ. P. 23(d)(1) ("In conducting an action under this rule, the court may issue orders that . . . require that the pleadings be amended to eliminate allegations about representation of absent persons and that the action proceed accordingly."). So if a company believes that a court would lack personal jurisdiction for the claims of out-of-state members of the putative class, "the proper procedural move is to file a motion to strike the nationwide class allegations." *Penikila v. Sergeant's Pet Care Prod., LLC*, 442 F. Supp. 3d 1212, 1214 (N.D. Cal. 2020); *see also* Spencer, *supra*, at 49–51. That way, a defendant would not have to subject itself to the burdens of "extensive class discovery" when the nationwide class is uncertifiable. *Molock*, 952 F.3d at 304 (Silberman, J., dissenting).

## II.

One final point about the class: Not all class members can state a claim for relief. Some of the class members' claims involve e-faxes that were sent to computers. The Telephone Consumer Protection Act makes it illegal (with certain exceptions) "to use any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement." 47 U.S.C. § 227(b)(1)(C). The district court and majority conclude that this prohibition applies to e-faxes sent to computers because, in their view, the term "telephone facsimile machine" encompasses computers. I disagree.

The statute defines "telephone facsimile machine" as "equipment which has the capacity (A) to transcribe text or images, or both, from paper into an electronic signal and to transmit that signal over a regular telephone line, or (B) to transcribe text or images (or both) from an electronic signal received over a regular telephone line onto paper." *Id.* § 227(a)(3). A computer, on its own, does not have the capacity to do either. You need to hook it up to extra equipment first—a printer or a scanner.

So does a computer fall under the statutory definition?  At first glance, it doesn't look like it—a fax sent to a computer is not a fax sent to equipment with the capacity to scan or print.

And there's another clue in the statute.  Recall that the TCPA makes it illegal to use a "telephone facsimile machine" or a "computer" to send an unsolicited advertisement "to a telephone facsimile machine."  *Id.* § 227(b)(1)(C).  Congress expressly included computers alongside "telephone facsimile machine[s]" in the (broad and open-ended) list of sender devices. But it omitted computers from the list of receiver devices.

Given this distinction, we cannot read "telephone facsimile machine" to encompass computers without creating two interpretive problems.  First, "[w]here Congress includes particular language in one section of a statute but omits it in another . . . it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983).  Here, the difference occurred not across sections, but in different parts of the same sentence.  So if we can assume that Congress remembered what it said in the first half of the sentence by the time it got to the second, we can take it that the omission of "computer" in the second half was no accident.  Second, our job is to "give effect to each word" in the statute.  *Nat'l Air Traffic Controllers Ass'n v. Sec'y of Dep't of Transp.*, 654 F.3d 654, 657 (6th Cir. 2011) (cleaned up).  If "telephone facsimile machine" included "computers," Congress would not have listed them separately.

In my view, understanding a "computer" to be a "telephone facsimile machine" conflicts with the statutory definition, the syntax of the relevant provision, and the common understanding of both terms.  Since the TCPA imposes liability for faxes sent to "telephone facsimile machines" and not to "computers," I would exclude from the class any claims involving faxes sent to computers.

\* \* \*

Because of these constraints, I believe the class should not include claims concerning faxes that were sent to fax machines outside of Michigan and faxes sent to all computers. Otherwise, I join the majority opinion.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

Nos. 20-1199/1200/1243

BRIAN LYNGAAS, D.D.S., individually and as the
representative of a class of similarly situated persons,

     Plaintiff - Appellee/Cross - Appellant (20-1199/20-1200),

     Plaintiff  -Appellant/Cross - Appellee (20-1200/20-1243),

     v.

CURADEN AG,

     Defendant - Appellee/Cross-Appellant (20-1200/20-1243),

CURADEN USA, INC.,

     Defendant - Appellant/Cross-Appellee (20-1199/20-1200).

> **FILED**
> Mar 24, 2021
> DEBORAH S. HUNT, Clerk

Before:  CLAY, GILMAN, and THAPAR, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.

THESE CASES were heard on the record from the district court and were argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the judgment of the district court is AFFIRMED.

**ENTERED BY ORDER OF THE COURT**

_____

Deborah S. Hunt, Clerk